# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| AUTOMOTIVE TECHNOLOGIES INTERNATIONAL, INC., a Delaware corporation, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| vs. | )- | C.A. No. 06-391 (GMS) |
| HYUNDAI MOTOR AMERICA, a California corporation, BMW OF NORTH AMERICA, LLC, a Delaware limited liability company and KIA MOTORS AMERICA, INC., a California corporation, | ) ) ) ) ) ) ) | |
| Defendants. | ) ) ) | |

## ATI'S BRIEF IN RESPONSE TO THE MOTION TO TRANSFER VENUE TO THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN MADE BY ONE OF THREE DEFENDANTS IN THIS CASE

Richard K. Herrmann #405
Mary B. Matterer #2696
MORRIS JAMES LLP
500 Delaware Avenue, Suite 1500
Wilmington, Delaware 19801-1494
(302) 888-6800
mmatterer@morrisjames.com

SOMMERS SCHWARTZ, P.C.
Andrew Kochanowski
2000 Town Center, Suite 900
Southfield, MI 48075
(248) 355-0300

BANIAK PINE & GANNON
Michael H. Baniak
150 N. Wacker Drive, Suite 1200
Chicago, IL 60606
(312) 673-0360

Dated: December 7, 2006

Attorneys for Plaintiff
AUTOMOTIVE TECHNOLOGIES
INTERNATIONAL, INC.

# TABLE OF CONTENTS

INDEX OF AUTHORITIES.................................................................................................. ii

INTRODUCTION ............................................................................................................... 1

FACTS ................................................................................................................................. 3

ARGUMENT ...................................................................................................................... 5

    A.    §1404(A) DOES NOT WARRANT TRANSFER................................................. 5

           1.    PLAINTIFF'S CHOICE OF FORUM SHOULD NOT BE
DISTURBED AS ATI CHOSE TO SUE BMW IN DELAWARE
FOR LEGITIMATE REASONS ............................................................ 6

           2.    THE BALANCE OF PRIVATE INTERESTS DOES NOT
STRONGLY FAVOR TRANSFER TO THE EASTERN
DISTRICT OF MICHIGAN .................................................................. 7

                    i.    No Witness Who May Be Called at Trial by ATI Lives
in the Eastern District of Michigan ................................. 8

                    ii.    Defendants' Discussion of Third Party Witnesses
Omits Any Showing of What Witnesses are Necessary,
or That They are not Amenable to Coming to Delaware ................ 9

                    iii.    Named Inventors ............................................................. 9

                    iv.    ATI's Choice to Earlier Sue in the Eastern District
of Michigan on Other Technology Should Not Matter
in the Court's Section 1404(a) Analysis ....................... 10

    B.    RATHER THAN FAVORING TRANSFER, THE
BALANCE OF PUBLIC INTEREST STRONGLY
FAVORS RETAINING THIS CASE IN DELAWARE ..................................... 11

CONCLUSION................................................................................................................... 13

## INDEX OF AUTHORITIES

**Cases**

*Affymetrix, Inc. v. Incyte Pharms., Inc.,* 28 F. Supp. 2d 192 (D. Del. 1998) ............................... 11

*Bae Systems Aircraft Controls, Inc. v. Eclipse Aviation Corp.,*
   224 F.R.D. 581 (D.Del. 2004) ...................................................................................... 7, 9

*Bergman v. Brainin,* 512 F. Supp. 972 (D.Del. 1981) .................................................... 7

*Bering Diagnostics GMBH,* 1998 WL 24354 (D. Del. 1998) ......................................... 12

*Critikon, Inc. v Becton Dickinson Vascular Access, Inc.,* 821 F.Supp. 962 (D. Del. 1993) ........... 7

*Jumara v State Farm Insurance Co.,* 55 F.3d 873 (3rd Cir. 1995) ................................................... 6

*Schering Corp. v Amgen, Inc.,* 969 F.Supp. 258 (D. Del. 1997) ......................................... 6, 9, 12

*Shutte v Armco Steel Corp.,* 431 F.2d 22 (3rd Cir. 1970) ................................................. 5

*Sony Electronics, Inc. v. Orion IP, LLC,*
   2006 WL 680657 (Slip Op. D. Del., March 14, 2006) ........................................... 10

*SRU Biosystems, Inc. v. Hobbs,* 2005 WL 2216889 (Slip Op. D. Del. Sept. 13, 2005) ............... 11

*Sunds Defibrator, Inc. v Durametal Corp.,*
   No. Civ. A86-483 MMS, 1997 WL 74660 (D. Del. 1997) ...................................... 9

*Textron Innovations, Inc. v Toro Co.,*
   No. Civ. A.05-486GMS, 2005 WL 2620196 (Slip. Op. D. Del. October 14, 2005) .................. 5

*Tuff Torq Corp. v Hydro-Gear L.P.,* 882 F.Supp. 359 (D.Del. 1994) ........................................ 6-7

*Waste Distillation Technology, Inc. v Pan American Resources, Inc.,*
   775 F. Supp. 759 (D.Del. 1991) .......................................................................... 5, 11


**Statutes**
28 U.S.C. §1404 (a) ................................................................................................................. 5


**Rules**
FRCP 45 ....................................................................................................................................... 10

**INTRODUCTION**

After this patent infringement action brought by Plaintiff Automotive Technologies International, Inc. ("ATI"), a Delaware corporation, against Hyundai Motor America, a California corporation ("Hyundai"), BMW of North America, LLC, a Delaware limited liability company ("BMW") and Kia Motors America, Inc., a California corporation ("Kia") had been pending for a number of months, on the eve of the scheduling conference with the Court, one out of the three defendants, BMW suddenly decided that the case needed to be in the Eastern District of Michigan. Its brief in support is essentially cribbed from the brief written by the defendants in the other action brought by ATI in this District, (*ATI vs. American Honda Motor Company, a California corporation, Elesys North America, Inc., a Georgia corporation, and General Motors Corporation, a Delaware corporation,* C.A. No. 06-187 GMS). It makes the same arguments and cites to the same cases as does the other motion. Strangely, however, neither of the remaining defendants in *this* case, Kia and Hyundai, have joined this motion. Perhaps their reluctance to also seek a transfer to Detroit arises from the fact that BMW's central thesis --- that the auto industry is "centered" in Detroit --- is contradicted by the fact that both of these defendants, who are US operations of Korean automakers, are "centered" in California, along with much of the US operations for the Japanese automakers. And of course, BMW itself is a Delaware corporation, a subsidiary of a prominent German car maker with US plants in the South and US headquarters in New Jersey — again nowhere near the alleged Detroit "center" of the auto industry.

ATI will essentially repeat what it said in response to the earlier motion (which is still pending before the same Court). ATI is a small research and development company. It has a portfolio of many patents in the field of automotive safety, a number of which are asserted in this

case against occupant sensing systems used by BMW and the other defendants. This Court's jurisdiction has been admitted by all Defendants. Not a single party in this dispute is incorporated in the State of Michigan. And the moving party here, like ATI, is a Delaware corporation.

The motion is frankly frivolous and should be denied. At the time of filing, ATI had neither a place of business nor employees within the Eastern District of Michigan. While BMW makes some incorrect allegations that ATI still maintains a place of business in Michigan, or that it closed its former Michigan office solely to gain a procedural advantage in filing in Delaware, the fact remains that these are speculations unsupported by any evidence. In contrast, ATI has submitted sworn declarations setting forth the actual facts that it has no Michigan presence whatsoever.[1] Just like the motion made in the other case, BMW's motion fixes on the fact that a couple of the named inventors of a couple of the patents at issue live near Detroit. But it submits no proof that these witnesses are necessary to litigate this case, or even that they are unwilling to travel to Delaware for trial. Defendant's motion omits mention of numerous other witnesses who are located throughout the country, including both of the other Defendants in this case, to whom the Delaware forum choice cannot rationally make a difference.

ATI chose Delaware for a rational and sensible reason: it, and at least one of the Defendants, chose it as its corporate place of business, all parties are subject to personal jurisdiction in this forum, this forum's docket is noticeably faster to resolution of complex cases than the proposed transferee court and many others, and there was no other forum in which witnesses had a markedly more convenient location than this one. Defendant's motion does

---

[1] ATI relies on the former declarations and incorporates these, along with the exhibits filed in opposition to the Motion To Transfer filed in the ATI/Honda matter into this response as Exhibits 1 and 2 (Breed and Piirainen Declarations).

2

nothing to overcome the presumption that ATI's forum choice should be followed.  For the above reasons, BMW's motion to transfer must be denied.


## FACTS

Plaintiff ATI is a little company, primarily engaged in research and development of automotive safety products. (**Exhibit 1**, Declaration of David S. Breed at Par.4).  It has over 150 patents in the automotive safety field, and has been conducting business since 1988, when its principal, Dr. David Breed, left another supplier, Breed Technologies, to acquire ATI. (*Id*. at Pars. 3-4).  Although it has from time to time produced products, ATI's primary focus lies in research and patenting of its automotive safety research. (**Exhibit 1**, Breed Decl. at Par. 3).  ATI is a "virtual" company, in that it has no central office, and operates with only a few employees through consulting agreements with scientists located throughout the United States and the former Soviet Union republic of Ukraine. (*Id*. at Par. 4; **Exhibit 2**, Declaration of Ray Piirainen at Pars. 2-3).  Dr. Breed is the primary inventor of ATI's extensive patent portfolio, and is the first-named inventor on all of the patents-in-suit.  Dr. Breed lives in Boonton Township, New Jersey. (**Exhibit 1**, Breed Decl. at Par. 5).  Until recently, ATI had a small office in the metropolitan Detroit area. (**Exhibit 2**, Piirainen Decl. at Par. 6).  Months before this suit was filed, that office had been closed, and ATI had no Michigan-based employees or scientist consultants. (*Id*. at Par. 5).  ATI no longer has a business address anywhere in the Eastern District of Michigan. (*Id*. at Par. 6).  ATI operates almost exclusively through digital means, storing its digitized records on servers in New Jersey and California, and what few administrative paper records it has are largely located with Ray Piirainen, in Charlotte, North

Carolina. (*Id.* at Par. 7).  Its patent attorney, Brian Roffe, is located in the New York City area.
(**Exhibit 1**, Breed Decl. at Par. 6).

The technology at issue in this litigation involves a number of systems in BMW, Kia, and
Hyundai vehicles.  Similar to the technology in the ATI/Honda case, these systems concern
passenger and child seat sensing.  Unlike the ATI/Honda case, the sensing technology here is a
mat placed in the passenger seat, designed and supplied by a Luxemburg supplier named IEE.

The patents-in-suit generally arise from applications filed by ATI in 1992, 1993 and May,
1994.[2]  The first-named inventor of each patent-in-suit is ATI's principal, Dr. Breed.  (*Id.*).  ATI
consultants Wilbur DuVall and Wendell Johnson, appear as the second and third named
inventors on virtually all of the other patents.[3]  The patents' claims cover a variety of hardware
and software aspects of the relationship between vehicle occupants, seats, and airbags, and the
deployment of airbags in relation to occupant presence and/or position.[4]  ATI alleges that
numerous models of BMW, Kia, and Hyundai use systems which infringe the subject patents.

---

[2]  For purposes of the record, ATI incorporates the exhibits supplied to the Court in response to
its earlier opposition. (Exhibit 3, group exhibit to earlier brief). ATI is aware that this Court is
familiar with the contents of those exhibits through its review in the ATI/Honda case.

[3]  Five additional inventors are listed in the two other patents-in-suit.

[4]  The technology arose in response to issues of passenger safety in an airbag-equipped vehicle.
Out-of-position passengers as well as small children or infants in car seats can easily be injured
by a deploying airbag.  Decisions relating to airbag suppression based on occupant position or
presence must be made almost instantly in a collision event.  Some of the concepts at issue in the
patents-in-suit are enabling airbag deployment relative to a pre-determined threshold;
development of deployment algorithms; systems for determining occupancy state of a seat of a
vehicle; trained pattern recognition algorithms; child seat sensing; rear-facing child seat sensing;
side airbag suppression; signal analysis; determination of occupant position; passenger weight
sensing; occupant classification; and occupant categorizing functions.

**ARGUMENT**

A.    **§1404(A) DOES NOT WARRANT TRANSFER**

§1404(a) provides:

> For the convenience of the parties and witnesses, in the interests of
> justice, a district court may transfer any civil action to any other
> district or division where it might have been brought.

28 U.S.C. §1404(a).  Considering a motion to transfer pursuant to this section, the Third Circuit

holds that:

> It is black letter law that a plaintiff's choice of a proper forum is a
> paramount consideration in any determination of a transfer request,
> and that choice should not be lightly disturbed.

*Shutte v Armco Steel Corp.*, 431 F.2d 22, 25 (3rd Cir. 1970) (omitted).  "It is the movant's burden

to establish the need to transfer, and the plaintiff's choice of venue will not be likely disturbed."

*Textron Innovations, Inc. v Toro Co.*, No. Civ. A.05-486GMS, 2005 WL 2620196 *1 (Slip. Op.

D. Del. October 14, 2005).  As *Textron* held, "Unless the balance of convenience strongly favors

a transfer in favor of defendant, the plaintiff's choice of forum should prevail." (*Id.*).  *See also,*

*Waste Distillation Technology, Inc. v Pan American Resources, Inc.*, 775 F. Supp. 759, 762

(D.Del. 1991) (movant "bears the burden of proving that justice requires a substitute forum and a

transfer is not to be liberally granted").

While there is no definitive list of balancing factors that a court should consider when

deciding a motion to transfer, courts construing §1404(a) have commonly considered factors

such as the plaintiff's choice of forum, the defendant's preference, the convenience of the parties

as indicated by their physical and financial condition, the convenience of the witnesses, the

location of documents, as well as public interests such as enforceability of judgments, practical

considerations that could facilitate trial, the relative administrative efficiency of the two fora, and

the local interest in deciding local controversies at home.  *See Jumara v State Farm Insurance Co.*, 55 F.3d 873, 879 (3rd Cir. 1995).  None of these factors support the relief requested in the instant motion.

### 1.    PLAINTIFF'S CHOICE OF FORUM SHOULD NOT BE DISTURBED AS ATI CHOSE TO SUE BMW IN DELAWARE FOR LEGITIMATE REASONS

Deference should be given to a plaintiff's choice of forum when it is based on rational and legitimate reasons.  *Schering Corp. v Amgen, Inc.*, 969 F.Supp. 258, 262 (D. Del. 1997) (internal citations omitted).  BMW (as well as Kia and Hyundai) make and sell cars throughout the United States—including in Delaware-- with occupant detection systems that infringe ATI's patents.  ATI sued BMW in Delaware since both ATI and BMW are incorporated in this state and are subject to the personal jurisdiction of this Court.  There is a commonality of facts in this litigation, namely that all of the occupant position/presence systems at issue are operated by the IEE-supplied sensor.  While the particular structure of how these occupant presence/position systems may vary, the basic technology employed in all of the systems is believed to be the same.    Thus, questions as to development of the infringing technology are common as to all three Defendants.

By filing a single lawsuit against all three Defendants which import, make, sell and use the sensor system in Delaware, ATI has sought to save costs by litigating in a single forum all of the common issues of fact and law it expects to have to litigate against these three entities.  The common issues relating to this case, included claim construction, scope and validity of the patents-in-suit, also led to a joint filing in this Court.  Given these legitimate reasons, the burden falls on Defendant to prove "that the balance of convenience of the parties and witnesses strongly favors the Defendants."  *Tuff Torq Corp. v Hydro-Gear L.P.*, 882 F.Supp. 359, 361

(D.Del. 1994) (internal quotations omitted); *Bergman v. Brainin,* 512 F. Supp. 972, 973 (D.Del. 1981).  Defendant's motion fails on this score.

> **2.    THE BALANCE OF PRIVATE INTERESTS DOES NOT STRONGLY FAVOR TRANSFER TO THE EASTERN DISTRICT OF MICHIGAN**

Defendant makes a desultory argument that the balance of private interests favors transferring this case to the Eastern District of Michigan because a number of the individuals likely to be called as witnesses may reside either in the State of Michigan or are closer to Michigan than to Delaware.

Defendants' motion paints too broad a picture of the private factors.  It ignores that BMW is a Delaware corporation.  "By incorporating in Delaware, it can be assumed that [BMW] desired the benefits it believed Delaware provides to chartered corporations...and should not now complain that another corporation has decided to sue [it] in Delaware."  *Critikon, Inc. v Becton Dickinson Vascular Access, Inc.*, 821 F.Supp. 962 (D. Del. 1993); *accord Tuff Torq*, 882 F. Supp. at 363).  There is no factual support for the notion that any of the defendants, much less the moving party BMW, actually has a "presence" in Michigan.  All three Defendants are large companies.  For companies like these, that are "engaged in business throughout the United States," the convenience of the parties' factors are entitled to little or no weight.  (*Id.*).  And BMW has already answered the lawsuit and filed counterclaims in Delaware district court, indicating a willingness to litigate here. *See Bae Systems Aircraft Controls, Inc. v. Eclipse Aviation Corp.,* 224 F.R.D. 581, 589 (D.Del. 2004) (denying motion to transfer, court notes "..the parties have taken significant steps to further the litigation in the District Court of Delaware.  Eclipse answered its complaint and filed the motion at bar... [t]ransfer will delay the litigation...").

i.     **No Witness Who May be Called at Trial by ATI Lives in the Eastern District of Michigan**

BMW asserts that ATI actually does have a presence in Michigan.  That assertion is simply false.  ATI has no place of business within the Eastern District of Michigan.  It has no employees in the State of Michigan, and none of the consultants that it employs are located anywhere close to Michigan.  ATI employs only four people, two of whom are located in Charlotte, North Carolina, with another in New Jersey.  It has a contractual relationship with five individuals as consultants, several of whom are the named inventors in the patents-in-suit.  These individuals live in Hawaii, Missouri, California, and the Ukraine.  It also has consulting arrangements with numerous other scientists, again largely located in the Ukraine.  (**Exhibit 2**, Piirainen Decl. at Pars. 3-4).  There is no Detroit-area presence between any of these people suggesting that the Eastern District of Michigan is a more convenient forum.

A primary inventor of the subject patents is David S. Breed, ATI's principal.  Dr. Breed lives in Boonton Township, New Jersey, which is much closer to the District of Delaware than the Eastern District of Michigan.  To the extent that issues relating to the prosecution of the patents at issue become relevant, all of the subject patents were prosecuted by Brian Roffe, a New York patent attorney with offices in the greater New York City area.  Some of the predecessor patents and applications were prepared and prosecuted by Karl Milde, a patent lawyer located in Westchester County, New York.  (*Id.* at Par. 6).  Neither witness would be particularly convenienced by having to travel to Detroit rather than to Delaware.

8

ii.    **Defendants' Discussion of Third Party Witnesses Omits Any Showing of What Witnesses are Necessary, or That They are not Amenable to Coming to Delaware**

Where, as here, a party moving for transfer cannot or will not supply the Court with a specific explanation of the importance of the third party witness to its case, the availability of those witnesses does not weigh heavily in favor of transfer. *Sunds Defibrator, Inc. v Durametal Corp.*, No. Civ. A86-483 MMS, 1997 WL 74660 at *3 (D. Del. 1997). And even if some, unnamed, third parties are important in this case, concerns about these witnesses are not timely at this stage. Dispositive pretrial motions or document discovery could make their testimony irrelevant or cumulative. And if it turns out that the third parties' testimony is required at trial, it can be introduced by videotape deposition. *See, Schering Corp.*, 969 F.Supp. 258 at 269 (denying a defendant's motion to transfer in part because of third party witness's videotaped testimony was sufficient). *See also, Bae Systems Aircraft, supra,* 224 F.R.D. 581 at 589 (denying motion to transfer, court noted, "… it is clear that discovery will be conducted at locations convenient to the parties and their employees. The only event that will take place in Delaware is the trial.").

iii.    **Named Inventors**

BMW's sole argument relating to witnesses appears to concern the named inventors. Two of the eight named inventors (DuVall and Johnson) are currently consultants to ATI, so do not "count" with respect to any inconvenience analysis. ATI will be able to have these individuals testify at trial. (**Exhibit 2**, Piirainen Decl. at Par. 3). Of course Dr. Breed is a party witness. It is clear from the fact that only three inventors are listed on all of the patents-in-suit, that the vast bulk of the inventions at issue occurred between the first-named inventor, Dr. Breed,

and the two current ATI consultants, Wilbur DuVall and Wendell Johnson. Thus, the convenience of the three chief witnesses has no bearing on the transfer analysis.

Five additional inventors are listed, but only in two of the eleven patents at issue. Two of them live outside the United States, Michael Kussul, in Ukraine, and Tie-Qi Chen in Canada. Neither of these individuals is subject to compulsory process, either in Kiev or from across the border in Detroit, so the location of a U.S. forum is irrelevant as to both. [5]

Defendant has not suggested to the Court that the remaining three inventors on two out of the twelve patents are unwilling or unable to come to Delaware, or indeed why their testimony is even needed in this case. ATI has a continuing relationship with its former employee inventors (all of whom assigned the inventions to ATI) and has been assured that, if necessary, these individuals would in fact be willing to come for trial in Delaware. (**Exhibit 2**, Piirainen Decl. at Par. 8).[6] Thus, the location of none of the eight inventors supports Defendants' motion.

>        **iv.** **ATI's Choice to Earlier Sue in the Eastern District of Michigan on Other Technology Should not Matter in the Court's Section 1404(a) Analysis**

It is true that ATI once had an office and employees in the Detroit area, though that fact itself would not necessarily weigh in favor of transfer. *Sony Electronics, Inc. v. Orion IP, LLC,* 2006 WL 680657 *2 (Slip Op. D. Del., March 14, 2006). BMW makes the argument that because ATI chose the Eastern District of Michigan for certain other cases, they must continue to

---

[5] FRCP 45 provides for service of process throughout the United States, so every US-based witness can be subpoenaed. The only question is whether at trial the witness would be compelled to appear live or through a live video feed. And, of course, two of the named inventors do not appear to even live in the United States, so whether the trial is in Detroit or in Delaware is irrelevant—they can only appear voluntarily.

[6] Kunhong Xu, a named inventor on one patent, currently works for GM, a party in the other Delaware action. (**Exhibit 2**, Piraiinen Decl. at Par. 8).

litigate there, perhaps forever.  But when ATI filed its three cases in Michigan between 1999 and 2003, it had a Michigan office and Michigan employees. (**Exhibit 3 at** Kochanowski Decl. at Par. 2).  More importantly, each of those cases were filed against parties that made the Eastern District of Michigan a more obvious forum, unlike here. (Id. at Par. 6).[7]  *See SRU Biosystems, Inc. v. Hobbs,* 2005 WL 2216889 *3 (Slip Op. D. Del. Sept. 13, 2005) (refusing transfer even when all events, and witnesses are in Massachusetts, and another action between parties already in progress in Massachusetts).

### B.    RATHER THAN FAVORING TRANSFER, THE BALANCE OF PUBLIC INTEREST STRONGLY FAVORS RETAINING THIS CASE IN DELAWARE

As a Delaware corporation, BMW should have "anticipated the possibility of being hauled into court here," and the costs necessarily incident to that possibility.  *Waste Distillation Technology, Inc. v Pan American Resources, Inc.*, 775 F.Supp. 759, 766 (D. Del. 1991).  See, *Affymetrix, Inc. v Incyte Pharms, Inc.*, 28 F.Supp. 2d 192, 208 (D. Del. 1998) ("…the parties are multi-million dollar corporations that can afford to litigate in a distant form.")  Nor is this a case involving truly local controversies that somehow could be better litigated in the Eastern District of Michigan.  BMW makes automobiles sold worldwide and throughout the United States, or supplies components for inclusion in such vehicles.  Where, as here, the accused infringer is incorporated in Delaware and sells accused products worldwide, the District Court located near its corporate headquarters does not have a significantly greater interest in the controversy than

---

[7] BMW refers to the Michigan cases as unsuccessful, hence the alleged forum switch.  BMW neglects to tell the Court that both it and the two other Defendants in this case, along with all of their suppliers, settled the side sensor litigation (which comprised three out of the five previous cases) under confidential terms with ATI, and took a license to the ATI technology.  Of the remaining two cases in Michigan, one is going to trial in February, 2007.

Delaware. *See, Schering Corp., supra*, 969 F. Supp. at 269; *Bering Diagnostics GMBH*, 1998 WL 24354 *7 (D. Del. 1998). The important public interests will be promoted by retaining jurisdiction in Delaware, including conserving judicial resources, reducing docket congestion, and avoiding potential inconsistent results.

ATI chose to sue BMW, Kia and Hyundai here because these parties are accused of infringing largely the same patents through common technology, and because this Court clearly has personal jurisdiction over all of the parties. There can be no question that Kia and Hyundai simply have no recognizable interests, much less witnesses, who necessitate transfer of the case to the Eastern District of Michigan. And, in fact, neither Defendant has requested a transfer to Detroit.

Nor should the argument that there should be a transfer because the case involves the U.S. auto industry, which is centered in Detroit gain *any* traction with the Court. The patents do not "involve" the auto industry, they involve a variety of electronic and software technologies that happen to be used in modern cars. The sensor commercialization apparently took place in Korea and Germany, the headquarters nations of the defendant car companies. There are automobile assembly plants throughout the U.S., including in Delaware. Even the moving party here, BMW, maintains no plants in Michigan. The automobile industry is a global one. Even the well-publicized Delphi-UAW fight is being played out in a bankruptcy courtroom in New York. There is nothing "local" to Detroit about this dispute, BMW's assertions notwithstanding.

## CONCLUSION

ATI brought this case in the District of Delaware for legitimate and practical reasons. Defendant's arguments are a concoction of conclusory allegations that do not come close to tilting the balance away from the presumption in favor of Plaintiff's chosen forum. For the above reasons, the Court should deny the Motion to Transfer and retain this action against all Defendants in Delaware.

Richard K. Herrmann #405
Mary B. Matterer #2696
MORRIS JAMES LLP
500 Delaware Avenue, Suite 1500
Wilmington, Delaware 19801-1494
(302) 888-6800
mmatterer@morrisjames.com

SOMMERS SCHWARTZ, P.C.
Andrew Kochanowski
2000 Town Center, Suite 900
Southfield, MI 48075
(248) 355-0300

BANIAK PINE & GANNON
Michael H. Baniak
150 N. Wacker Drive, Suite 1200
Chicago, IL 60606
(312) 673-0360

Dated: December 7, 2006

Attorneys for Plaintiff
AUTOMOTIVE TECHNOLOGIES
INTERNATIONAL, INC.

# EXHIBIT   1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

AUTOMOTIVE TECHNOLOGIES
INTERNATIONAL, INC.,
a Delaware corporation,

      Plaintiff,

vs.

AMERICAN HONDA MOTOR COMPANY,
a California corporation,
ELESYS NORTH AMERICA, INC.,
a Georgia corporation, and
GENERAL MOTORS CORPORATION,
a Delaware corporation,

      Defendants.

_____/

Case No. 1:06-CV-00187-GMS
Hon. Judge Gregory M. Sleet

## DECLARATION OF DAVID BREED

I, David Breed, under penalty of perjury do testify as follows:

1.     I am the Chairman and Chief Executive Officer of Plaintiff, ATI, Inc.  I have a degree from Carlton College, a BA in physics, a Bachelors and Masters Degrees in mechanical engineering from MIT, a Masters Degree in industrial management from MIT, and a Ph.D. in mechanical engineering from Columbia University in 1972.  While in school, beginning in the early 1960's, I began work with Breed Corporation, a company formed by my brother and myself.  I worked at Breed Corporation on a full time basis from 1963 to 1988.

2.     In the late 1960's Breed Corporation began being involved in developing automotive sensors.  I am intimately familiar with the automotive safety sensor business.

3.     When I left Breed Corporation in 1988, I acquired ATI to develop next-generation auto safety products.  These included crash sensors for occupant restraint systems, other

occupant sensors, airbag designs, and related projects. I have over 150 issued patents in this field. While ATI has from time to time been involved in developing commercial products, the bulk of our work lies in research and patent development.

4. Since acquiring ATI, I have had the company primarily engaged in research and development towards automotive safety products. At various times the company has had a physical office in the Metropolitan Detroit area for convenience, to allow us to present talks and lectures to various automotive suppliers and manufacturers, as well as to conduct some of our prototype activities. However, towards the end of 2005, we made a decision to close that office, which was only staffed by one or two people, and to conduct our prototyping and research activities largely off-shore. For the past four or five years, ATI has employed on a consulting basis a variety of scientists in Ukraine. The bulk of our research activity, to the extent is has a physical location, has been conducted in Ukraine throughout this time.

5. I understand that references have been made in Defendants' motion to transfer regarding my ownership of a summer home in Pentwater, Michigan. First, I do not own that home, it is held in joint tenancy with a relative. Second, I use that home for brief summer vacations. Third, I may point out that the home in located in the Western District of Michigan. My primary residence is in Boonton Township, New Jersey.

6. All of the patents involved in this case were prosecuted by Brian Roffe, ATI's long-standing patent lawyer. Some of the initial applications that led to the patents-in-suit were prepared by Karl Milde. Mr. Roffe lives in the greater New York area, and Mr. Milde in Westchester County, New York.

7.    All of our material business dealings with Autoliv, including our licenses with Autoliv, were with Autoliv's Swedish personnel, and took place in Sweden.

FURTHER AFFIANT SAYETH NOT.

DAVID S. BREED

June 20, 2006

# EXHIBIT   2

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

AUTOMOTIVE TECHNOLOGIES                    Case No. 1:06-CV-00187-GMS
INTERNATIONAL, INC.,                       Hon. Judge Gregory M. Sleet
a Delaware corporation,

      Plaintiff,

vs.

AMERICAN HONDA MOTOR COMPANY,
a California corporation,
ELESYS NORTH AMERICA, INC.,
a Georgia corporation, and
GENERAL MOTORS CORPORATION,
a Delaware corporation,

      Defendants.

_____/

## DECLARATION OF RAY PIIRAINEN

I, Ray Piirainen, under penalty of perjury do testify as follows:

1.     I am an employee of ATI, Inc. I've been employed by ATI since July 18, 1997. My duties for ATI include accounting and general administrative work. I am familiar with the operation of ATI and the facts set forth in this Declaration.

2.     ATI currently has four employees worldwide. These include myself, my wife Nancy Piirainen (who also performs administrative duties), ATI's chairman and CEO David Breed, and a part-time employee hired in June of this year, who also lives in New Jersey. David Breed is located in Boonton, New Jersey. I and Nancy Piirainen are located outside Charlotte, North Carolina. To the extent that ATI has any one place in which its administrative business is conducted, it is here in North Carolina.

3.      ATI is largely a research and development company, although from time to time it has developed commercialized prototypes and products.  The bulk of its efforts, however are directed toward research and patenting that research.  ATI conducts its business largely through consulting arrangements with various individuals.  Some of these individuals have had long time relationships with ATI, which was started in 1988.  The five consultants currently include the following: Will DuVall, one of the named inventors on the subject patents-in-suit, who is located in Branson West, Missouri.  Another consultant for ATI is Wendell Johnson, who is located in Hawaii.  Both DuVall and Johnson contractually act on behalf of ATI and will come to trial in Delaware unless health reasons interfere.  Ryan Breed has been retained as of June 1, 2006 through September 2006 as a consultant.  ATI also has two other consultants, both located in Kiev, Ukraine Republic.

4.      In addition to formal retained consultants, ATI has business relationships with numerous other researchers and scientists.  The majority of these scientists are located in the Ukraine.  Others who have a relationship with ATI include Vittorio Castelli, who lives in Yorktown Heights, New York and in Rome, Italy.

5.      ATI has no employees or other consultants, or other individuals with whom it has a business relationship, who reside in the Eastern District of Michigan.

6.      At the time of filing of this lawsuit on March 17, 2006, ATI had no office in the Eastern District of Michigan.  While ATI at one time did have an office and a prototype shop in Rochester Hills, Michigan and in Auburn Hills, Michigan, which was used by a few employees and consultants, these offices are no longer in existence.  ATI has no telephone number in the State of Michigan, and does not receive any mail in the Eastern District of Michigan.  The

2

references to ATI's offices and business presence cited in Defendants' motion to transfer were at one time accurate, but are no longer true.

7.    ATI maintains virtually no paper records.   Several years ago, ATI digitized virtually all of its records, and maintains a practice of keeping only digital records for its operations.   The only known exception to this are records stored by our patent counsel Brian Roffe in Valley Stream, New York, financial records stored in North Carolina and litigation-related records maintained by our outside litigation counsel.   It is our practice to produce records electronically.   All of the records that we would produce in this case are stored on servers in California and New Jersey.

8.    I have recently personally spoken with Jeffrey Morin and Andrew Varga, two former ATI employees who are named inventors on two of the patents at issue.   Both have recently indicated to me that they are willing to come to Delaware for trial of this case if necessary. I am aware from having spoken to her within the past year, that Kunghong Xu, a named inventor on one of the patents at issue, is currently working for General Motors. I have not been able to get in touch with her, but would expect General Motors to make her available for trial in Delaware.

FURTHER AFFIANT SAYETH NOT.

RAY PIIRAINEN
June 20, 2006

3

# EXHIBIT  3

# EXHIBIT  1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| AUTOMOTIVE TECHNOLOGIES INTERNATIONAL, INC., <br><br> Plaintiff, <br><br> v. <br><br> AMERICAN HONDA MOTOR CO., INC., ELESYS NORTH AMERICA, INC., and GENERAL MOTORS CORPORATION, <br><br> Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)   Civil Action No. 06-187-GMS |

## ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIMS OF AMERICAN HONDA MOTOR CO., INC.

Pursuant to Fed. R. Civ. P. 8 and 12, Defendant American Honda Motor Co., Inc. ("Honda"), answers the First Amended Complaint of Automotive Technologies International, Inc. ("ATI") as follows:

### PARTIES, JURISDICTION AND VENUE

1.    Plaintiff Automotive Technologies International, Inc. ("ATI") is a Delaware corporation.

### ANSWER:

Admitted.

2.    Defendant American Honda Motor Company ("Honda") is a California corporation. Defendant Honda imports and sells in the United States automobiles manufactured in Japan and the United States under the "Honda" and "Acura" names.

**ANSWER:**

Honda admits that it is a California corporation. Honda admits that it imports and sells in the United States certain vehicles manufactured in Japan under the "Honda" and "Acura" names. Honda admits that it sells in the United States vehicles manufactured in the United States under the "Honda" and "Acura" names.

3.    Defendant Elesys North America, Inc. ("Elesys") is a Georgia corporation. Elesys is a supplier of products to the automotive industry.

**ANSWER:**

Honda is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 3, and therefore denies these allegations.

4.    Defendant General Motors Corporation ("GM") is a Delaware corporation. GM sells vehicles in the United States under the "Buick," "Pontiac," and "Saturn" names, among others.

**ANSWER:**

Honda is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 4, and therefore denies these allegations.

5.    This is an action for patent infringement. All of the acts of patent infringement complained of in this Complaint occurred, among other places, within this judicial district.

**ANSWER:**

Honda admits that this purports to be an action for alleged patent infringement. Honda denies the remaining allegations of paragraph 5.

6.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1338(a) and 28 U.S.C. § 1331 over this infringement action, arising under the Patent Act, 35 U.S.C. § 1 et seq., including §§ 271 and 281-285.

**ANSWER:**

Admitted.

2

7.    Venue is proper in this Court pursuant to 28 U.S.C. §1391(b), (c) and 28 U.S.C. § 1400(b). The Court has personal jurisdiction over each of the parties.

**ANSWER:**

Admitted. Pursuant to 28 U.S.C. § 1404(a), however, venue is most proper in the United States District Court for the Eastern District of Michigan.

## JURISDICTION AND VENUE

8.    The following patents have been issued duly and legally to Plaintiff ATI on the following dates:

a.    U.S. Patent No, 5,901,978 entitled "Method and Apparatus for Detecting the Presence of a Child Seat," issued May 11, 1999. (Exhibit 1)

b.    U.S. Patent No. 6,242,701 entitled "Apparatus and Method for Measuring Weight of an Occupying Item of a Seat," issued June 5, 2001. (Exhibit 2)

c.    U.S. Patent No. 6,325,414 entitled "Method and Arrangement for Controlling Deployment of a Side Airbag," issued December 4, 2001. (Exhibit 3)

d.    U.S. Patent No. 6,397,136 entitled "System for Determining the Occupancy State of a Seat in a Vehicle," issued May 28, 2002. (Exhibit 4)

e.    U.S. Patent No. 6,422,595 entitled "Occupant Position Sensor and Method and Arrangement for Controlling a Vehicular Component Based on an Occupant's Position," issued July 23, 2002. (Exhibit 5)

f.    U.S. Patent No. 6,869,100 entitled "Method and Apparatus for Controlling an Airbag," issued March 22, 2005. (Exhibit 6)

g.    U.S. Patent No. 6,757,602 entitled "System For Determining the Occupancy State of a Seat in a Vehicle and Controlling a Component Based Thereon," issued June 29, 2004. (Exhibit 7)

h.    U.S. Patent No. 6,712,387 entitled "Method and Apparatus for Controlling Deployment of a Side Airbag," issued March 30, 2004. (Exhibit 8)

i.    U.S. Patent No. 6,942,248 entitled "Occupant Restraint Device Control System and Method," issued September 13, 2005. (Exhibit 9)

3

j.   U.S. Patent No. 6,958,451 entitled "Apparatus and Method for Measuring Weight of an Occupying Item of a Seat," issued October 25, 2005. (Exhibit 10)

k.   U.S. Patent No. 6,484,080 entitled "Method and Apparatus for Controlling a Vehicular Component," issued November 19, 2002. (Exhibit 11)

l.   U.S. Patent No. 6,850,824 entitled "Method and Apparatus for Controlling a Vehicular Component," issued February 1, 2005. (Exhibit 12)

**ANSWER:**

Honda admits that U.S. Patent Nos. 5,901,978, 6,242,701, 6,325,414, 6,397,136, 6,422,595, 6,869,100, 6,757,602, 6,712,387, 6,942,248, 6,958,451, 6,484,080 and 6,850,824 ("the ATI Patents") are attached to the Plaintiff's First Amended Complaint as Exhibits 1-12, respectively. Honda admits that ATI is the listed assignee on the face of the ATI Patents. Honda admits that the ATI Patents have titles of inventions and the issue dates identified in paragraph 8, a-l. Honda is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 8, and on that basis, denies these allegations.

## PATENT INFRINGEMENT

9.   All of the patents set forth in paragraph 8, a-l (collectively, "the ATI Patents"), are valid, subsisting, enforceable, and are presently owned by ATI and have been owned by ATI for all times relevant hereto.

**ANSWER:**

Honda denies that all of the patents set forth in paragraph 8, a-l, are valid. Honda is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 9, and therefore denies these allegations.

10.   The general subjects covered by the ATI Patents include, but are not limited to occupant sensing, position sensing, weight sensing, airbag deployment, and related systems as used in a vehicle containing airbags.

4

**ANSWER:**

Honda admits that some of the subjects identified in paragraph 10 are addressed in some of the ATI Patents. Honda is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 10, and therefore denies these allegations.

11.    Among the products made, sold, used, or imported by Elesys are the following:

    a.    "Passenger Sensing System";
    b.    "Seat Sentry System";
    c.    "Occupant Detection System"; and
    d.    "Low Risk Deployment System".

**ANSWER:**

Honda admits that Elesys North America, Inc. ("ENA") has supplied to Honda, through third-parties, electronic control units ("ECUs") that are used in the Occupant Detection System. Honda is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 11, and therefore denies the allegations.

12.    Elesys sells some or all of the above systems, either singularly or in combination, to Defendants Honda and GM. Upon information and belief, Elesys has supplied Honda since approximately 2001. Upon information and belief, Elesys has supplied GM since 2004. Elesys has recently announced the intention to supply the product systems, or some of them, to approximately 1.1 million additional GM vehicles.

**ANSWER:**

Honda admits that ENA has supplied to Honda, through third-parties, the ECUs that are used in the Occupant Detection System since 2005. Honda is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 12, and therefore denies the remaining allegations.

13.    All of the product systems referenced above infringe, directly or by contributory infringement, the ATI Patents. None of the Defendants has any right or license from ATI under the ATI Patents.

**ANSWER:**

Honda admits that Honda has no license from ATI under the ATI Patents. Honda denies

the remaining allegations in paragraph 13.

14.     Defendant Honda makes, uses, imports and/or sells vehicles with an occupant position detection system called Occupant Position Detection System ("OPDS") in various model Hondas and Acuras sold in the United States. The OPDS system may vary slightly from model to model, but on information and belief, contains the Elesys Passenger Sensing System, the Occupant Detection System, the Seat Sentry and/or the Low Risk Deployment System (since 2006). Certain portions of the OPDS system are supplied by other automotive suppliers. Among the variations of the OPDS system used in Honda and Acura vehicles is a system employing a strain gage weight sensor and/or seat belt sensors. The OPDS system comprises and controls, or works in conjunction with a controller for, among other things, suppressing or allowing the deployment of side airbags and side curtain airbags in a vehicle equipped with the system(s). Upon information and belief, the OPDS system has been used in the following models:

| Year | Model |
|------|-------|
| 2002 | Honda Accord |
| 2003 | Honda Accord |
| 2003 | Honda Civic Hybrid |
| 2004 | Honda Accord |
| 2005 | Honda Odyssey |
| 2005 | Honda Pilot |
| 2005 | Honda Accord Hybrid |

| Year | Model |
|------|-------|
| 2005 | Honda Accord |
| 2005 | Honda Element |
| 2006 | Honda Element |
| 2006 | Honda Accord |
| 2006 | Honda CRV |
| 2006 | Honda Ridgeline |
| 2006 | Honda Civic |
| 2006 | Honda Accord Hybrid |

| Year | Model |
|------|-------|
| 2001 | Acura MDX |
| 2002 | Acura MDX |
| 2002 | Acura 3.2 CL |
| 2003 | Acura TL |
| 2003 | Acura MDX |
| 2004 | Acura TL |
| 2004 | Acura MDX |

6

| 2005 | Acura TL |
|------|----------|
| 2005 | Acura MDX |
| 2006 | Acura TSX |
| 2006 | Acura TL |
| 2006 | Acura RL |
| 2006 | Acura MDX |

**ANSWER:**

Honda admits that it imported certain vehicles listed in the tables of paragraph 14 in the United States. Honda admits that it sold in the United States vehicles listed in the tables of paragraph 14. Honda admits that ENA has supplied to Honda, through third-parties, the ECUs that are used in the Occupant Position Detection System ("the OPDS"). Honda admits that the sensors for the OPDS have been provided, through third-parties, by a supplier other than ENA. Honda admits that the OPDS is for use with a side airbag system. Honda admits that the OPDS has been used in the following vehicle models: 2002, 2003 and 2004 Honda Accord as an option, 2005 Honda Odyssey, 2005 Honda Pilot, 2005 Honda Accord Hybrid, 2005 Honda Accord, 2005 and 2006 Honda Element as an option, 2006 Honda CRV, 2006 Honda Accord Hybrid, 2001, 2002, 2003, 2004, 2005 and 2006 Accura MDX, 2002 Accura 3.2 CL, 2003, 2004, 2005 and 2006 Accura TL, and 2006 Accura RL. Honda denies the remaining allegations in paragraph 14.

15.    Upon information and belief, additional Honda and Acura models to those listed in paragraph 14 have been equipped with the OPDS system, and continue to be sold in the United States with the OPDS system.

**ANSWER:**

Honda admits that certain Honda and Acura vehicles having the OPDS are not listed in the tables of paragraph 14. Honda denies the remaining allegations in paragraph 15.

16.    Each of the vehicles listed above, and those vehicles not specifically listed but which use the system described above, infringe the ATI Patents.

**ANSWER:**

Honda denies that any Honda or Acura model vehicle, or any system used therein, infringes the ATI Patents. Honda is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 16, and therefore denies the remaining allegations.

17. Defendant Honda markets and sells these models to the public. Defendant will continue to do so unless enjoined by this Court.

**ANSWER:**

Honda admits that Honda markets and sells to the public the models identified in the tables of paragraph 14. Honda denies the remaining allegations of paragraph 17.

18. Defendant GM makes, uses, and sells vehicles which employ some or all of the Elesys product systems set forth above in paragraph 11, called in some instance, the Passenger Presence System. Certain GM vehicles use the Elesys systems in conjunction with seatbelt sensors. The Elesys system in GM vehicles comprises and controls, or works in conjunction with a controller for, among other things, suppressing or allowing the deployment of side airbags and side curtain airbags in a vehicle equipped with the system(s). Upon information and belief the Elesys systems are supplied in the following GM vehicles:

| Year | Model |
|------|-------|
| 2005 | Pontiac G6 |
| 2006 | Pontiac G6 |
| 2005 | Pontiac Grand Prix |
| 2006 | Pontiac Grand Prix |
| 2005 | Saturn Ion |
| 2006 | Saturn Ion |
| 2005 | Saturn Vue |
| 2006 | Saturn Vue |
| 2005 | Buick LaCrosse |
| 2006 | Buick LaCrosse |

**ANSWER:**

Honda is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 18, and therefore denies the allegations.

8

19.    Upon information and belief, GM makes and sells other models than those listed in Paragraph 17 [sic, 18] with the Passenger Presence System or other-named system using Elesys products. Each of the vehicles listed above, and those vehicles not specifically listed but which use the system described above, infringe the ATI Patents set forth in paragraph 8, with the exception of the '387, '451, '414, and '701 Patents. Defendant GM markets and sells these models to the public. Defendant will continue to do so unless enjoined by this Court.

**ANSWER:**

Honda is without knowledge or information sufficient to form a belief as to the truth of

the allegations in paragraph 19, and therefore denies the allegations.


20.    At least as early as February, 2004, ATI advised elesys of the existence of various of the above-listed patents and sought to discuss the license of the ATI Patents to elesys. Elesys was formed as a joint venture between Defendant Honda and a third-party, NEC, Inc., another automotive supplier. Upon information and belief, as of February, 2004, Honda had knowledge of various of the ATI patents at issue in this case. Additionally, certain of the patents at issue in this action have been actually known to NEC and Honda, Japan, earlier than February, 2004.

**ANSWER:**

Honda denies that ENA was formed as a joint venture between Honda and NEC, Inc.

ENA is wholly owned by Honda elesys Co., Ltd., which is a joint venture between Honda Motor

Co., Ltd. and NEC, Inc. Honda denies that it had knowledge of "various of the ATI patents at

issue in this case" as of February 2004. Honda is without knowledge or information sufficient to

form a belief to the truth of the remaining allegations in paragraph 20, and therefore denies these

allegations.


21.    In addition to the above, beginning in October, 2005, ATI placed Honda on notice of certain patents at issue in this lawsuit via written communications with Koichi Kondo, William R. Willen, of Honda, and Takeo Oi, Intellectual Property Division of Honda Motor Company, Ltd. in Japan. As a result, Honda has known of certain if not all of the patents at issue in this case prior to this Complaint.

**ANSWER:**

Honda admits that ATI sent Koichi Kondo and William R. Willen, respectively, letters

dated October 14, 2005, with respect to the '701 patent. Honda admits that ATI sent Takeo Oi,

Manager of Intellectual Property Division of Honda Motor Co., Ltd. in Japan a letter dated January 26, 2006, with respect to the '701, the '978, the '414, the '136, the '595, the '100, the '602, the '387, the '248, the '451, and the '080 patents. Honda admits that it had knowledge of the '701 prior to ATI's Complaint. Honda denies the remaining allegations in paragraph 21.

## AFFIRMATIVE DEFENSES

Further responding to ATI's First Amended Complaint, Honda asserts the following affirmative defenses and reserves the right to amend its Answer as additional information becomes available:

1.    ATI's claims are barred by laches and estoppel.

2.    Honda incorporates by reference as affirmative defenses the allegations set forth below supporting its Counterclaims.

## COUNTERCLAIMS

For its Counterclaims against ATI, Honda states as follows:

1.    This Court has jurisdiction over these Counterclaims pursuant to Rule 13, Fed. R. Civ. P. Jurisdiction in this Court also is proper pursuant to 28 U.S.C. §§ 1331, 1338(a), 2201, and 2202. Venue is proper for these Counterclaims because ATI elected this forum for suit and pursuant to 28 U.S.C. §§ 1391(c) and 1400(b). Pursuant to 28 U.S.C. § 1404(a), venue is also proper in the United States District Court for the Eastern District of Michigan.

2.    An actual controversy exists between the parties as to the asserted infringement, validity, and enforceability of the ATI Patents.

3.    An actual controversy exists between the parties as to the asserted infringement, validity, and enforceability of U.S. Patent No. 6,950,022 ("the '022 Patent"). ATI asserted the

10

infringement, validity and enforceability of the '022 Patent in the Complaint and removed the assertions based on the '022 Patent in the First Amended Complaint.

## FIRST COUNTERCLAIM

### DECLARATION OF NONINFRINGEMENT OF THE ATI PATENTS

3.     Honda repeats and realleges the allegations of paragraphs 1 through 2 of these Counterclaims.

4.     Honda has not infringed and is not infringing, either directly, contributorily, or by active inducement, any claim of the ATI Patents.

## SECOND COUNTERCLAIM

### DECLARATION OF INVALIDITY OF THE ATI PATENTS

5.     Honda repeats and realleges the allegations of paragraphs 1 through 2 of these Counterclaims.

6.     The ATI Patents are invalid and void for failure to comply with the requirements of Title 35, United States Code, including, but not limited to, §§ 102, 103, and 112.

## THIRD COUNTERCLAIM

### DECLARATION OF NONINFRINGEMENT OF U.S. PATENT NO. 6,950,022

7.     Honda repeats and realleges the allegations of paragraphs 1 and 3 of these Counterclaims.

8.     Honda has not infringed and is not infringing, either directly, contributorily, or by active inducement, any claim of the '022 Patent.

## FOURTH COUNTERCLAIM

### DECLARATION OF INVALIDITY OF U.S. PATENT NO. 6,950,022

9.     Honda repeats and realleges the allegations of paragraphs 1 and 3 of these Counterclaims.

10.    The '022 Patent is invalid and void for failure to comply with the requirements of Title 35, United States Code, including, but not limited to, §§ 102, 103, and 112.

## EXCEPTIONAL CASE

ATI's attempt to read the claims of the ATI Patents on the activities and products of Honda makes this case exceptional under 35 U.S.C. § 285.

## PRAYER FOR RELIEF

WHEREFORE, Honda prays for a judgment:

a)    dismissing ATI's First Amended Complaint with prejudice;

b)    declaring that Honda has not infringed any claim of the ATI Patents and the '022 Patent;

c)    declaring that the ATI patents and the '022 Patent are invalid;

d)    adjudging this case to be an exceptional case pursuant to 35 U.S.C. § 285, and awarding Honda its costs and attorneys' fees; and

e)    granting such other and further relief as the Court may deem just and proper.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Thomas C. Grimm*

OF COUNSEL:

Timothy Q. Delaney
Ralph J. Gabric
Miyoung Shin
Rickard DeMille
BRINKS HOFER GILSON & LIONE
NBC Tower - Suite 3600
455 North Cityfront Plaza Drive
Chicago, IL  60611
(312) 321-4200

Thomas C. Grimm (#1098)
Benjamin J. Schladweiler (#4601)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE  19899-1347
tgrimm@mnat.com
bschladweiler@mnat.com
(302) 658-9200
   *Attorneys for Defendants*

June 12, 2006
524397

12

## CERTIFICATE OF SERVICE

I hereby certify that on June 12, 2006, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF which will send notification of such filing to the following:

Richard K. Herrmann, Esquire
MORRIS, JAMES, HITCHENS & WILLIAMS LLP

Additionally, I hereby certify that true and correct copies of the foregoing were caused to be served on June 12, 2006 upon the following individuals in the manner indicated:

### BY HAND

Richard K. Herrmann, Esquire
MORRIS, JAMES, HITCHENS & WILLIAMS LLP
222 Delaware Avenue, 10th Floor
Wilmington, DE 19801

### BY FACSIMILE

Andrew Kochanowski, Esquire
SOMMERS SCHWARTZ, P.C.
2000 Town Center, Suite 900
Southfield, MI 48075
(248) 746-4001 (fax)

Michael H. Baniak, Esquire
BANIAK PINE & GANNON
150 N. Wacker Drive, Suite 1200
Chicago, IL 60606
(312) 673-0361 (fax)

/s/ Thomas C. Grimm
Thomas C. Grimm (#1098)
tgrimm@mnat.com

524397

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| AUTOMOTIVE TECHNOLOGIES INTERNATIONAL, INC., | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) ) | Civil Action No. 06-187-GMS |
| AMERICAN HONDA MOTOR CO., INC., ELESYS NORTH AMERICA, INC., and GENERAL MOTORS CORPORATION, | ) ) ) ) | |
| Defendants. | ) ) | |

## ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIMS OF ELESYS NORTH AMERICAN, INC.

Pursuant to Fed. R. Civ. P. 8 and 12, Defendant Elesys North American, Inc. ("ENA") answers the First Amended Complaint of Automotive Technologies International, Inc. ("ATI") as follows:

### PARTIES, JURISDICTION AND VENUE

1. Plaintiff Automotive Technologies International, Inc. ("ATI") is a Delaware corporation.

### ANSWER:

Admitted.

2. Defendant American Honda Motor Company ("Honda") is a California corporation. Defendant Honda imports and sells in the United States automobiles manufactured in Japan and the United States under the "Honda" and "Acura" names.

**ANSWER:**

ENA is without knowledge or information sufficient to form a belief as to the truth of allegations in paragraph 2, and therefore denies these allegations.

3.    Defendant Elesys North America, Inc. ("Elesys") is a Georgia corporation. Elesys is a supplier of products to the automotive industry.

**ANSWER:**

ENA admits that it is a Georgia corporation. ENA admits that it is a supplier of specific products to certain companies in the automotive industry. ENA denies the remaining allegations of paragraph 3.

4.    Defendant General Motors Corporation ("GM") is a Delaware corporation. GM sells vehicles in the United States under the "Buick," "Pontiac," and "Saturn" names, among others.

**ANSWER:**

ENA is without knowledge or information sufficient to form a belief as to the truth of allegations in paragraph 4, and therefore denies these allegations.

5.    This is an action for patent infringement. All of the acts of patent infringement complained of in this Complaint occurred, among other places, within this judicial district.

**ANSWER:**

ENA admits that this purports to be an action for alleged patent infringement. ENA denies the remaining allegations of paragraph 5.

6.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1338(a) and 28 U.S.C. § 1331 over this infringement action, arising under the Patent Act, 35 U.S.C. § 1 et seq., including §§ 271 and 281-285.

**ANSWER:**

Admitted.

7.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b), (c) and 28 U.S.C. § 1400(b). The Court has personal jurisdiction over each of the parties.

**ANSWER:**

Admitted. Pursuant to 28 U.S.C. § 1404(a), however, venue is most proper in the United States District Court for the Eastern District of Michigan.

## GENERAL ALLEGATIONS

8.    The following patents have been issued duly and legally to Plaintiff ATI on the following dates:

a.    U.S. Patent No. 5,901,978 entitled "Method and Apparatus for Detecting the Presence of a Child Seat," issued May 11, 1999. (Exhibit 1)

b.    U.S. Patent No. 6,242,701 entitled "Apparatus and Method for Measuring Weight of an Occupying Item of a Seat," issued June 5, 2001. (Exhibit 2)

c.    U.S. Patent No. 6,325,414 entitled "Method and Arrangement for Controlling Deployment of a Side Airbag," issued December 4,    2001. (Exhibit 3)

d.    U.S. Patent No. 6,397,136 entitled "System for Determining the Occupancy State of a Seat in a Vehicle," issued May 28, 2002. (Exhibit 4)

e.    U.S. Patent No. 6,422,595 entitled "Occupant Position Sensor and Method and Arrangement for Controlling a Vehicular Component Based on an Occupant's Position," issued July 23, 2002. (Exhibit 5)

f.    U.S. Patent No. 6,869,100 entitled "Method and Apparatus for Controlling an Airbag," issued March 22, 2005. (Exhibit 6)

g.    U.S. Patent No. 6,757,602 entitled "System For Determining the Occupancy State of a Seat in a Vehicle and Controlling a Component Based Thereon," issued June 29, 2004. (Exhibit 7)

h.    U.S. Patent No. 6,712,387 entitled "Method and Apparatus for Controlling Deployment of a Side Airbag," issued March 30, 2004. (Exhibit 8)

i.    U.S. Patent No. 6,942,248 entitled "Occupant Restraint Device Control System and Method," issued September 13, 2005. (Exhibit 9)

3

j.    U.S. Patent No. 6,958,451 entitled "Apparatus and Method for Measuring Weight of an Occupying Item of a Seat," issued October 25, 2005. (Exhibit 10)

k.    U.S. Patent No. 6,484,080 entitled "Method and Apparatus for Controlling a Vehicular Component," issued November 19, 2002. (Exhibit 11)

l.    U.S. Patent No. 6,850,824 entitled "Method and Apparatus for Controlling a Vehicular Component," issued February 1, 2005. (Exhibit 12)

**ANSWER:**

ENA admits that U.S. Patent Nos. 5,901,978, 6,242,701, 6,325,414, 6,397,136, 6,422,595, 6,869,100, 6,757,602, 6,712,387, 6,942,248, 6,958,451, 6,484,080 and 6,850,824 ("the ATI Patents") are attached to the Plaintiff's First Amended Complaint as Exhibits 1-12, respectively. ENA admits that ATI is the listed assignee on the face of the ATI Patents. ENA admits that the ATI Patents have titles of inventions and the issue dates identified in paragraph 8, a-l. ENA is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 8, and on that basis, denies these allegations.

**PATENT INFRINGEMENT**

9.    All of the patents set forth in paragraph 8, a-l (collectively, "the ATI Patents"), are valid, subsisting, enforceable, and are presently owned by ATI and have been owned by ATI for all times relevant hereto.

**ANSWER:**

ENA denies that all of the patents set forth in paragraph 8, a-l, are valid. ENA is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 9, and therefore denies these allegations.

10.    The general subjects covered by the ATI Patents include, but are not limited to occupant sensing, position sensing, weight sensing, airbag deployment, and related systems as used in a vehicle containing airbags.

4

**ANSWER:**

ENA admits that some of the subjects identified in paragraph 10 are addressed in some of the ATI Patents. ENA is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 10, and therefore denies these allegations.

11.  Among the products made, sold, used, or imported by Elesys are the following:
   a.  "Passenger Sensing System";
   b.  "Seat Sentry System";
   c.  "Occupant Detection System"; and
   d.  "Low Risk Deployment System".

**ANSWER:**

ENA admits that ENA made and sold the electronic control units ("ECUs") and sensor assemblies for the Passenger Sensing System and has imported and sold the ECUs that are used in the Occupant Detection System. The Passenger Sensing System was previously referred to as the Seat Sentry System. ENA admits that ENA has made the Low Risk Deployment System. ENA denies the remaining allegations in paragraph 11.

12.  Elesys sells some or all of the above systems, either singularly or in combination, to Defendants Honda and GM. Upon information and belief, Elesys has supplied Honda since approximately 2001. Upon information and belief, Elesys has supplied GM since 2004. Elesys has recently announced the intention to supply the product systems, or some of them, to approximately 1.1 million additional GM vehicles.

**ANSWER:**

ENA admits that it has sold to GM on a commercial scale the ECUs and the sensor assemblies for the Passenger Sensing System since 2004. ENA admits that it has sold to Honda, through third-parties, the ECUs that are used in the Occupant Detection System since 2005. ENA denies the remaining allegations in paragraph 12.

13.    All of the product systems referenced above infringe, directly or by contributory infringement, the ATI Patents. None of the Defendants has any right or license from ATI under the ATI Patents.

**ANSWER:**

ENA admits that ENA has no license from ATI under the ATI Patents. ENA denies the remaining allegations in paragraph 13.

14.    Defendant Honda makes, uses, imports and/or sells vehicles with an occupant position detection system called Occupant Position Detection System ("OPDS") in various model Hondas and Acuras sold in the United States. The OPDS system may vary slightly from model to model, but on information and belief, contains the Elesys Passenger Sensing System, the Occupant Detection System, the Seat Sentry and/or the Low Risk Deployment System (since 2006). Certain portions of the OPDS system are supplied by other automotive suppliers. Among the variations of the OPDS system used in Honda and Acura vehicles is a system employing a strain gage weight sensor and/or seat belt sensors. The OPDS system comprises and controls, or works in conjunction with a controller for, among other things, suppressing or allowing the deployment of side airbags and side curtain airbags in a vehicle equipped with the system(s). Upon information and belief, the OPDS system has been used in the following models:

| Year | Model |
|------|-------|
| 2002 | Honda Accord |
| 2003 | Honda Accord |
| 2003 | Honda Civic Hybrid |
| 2004 | Honda Accord |
| 2005 | Honda Odyssey |
| 2005 | Honda Pilot |
| 2005 | Honda Accord Hybrid |

| Year | Model |
|------|-------|
| 2005 | Honda Accord |
| 2005 | Honda Element |
| 2006 | Honda Element |
| 2006 | Honda Accord |
| 2006 | Honda CRV |
| 2006 | Honda Ridgeline |
| 2006 | Honda Civic |
| 2006 | Honda Accord Hybrid |

| Year | Model |
|------|-------|
| 2001 | Acura MDX |
| 2002 | Acura MDX |
| 2002 | Acura 3.2 CL |

| 2003 | Acura TL |
|------|----------|
| 2003 | Acura MDX |
| 2004 | Acura TL |
| 2004 | Acura MDX |
| 2005 | Acura TL |
| 2005 | Acura MDX |
| 2006 | Acura TSX |
| 2006 | Acura TL |
| 2006 | Acura RL |
| 2006 | Acura MDX |

**ANSWER:**

ENA admits that it has sold to Honda, through third parties, ECUs that are used in the Occupant Position Detection System ("OPDS"). ENA denies that the OPDS contains the Elesys Passenger Sensing System, the Occupant Detection System, the Seat Sentry System and/or the Low Risk Deployment System. ENA is without information or knowledge sufficient to form a belief as to the truth of the remaining allegations in paragraph 14, and therefore denies these allegations.

15.    Upon information and belief, additional Honda and Acura models to those listed in paragraph 14 have been equipped with the OPDS system, and continue to be sold in the United States with the OPDS system.

**ANSWER:**

ENA is without information or knowledge sufficient to form a belief as to the truth of allegations in paragraph 15, and therefore denies these allegations.

16.    Each of the vehicles listed above, and those vehicles not specifically listed but which use the system described above, infringe the ATI Patents.

**ANSWER:**

ENA denies that any product made, sold, offered for sale or used by ENA infringes the ATI Patents. ENA is without information or knowledge sufficient to form a belief as to the truth of the remaining allegations in paragraph 16, and therefore denies these allegations.

7

17.    Defendant Honda markets and sells these models to the public. Defendant will continue to do so unless enjoined by this Court.

**ANSWER:**

ENA is without information or knowledge sufficient to form a belief as to the truth of

allegations in paragraph 17, and therefore denies these allegations.

18.    Defendant GM makes, uses, and sells vehicles which employ some or all of the Elesys product systems set forth above in paragraph 11, called in some instance, the Passenger Presence System. Certain GM vehicles use the Elesys systems in conjunction with seatbelt sensors. The Elesys system in GM vehicles comprises and controls, or works in conjunction with a controller for, among other things, suppressing or allowing the deployment of side airbags and side curtain airbags in a vehicle equipped with the system(s). Upon information and belief the Elesys systems are supplied in the following GM vehicles:

| Year | Model |
|------|-------|
| 2005 | Pontiac G6 |
| 2006 | Pontiac G6 |
| 2005 | Pontiac Grand Prix |
| 2006 | Pontiac Grand Prix |
| 2005 | Saturn Ion |
| 2006 | Saturn Ion |
| 2005 | Saturn Vue |
| 2006 | Saturn Vue |
| 2005 | Buick LaCrosse |
| 2006 | Buick LaCrosse |

**ANSWER:**

ENA admits that it has sold to GM the ECUs and the sensor assemblies for the Passenger

Sensing System. ENA is without information or knowledge sufficient to form a belief as to the

truth of the remaining allegations in paragraph 18, and therefore denies these allegations.

19.    Upon information and belief, GM makes and sells other models than those listed in Paragraph 17 [sic, 18] with the Passenger Presence System or other-named system using Elesys products. Each of the vehicles listed above, and those vehicles not specifically listed but which use the system described above, infringe the ATI Patents set forth in paragraph 8, with the exception of the '387, '451, '414, and '701 Patents. Defendant GM markets and sells these models to the public. Defendant will continue to do so unless enjoined by this Court.

8

**ANSWER:**

ENA denies that any product made, sold, offered for sale or used by ENA infringes the ATI Patents. ENA is without information or knowledge sufficient to form a belief as to the truth of the remaining allegations in paragraph 19, and therefore denies these allegations.

20.    At least as early as February, 2004, ATI advised Elesys of the existence of various of the above-listed patents and sought to discuss the license of the ATI Patents to Elesys. Elesys was formed as a joint venture between Defendant Honda and a third-party, NEC, Inc., another automotive supplier. Upon information and belief, as of February, 2004, Honda had knowledge of various of the ATI patents at issue in this case. Additionally, certain of the patents at issue in this action have been actually known to NEC and Honda, Japan, earlier than February, 2004.

**ANSWER:**

ENA admits that in or about February 2004, ATI advised ENA of the existence of various patents and published patent applications allegedly owned by ATI and sought to discuss licensing of these patents to ENA. The patents that ATI advised ENA of included the '978, the '414, the '136, and the '595 patents. The published patent applications that ATI advised ENA of included US 2003/0001368 (which later matured into the '100 patent), US 2003/0002690 (which later matured into the '022), and US2003/0056997 (which later matured into the '451 patent). ENA denies that ENA was formed as a joint venture between Honda and NEC, Inc. ENA is wholly owned by Honda elesys Co., Ltd., which is a joint venture between Honda Motor Co., Ltd. and NEC, Inc. ENA is without information or knowledge sufficient to form a belief as to the truth of the remaining allegations in paragraph 20, and therefore denies the allegations.

21.    In addition to the above, beginning in October, 2005, ATI placed Honda on notice of certain patents at issue in this lawsuit via written communications with Koichi Kondo, William R. Willen, of Honda, and Takeo Oi, Intellectual Property Division of Honda Motor Company, Ltd. in Japan. As a result, Honda has known of certain if not all of the patents at issue in this case prior to this Complaint.

9

### ANSWER:

ENA is without information or knowledge sufficient to form a belief as to the truth of allegations in paragraph 21, and therefore denies these allegations.

### AFFIRMATIVE DEFENSES

Further responding to ATI's First Amended Complaint, ENA asserts the following affirmative defenses and reserves the right to amend its Answer as additional information becomes available:

1. ATI's claims are barred by laches and estoppel.

2. ENA incorporates by reference as affirmative defenses the allegations set forth below supporting its Counterclaims.

### COUNTERCLAIMS

For its Counterclaims against ATI, ENA states as follows:

1. This Court has jurisdiction over these Counterclaims pursuant to Rule 13, Fed. R. Civ. P. Jurisdiction in this Court also is proper pursuant to 28 U.S.C. §§ 1331, 1338(a), 2201, and 2202. Venue is proper for these Counterclaims because ATI elected this forum for suit and pursuant to 28 U.S.C. §§ 1391(c) and 1400(b). Pursuant to 28 U.S.C. § 1404(a), venue is also proper in the United States District Court for the Eastern District of Michigan.

2. An actual controversy exists between the parties as to the asserted infringement, validity, and enforceability of the ATI Patents.

3. An actual controversy exists between the parties as to the asserted infringement, validity, and enforceability of U.S. Patent No. 6,950,022 ("the '022 Patent"). ATI asserted the infringement the '022 Patent in the Complaint based on ENA's supply to Honda and GM and removed the assertions based on the '022 Patent in the First Amended Complaint.

10

4.    An actual controversy exists between the parties based on ENA's supply to GM as to the asserted infringement of U.S. Patent Nos. 6,712,387 ("the '387 Patent"), 6,958,451 ("the '451 Patent"), 6,325,414 ("the '414 Patent"), and 6,242,701 ("the '701 Patent"). ATI asserted that ENA's supply to GM infringes the '387, '451, '414, and '701 Patents in the Complaint. ATI removed these assertions in the First Amended Complaint.

## FIRST COUNTERCLAIM

### DECLARATION OF NONINFRINGEMENT OF THE ATI PATENTS

3.    ENA repeats and realleges the allegations of paragraphs 1, 2 and 4 of these Counterclaims.

4.    ENA has not infringed and is not infringing, either directly, contributorily, or by active inducement, any claim of the ATI Patents.

5.    ENA has not infringed and is not infringing, either directly, contributorily, or by active inducement, any claim of the '387, '451, '414, or the '701 Patents by ENA's supply to GM.

## SECOND COUNTERCLAIM

### DECLARATION OF INVALIDITY OF THE ATI PATENTS

6.    ENA repeats and realleges the allegations of paragraphs 1, 2 and 4 of these Counterclaims.

7.    The ATI Patents are invalid and void for failure to comply with the requirements of Title 35, United States Code, including, but not limited to, §§ 102, 103, and 112.

## THIRD COUNTERCLAIM

### DECLARATION OF NONINFRINGEMENT OF U.S. PATENT NO. 6,950,022

8.    ENA repeats and realleges the allegations of paragraphs 1 and 3 of these Counterclaims.

11

9.     ENA has not infringed and is not infringing, either directly, contributorily, or by active inducement, any claim of the '022 Patent.

## FOURTH COUNTERCLAIM
## DECLARATION OF INVALIDITY OF U.S. PATENT NO. 6,950,022

10.     ENA repeats and realleges the allegations of paragraphs 1 and 3 of these Counterclaims.

11.     The '022 Patent is invalid and void for failure to comply with the requirements of Title 35, United States Code, including, but not limited to, §§ 102, 103, and 112.

## EXCEPTIONAL CASE

ATI's attempt to read the claims of the patents-in-suit on the activities and products of ENA makes this case exceptional under 35 U.S.C. § 285.

## PRAYER FOR RELIEF

WHEREFORE, ENA prays for a judgment:

a)   dismissing ATI's First Amended Complaint with prejudice;

b)   declaring that ENA has not infringed any claim of the ATI Patents and the '022 Patent;

c)   declaring that ENA has not infringed any claim of the'387, '451, '414, and '701 Patents by ENA's supply to GM;

d)   declaring that the ATI Patents and the '022 Patent are invalid;

e)   adjudging this case to be an exceptional case pursuant to 35 U.S.C. § 285, and awarding ENA its costs and attorneys' fees; and

f)   granting such other and further relief as the Court may deem just and proper.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Thomas C. Grimm*

Thomas C. Grimm (#1098)
Benjamin J. Schladweiler (#4601)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE 19899-1347
tgrimm@mnat.com
bschladweiler@mnat.com
(302) 658-9200

OF COUNSEL:                          *Attorneys for Defendants*

Timothy Q. Delaney
Ralph J. Gabric
Miyoung Shin
Rickard DeMille
BRINKS HOFER GILSON & LIONE
NBC Tower - Suite 3600
455 North Cityfront Plaza Drive
Chicago, IL 60611
(312) 321-4200

June 12, 2006
524383

13

## CERTIFICATE OF SERVICE

I hereby certify that on June 12, 2006, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF which will send notification of such filing to the following:

    Richard K. Herrmann, Esquire
    MORRIS, JAMES, HITCHENS & WILLIAMS LLP

Additionally, I hereby certify that true and correct copies of the foregoing were caused to be served on June 12, 2006 upon the following individuals in the manner indicated:

**BY HAND**

    Richard K. Herrmann, Esquire
    MORRIS, JAMES, HITCHENS & WILLIAMS LLP
    222 Delaware Avenue, 10th Floor
    Wilmington, DE 19801

**BY FACSIMILE**

    Andrew Kochanowski, Esquire
    SOMMERS SCHWARTZ, P.C.
    2000 Town Center, Suite 900
    Southfield, MI 48075
    (248) 746-4001 (fax)

    Michael H. Baniak, Esquire
    BANIAK PINE & GANNON
    150 N. Wacker Drive, Suite 1200
    Chicago, IL 60606
    (312) 673-0361 (fax)

                         */s/ Thomas C. Grimm*
                         Thomas C. Grimm (#1098)
                         tgrimm@mnat.com

524383

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| AUTOMOTIVE TECHNOLOGIES INTERNATIONAL, INC., | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) Civil Action No. 06-187-GMS ) |
| AMERICAN HONDA MOTOR CO., INC., ELESYS NORTH AMERICA, INC., and GENERAL MOTORS CORPORATION, | ) ) ) ) |
| Defendants. | ) ) |

## ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIMS OF GENERAL MOTORS CORPORATION

Pursuant to Fed. R. Civ. P. 8 and 12, Defendant General Motors Corporation ("GM") answers the First Amended Complaint of Automotive Technologies International, Inc. ("ATI") as follows:

### PARTIES, JURISDICTION AND VENUE

1.     Plaintiff Automotive Technologies International, Inc. ("ATI") is a Delaware corporation.

**ANSWER:**

Admitted.

2.     Defendant American Honda Motor Company ("Honda") is a California corporation. Defendant Honda imports and sells in the United States automobiles manufactured in Japan and the United States under the "Honda" and "Acura" names.

**ANSWER:**

GM is without knowledge or information sufficient to form a belief as to the truth of allegations in paragraph 2, and therefore denies these allegations.

3.    Defendant Elesys North America, Inc. ("Elesys") is a Georgia corporation. Elesys is a supplier of products to the automotive industry.

**ANSWER:**

GM is without knowledge or information sufficient to form a belief as to the truth of allegations in paragraph 3, and therefore denies these allegations.

4.    Defendant General Motors Corporation ("GM") is a Delaware corporation. GM sells vehicles in the United States under the "Buick," "Pontiac," and "Saturn" names, among others.

**ANSWER:**

Admitted.

5.    This is an action for patent infringement. All of the acts of patent infringement complained of in this Complaint occurred, among other places, within this judicial district.

**ANSWER:**

GM admits that this purports to be an action for alleged patent infringement. GM denies the remaining allegations of paragraph 5.

6.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1338(a) and 28 U.S.C. §1331 over this infringement action, arising under the Patent Act, 35 U.S.C. § 1 et seq., including §§ 271 and 281-285.

**ANSWER:**

Admitted.

7.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b), (c) and 28 U.S.C. § 1400(b). The Court has personal jurisdiction over each of the parties.

**ANSWER:**

Admitted. Pursuant to 28 U.S.C. § 1404(a), however, venue is most proper in the United States District Court for the Eastern District of Michigan.

2

### GENERAL ALLEGATIONS

8.    The following patents have been issued duly and legally to Plaintiff ATI on the following dates:

a.    U.S. Patent No. 5,901,978 entitled "Method and Apparatus for Detecting the Presence of a Child Seat," issued May 11, 1999. (Exhibit 1)

b.    U.S. Patent No. 6,242,701 entitled "Apparatus and Method for Measuring Weight of an Occupying Item of a Seat," issued June 5, 2001. (Exhibit 2)

c.    U.S. Patent No. 6,325,414 entitled "Method and Arrangement for Controlling Deployment of a Side Airbag," issued December 4, 2001. (Exhibit 3)

d.    U.S. Patent No. 6,397,136 entitled "System for Determining the Occupancy State of a Seat in a Vehicle," issued May 28, 2002. (Exhibit 4)

e.    U.S. Patent No. 6,422,595 entitled "Occupant Position Sensor and Method and Arrangement for Controlling a Vehicular Component Based on an Occupant's Position," issued July 23, 2002. (Exhibit 5)

f.    U.S. Patent No. 6,869,100 entitled "Method and Apparatus for Controlling an Airbag," issued March 22, 2005. (Exhibit 6)

g.    U.S. Patent No. 6,757,602 entitled "System For Determining the Occupancy State of a Seat in a Vehicle and Controlling a Component Based Thereon," issued June 29, 2004. (Exhibit 7)

h.    U.S. Patent No. 6,712,387 entitled "Method and Apparatus for Controlling Deployment of a Side Airbag," issued March 30, 2004. (Exhibit 8)

i.    U.S. Patent No. 6,942,248 entitled "Occupant Restraint Device Control System and Method," issued September 13, 2005. (Exhibit 9)

j.    U.S. Patent No. 6,958,451 entitled "Apparatus and Method for Measuring Weight of an Occupying Item of a Seat," issued October 25, 2005. (Exhibit 10)

k.    U.S. Patent No. 6,484,080 entitled "Method and Apparatus for Controlling a Vehicular Component," issued November 19, 2002. (Exhibit 11)

3

       1.      U.S. Patent No. 6,850,824 entitled "Method and Apparatus for Controlling a Vehicular Component," issued February 1, 2005. (Exhibit 12)

**ANSWER:**

GM admits that U.S. Patent Nos. 5,901,978, 6,242,701, 6,325,414, 6,397,136, 6,422,595, 6,869,100, 6,757,602, 6,712,387, 6,942,248, 6,958,451, 6,484,080 and 6,850,824 ("the ATI Patents") are attached to the Plaintiff's First Amended Complaint as Exhibits 1-12, respectively. GM admits that ATI is the listed assignee on the face of the ATI Patents. GM admits that the ATI Patents have titles of inventions and the issue dates identified in paragraph 8, a-1. GM is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 8, and therefore denies the remaining allegations.

## PATENT INFRINGEMENT

      9.      All of the patents set forth in paragraph 8, a-1 (collectively, "the ATI Patents"), are valid, subsisting, enforceable, and are presently owned by ATI and have been owned by ATI for all times relevant hereto.

**ANSWER:**

GM denies that all of the patents set forth in paragraph 8, a-1 are valid. GM is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 9, and therefore denies these allegations.

      10.     The general subjects covered by the ATI Patents include, but are not limited to occupant sensing, position sensing, weight sensing, airbag deployment, and related systems as used in a vehicle containing airbags.

**ANSWER:**

GM admits that some of the subjects identified in paragraph 10 are addressed in some of the ATI Patents. GM is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 10, and therefore denies these allegations.

11.    Among the products made, sold, used, or imported by Elesys are the following:

    a.    "Passenger Sensing System";
    b.    "Seat Sentry System";
    c.    "Occupant Detection System"; and
    d.    "Low Risk Deployment System".

**ANSWER:**

GM admits that Elesys North America, Inc. (ENA) sold the electronic control units

("ECUs") and sensor assemblies for the Passenger Sensing System to GM. GM is without

knowledge or information sufficient to form a belief as to the truth of the remaining allegations

in paragraph 11, and therefore denies these allegations.

12.    Elesys sells some or all of the above systems, either singularly or in combination, to Defendants Honda and GM. Upon information and belief, Elesys has supplied Honda since approximately 2001. Upon information and belief, Elesys has supplied GM since 2004. Elesys has recently announced the intention to supply the product systems, or some of them, to approximately 1.1 million additional GM vehicles.

**ANSWER:**

GM admits that ENA has sold the ECUs and the sensor assemblies for the Passenger

Sensing System to GM since at least 2004. GM is without knowledge or information sufficient

to form a belief as to the truth of the remaining allegations in paragraph 12, and therefore denies

these allegations.

13.    All of the product systems referenced above infringe, directly or by contributory infringement, the ATI Patents. None of the Defendants has any right or license from ATI under the ATI Patents.

**ANSWER:**

GM admits that GM has no license from ATI under the ATI Patents. GM denies the

remaining allegations in paragraph 13.

**ANSWER:**

GM is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 14, and therefore denies these allegations.

15.   Upon information and belief, additional Honda and Acura models to those listed in paragraph 14 have been equipped with the OPDS system, and continue to be sold in the United States with the OPDS system.

**ANSWER:**

GM is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 15, and therefore denies these allegations.

16.   Each of the vehicles listed above, and those vehicles not specifically listed but which use the system described above, infringe the ATI Patents.

**ANSWER:**

GM is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 16, and therefore denies these allegations.

17.   Defendant Honda markets and sells these models to the public.  Defendant will continue to do so unless enjoined by this Court.

**ANSWER:**

GM is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 17, and therefore denies these allegations.

18.   Defendant GM makes, uses, and sells vehicles which employ some or all of the Elesys product systems set forth above in paragraph 11, called in some instance, the Passenger Presence System.  Certain GM vehicles use the Elesys systems in conjunction with seatbelt sensors.  The Elesys system in GM vehicles comprises and controls, or works in conjunction with a controller for, among other things, suppressing or allowing the deployment of side airbags and side curtain airbags in a vehicle equipped with the system(s).  Upon information and belief the Elesys systems are supplied in the following GM vehicles:

7

| Year | Model |
|------|-------|
| 2005 | Pontiac G6 |
| 2006 | Pontiac G6 |
| 2005 | Pontiac Grand Prix |
| 2006 | Pontiac Grand Prix |
| 2005 | Saturn Ion |
| 2006 | Saturn Ion |
| 2005 | Saturn Vue |
| 2006 | Saturn Vue |
| 2005 | Buick LaCrosse |
| 2006 | Buick LaCrosse |

**ANSWER:**

GM admits that GM made, used and sold vehicles containing the Passenger Sensing System. GM admits that the following vehicles employ the Passenger Sensing System: 2006 Pontiac G6, 2006 Pontiac Grand Prix, 2006 Saturn Ion, 2006 Saturn Vue, 2005 Buick LaCrosse and 2006 Buick LaCrosse. GM denies the remaining allegations of paragraph 18.

19.    Upon information and belief, GM makes and sells other models than those listed in Paragraph 17 [sic, 18] with the Passenger Presence System or other-named system using Elesys products. Each of the vehicles listed above, and those vehicles not specifically listed but which use the system described above, infringe the ATI Patents set forth in paragraph 8, with the exception of the '387, '451, '414, and '701 Patents. Defendant GM markets and sells these models to the public. Defendant will continue to do so unless enjoined by this Court.

**ANSWER:**

GM admits that it marketed and sold to the public vehicles listed in the table of paragraph 18. GM denies the remaining allegations in paragraph 19.

20.    At least as early as February, 2004, ATI advised Elesys of the existence of various of the above-listed patents and sought to discuss the license of the ATI Patents to Elesys. Elesys was formed as a joint venture between Defendant Honda and a third-party, NEC, Inc., another automotive supplier. Upon information and belief, as of February, 2004, Honda had knowledge of various of the ATI patents at issue in this case. Additionally, certain of the patents at issue in this action have been actually known to NEC and Honda, Japan, earlier than February, 2004.

**ANSWER:**

GM is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 20, and therefore denies these allegations.

21.     In addition to the above, beginning in October, 2005, ATI placed Honda on notice of certain patents at issue in this lawsuit via written communications with Koichi Kondo, William R. Willen, of Honda, and Takeo Oi, Intellectual Property Division of Honda Motor Company, Ltd. in Japan. As a result, Honda has known of certain if not all of the patents at issue in this case prior to this Complaint.

**ANSWER:**

GM is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 21, and therefore denies these allegations.

## AFFIRMATIVE DEFENSES

Further responding to ATI's First Amended Complaint, GM asserts the following affirmative defenses and reserves the right to amend its Answer as additional information becomes available:

1.     ATI's claims are barred by laches and estoppel.

2.     GM incorporates by reference as affirmative defenses the allegations set forth below supporting its Counterclaims.

## COUNTERCLAIMS

For its Counterclaims against ATI, GM states as follows:

1.     This Court has jurisdiction over these Counterclaims pursuant to Rule 13, Fed. R. Civ. P. Jurisdiction in this Court also is proper pursuant to 28 U.S.C. §§ 1331, 1338(a), 2201, and 2202. Venue is proper for these Counterclaims because ATI elected this forum for suit and

9

pursuant to 28 U.S.C. §§ 1391(c) and 1400(b).  Pursuant to 28 U.S.C. § 1404(a), venue is also

proper in the United States District Court for the Eastern District of Michigan.

2.    An actual controversy exists between the parties as to the asserted infringement,

validity, and enforceability of the U.S. Patent Nos. 5,901,978, 6,397,136, 6,422,595, 6,869,100,

6,757,602, 6,942,248, 6,484,080, and 6,850,824 ("Patents-in-suit").

## FIRST COUNTERCLAIM

### DECLARATION OF NONINFRINGEMENT OF THE PATENTS-IN-SUIT

3.    GM repeats and realleges the allegations of paragraphs 1 through 2 of these

Counterclaims.

4.    GM has not infringed and is not infringing, either directly, contributorily, or by

active inducement, any claim of the Patents-in-suit.

## SECOND COUNTERCLAIM

### DECLARATION OF INVALIDITY OF THE PATENTS-IN-SUIT

5.    GM repeats and realleges the allegations of paragraphs 1 through 2 of these

Counterclaims.

6.    The Patents-in-suit are invalid and void for failure to comply with the requirements

of Title 35, United States Code, including, but not limited to, §§ 102, 103, and 112.

### EXCEPTIONAL CASE

ATI's attempt to read the claims of the patents-in-suit on the activities and products of GM

make this case exceptional under 35 U.S.C. § 285.

### PRAYER FOR RELIEF

WHEREFORE, GM prays for a judgment:

a)    dismissing ATI's First Amended Complaint with prejudice;

10

b) declaring that GM has not infringed any claim of the Patents-in-suit;

c) declaring that the Patents-in-suit are invalid;

d) adjudging this case to be an exceptional case pursuant to 35 U.S.C. § 285, and awarding

GM its costs and attorney fees; and

e) granting such other and further relief as the Court may deem just and proper.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Thomas C. Grimm*
_____
Thomas C. Grimm (#1098)
Benjamin J. Schladweiler (#4601)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE  19899-1347
tgrimm@mnat.com
bschladweiler@mnat.com
(302) 658-9200
     *Attorneys for Defendants*

OF COUNSEL:

Timothy Q. Delaney
Ralph J. Gabric
Miyoung Shin
Rickard DeMille
BRINKS HOFER GILSON & LIONE
NBC Tower - Suite 3600
455 North Cityfront Plaza Drive
Chicago, IL  60611
(312) 321-4200

June 12, 2006
524384

11

## CERTIFICATE OF SERVICE

I hereby certify that on June 12, 2006, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF which will send notification of such filing to the following:

> Richard K. Herrmann, Esquire
> MORRIS, JAMES, HITCHENS & WILLIAMS LLP

Additionally, I hereby certify that true and correct copies of the foregoing were caused to be served on June 12, 2006 upon the following individuals in the manner indicated:

### BY HAND

> Richard K. Herrmann, Esquire
> MORRIS, JAMES, HITCHENS & WILLIAMS LLP
> 222 Delaware Avenue, 10th Floor
> Wilmington, DE 19801

### BY FACSIMILE

> Andrew Kochanowski, Esquire
> SOMMERS SCHWARTZ, P.C.
> 2000 Town Center, Suite 900
> Southfield, MI 48075
> (248) 746-4001 (fax)

> Michael H. Baniak, Esquire
> BANIAK PINE & GANNON
> 150 N. Wacker Drive, Suite 1200
> Chicago, IL 60606
> (312) 673-0361 (fax)

> /s/ Thomas C. Grimm
> Thomas C. Grimm (#1098)
> tgrimm@mnat.com

524384

# EXHIBIT   2

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

AUTOMOTIVE TECHNOLOGIES
INTERNATIONAL, INC.,
a Delaware corporation,

       Plaintiff,

vs.

AMERICAN HONDA MOTOR COMPANY,
a California corporation,
ELESYS NORTH AMERICA, INC.,
a Georgia corporation, and
GENERAL MOTORS CORPORATION,
a Delaware corporation,

       Defendants.

_____/

Case No. 1:06-CV-00187-GMS
Hon. Judge Gregory M. Sleet

## DECLARATION OF DAVID BREED

I, David Breed, under penalty of perjury do testify as follows:

1.     I am the Chairman and Chief Executive Officer of Plaintiff, ATI, Inc.  I have a degree from Carlton College, a BA in physics, a Bachelors and Masters Degrees in mechanical engineering from MIT, a Masters Degree in industrial management from MIT, and a Ph.D. in mechanical engineering from Columbia University in 1972.  While in school, beginning in the early 1960's, I began work with Breed Corporation, a company formed by my brother and myself.  I worked at Breed Corporation on a full time basis from 1963 to 1988.

2.     In the late 1960's Breed Corporation began being involved in developing automotive sensors.  I am intimately familiar with the automotive safety sensor business.

3.     When I left Breed Corporation in 1988, I acquired ATI to develop next-generation auto safety products.  These included crash sensors for occupant restraint systems, other

occupant sensors, airbag designs, and related projects. I have over 150 issued patents in this field. While ATI has from time to time been involved in developing commercial products, the bulk of our work lies in research and patent development.

4.    Since acquiring ATI, I have had the company primarily engaged in research and development towards automotive safety products. At various times the company has had a physical office in the Metropolitan Detroit area for convenience, to allow us to present talks and lectures to various automotive suppliers and manufacturers, as well as to conduct some of our prototype activities. However, towards the end of 2005, we made a decision to close that office, which was only staffed by one or two people, and to conduct our prototyping and research activities largely off-shore. For the past four or five years, ATI has employed on a consulting basis a variety of scientists in Ukraine. The bulk of our research activity, to the extent is has a physical location, has been conducted in Ukraine throughout this time.

5.    I understand that references have been made in Defendants' motion to transfer regarding my ownership of a summer home in Pentwater, Michigan. First, I do not own that home, it is held in joint tenancy with a relative. Second, I use that home for brief summer vacations. Third, I may point out that the home in located in the Western District of Michigan. My primary residence is in Boonton Township, New Jersey.

6.    All of the patents involved in this case were prosecuted by Brian Roffe, ATI's long-standing patent lawyer. Some of the initial applications that led to the patents-in-suit were prepared by Karl Milde. Mr. Roffe lives in the greater New York area, and Mr. Milde in Westchester County, New York.

7.    All of our material business dealings with Autoliv, including our licenses with Autoliv, were with Autoliv's Swedish personnel, and took place in Sweden.

FURTHER AFFIANT SAYETH NOT.

DAVID S. BREED

June 20, 2006

# EXHIBIT 3

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

AUTOMOTIVE TECHNOLOGIES
INTERNATIONAL, INC.,
a Delaware corporation,

      Plaintiff,

vs.

AMERICAN HONDA MOTOR COMPANY,
a California corporation,
ELESYS NORTH AMERICA, INC.,
a Georgia corporation, and
GENERAL MOTORS CORPORATION,
a Delaware corporation,

      Defendants.
_____/

Case No. 1:06-CV-00187-GMS
Hon. Judge Gregory M. Sleet

## DECLARATION OF RAY PIIRAINEN

I, Ray Piirainen, under penalty of perjury do testify as follows:

1.     I am an employee of ATI, Inc.  I've been employed by ATI since July 18, 1997.  My duties for ATI include accounting and general administrative work.  I am familiar with the operation of ATI and the facts set forth in this Declaration.

2.     ATI currently has four employees worldwide.  These include myself, my wife Nancy Piirainen (who also performs administrative duties), ATI's chairman and CEO David Breed, and a part-time employee hired in June of this year, who also lives in New Jersey.  David Breed is located in Boonton, New Jersey.  I and Nancy Piirainen are located outside Charlotte, North Carolina.  To the extent that ATI has any one place in which its administrative business is conducted, it is here in North Carolina.

3.    ATI is largely a research and development company, although from time to time it has developed commercialized prototypes and products. The bulk of its efforts, however are directed toward research and patenting that research. ATI conducts its business largely through consulting arrangements with various individuals. Some of these individuals have had long time relationships with ATI, which was started in 1988. The five consultants currently include the following: Will DuVall, one of the named inventors on the subject patents-in-suit, who is located in Branson West, Missouri. Another consultant for ATI is Wendell Johnson, who is located in Hawaii. Both DuVall and Johnson contractually act on behalf of ATI and will come to trial in Delaware unless health reasons interfere. Ryan Breed has been retained as of June 1, 2006 through September 2006 as a consultant. ATI also has two other consultants, both located in Kiev, Ukraine Republic.

4.    In addition to formal retained consultants, ATI has business relationships with numerous other researchers and scientists. The majority of these scientists are located in the Ukraine. Others who have a relationship with ATI include Vittorio Castelli, who lives in Yorktown Heights, New York and in Rome, Italy.

5.    ATI has no employees or other consultants, or other individuals with whom it has a business relationship, who reside in the Eastern District of Michigan.

6.    At the time of filing of this lawsuit on March 17, 2006, ATI had no office in the Eastern District of Michigan. While ATI at one time did have an office and a prototype shop in Rochester Hills, Michigan and in Auburn Hills, Michigan, which was used by a few employees and consultants, these offices are no longer in existence. ATI has no telephone number in the State of Michigan, and does not receive any mail in the Eastern District of Michigan. The

2

references to ATI's offices and business presence cited in Defendants' motion to transfer were at one time accurate, but are no longer true.

7.     ATI maintains virtually no paper records.   Several years ago, ATI digitized virtually all of its records, and maintains a practice of keeping only digital records for its operations.  The only known exception to this are records stored by our patent counsel Brian Roffe in Valley Stream, New York, financial records stored in North Carolina and litigation-related records maintained by our outside litigation counsel.  It is our practice to produce records electronically.  All of the records that we would produce in this case are stored on servers in California and New Jersey.

8.     I have recently personally spoken with Jeffrey Morin and Andrew Varga, two former ATI employees who are named inventors on two of the patents at issue.  Both have recently indicated to me that they are willing to come to Delaware for trial of this case if necessary. I am aware from having spoken to her within the past year, that Kunghong Xu, a named inventor on one of the patents at issue, is currently working for General Motors. I have not been able to get in touch with her, but would expect General Motors to make her available for trial in Delaware.

FURTHER AFFIANT SAYETH NOT.

RAY PIIRAINEN
June 20, 2006

3

# EXHIBIT 4

**030310 Honda, NEC venture supplies electronic safety systems**

**By Julie Cantwell**
**Automotive News / March 10, 2003**

DETROIT -- Honda Motor Co. and NEC Solutions have formed a business to sell occupant-sensing technology to other automakers.

Elesys North America Inc. of McDonough, Ga., was incorporated in October, but the company used last week's SAE World Congress to talk about its business plans.

Honda owns two-thirds and NEC owns the remaining one-third of Elesys North America, which is a subsidiary of Honda Elesys Co. Ltd. of Yokohama, Japan. The company is the spinoff of NEC's Automotive Electronics Division.

Elesys North America's president, Akio Kobayashi, 52, was with Honda r&d for 25 years, the past 15 years as chief engineer.

Elesys' key technology is the SeatSentry Occupant Sensing System, licensed from the Massachusetts Institute of Technology.

The product relies on wires embedded underneath the seat cover to generate an electromagnetic field that detects the size of a seat occupant and whether he or she is out of position.

**Not based on weight**

The product is used in Honda and Acura vehicles to determine when to deactivate the side-impact airbags. It will be configured to control the front airbags by Sept. 1, in time to meet the National Highway Traffic Safety Administration's new regulations for detecting children and small adults, said Philip Rittmueller, 60, vice president of Elesys North America.

"Most of our competitors' systems rely on pressure or weight for detection," said Rittmueller, who was a vice president for NEC Solutions. "This (SeatSentry) is not necessarily a weight-based system. It's used more to look at the effective area of a person sitting down. It doesn't matter how tight the seat belt is."

Elesys also plans to sell its technology to seat makers that supply automakers other than Honda.

Rittmueller would not disclose sales goals but said the company expects to turn a profit in about three years.

He said the SeatSentry would add less than $100 to the cost of a vehicle. The system is designed to last 15 years. Rittmueller declined to estimate the cost to repair or replace it.

**Big 3 interested**

The company already has a production contract with one of the Big 3 automakers, a spokesman said, but he did not identify the automaker or disclose production timing. He said contract discussions are under way with the two remaining Big 3 carmakers.

Elesys has 200 employees globally, including 53 in the United States. The company has an office in

Plymouth, Mich., called the Detroit Safety Center, to handle sales, program management and engineering support.

Elesys also supplies technology for electronic power steering, traction control systems, antilock braking systems and supplemental restraint systems for crash sensing.

The company also is developing adaptive cruise control, millimeter wave radar, a lane recognition system and an advanced occupant posture detection system.

# EXHIBIT   5

## Additional Information About Your Seat Belts

If a seat belt is worn during a crash, it must be replaced by the dealer. A belt that has been worn during a crash may not provide the same level of protection in a subsequent crash.

The dealer should also inspect the anchors for damage and replace them if needed. If the automatic seat belt tensioners activate during a crash, they must be replaced.

For information on how to clean your seat belts, see page 234 .

⚠ **WARNING**

Not checking or maintaining seat belts can result in serious injury or death if the seat belts do not work properly when needed.

Check your seat belts regularly and have any problem corrected as soon as possible.

19

# Additional Information About Your Airbags

## Airbag System Components



[1] Driver's Airbag
[2] Front Passenger's Airbag
[3] Control Unit
[4] Front Seat Belt Tensioners
[5] Side Airbags
[6] Driver's Seat Position Sensor
[7] Front Passenger's Weight Sensors
[8] Front Impact Sensors
[9] Passenger Airbag Off Indicator
[10] Side Impact Sensors
[11] Occupant Position Detection System (OPDS) Sensors
[12] SRS Indicator



Your airbag system includes:

• Two SRS (Supplemental Restraint System) front airbags. The driver's airbag is stored in the center of the steering wheel; the front passenger's airbag is stored in the dashboard. Both are marked "SRS AIRBAG" (see page 22 ).

• Two side airbags, one for the driver and one for a front passenger. The airbags are stored in the outer edges of the seat-backs. Both are marked "SIDE AIRBAG" (see page 25 ).

• Two side curtain airbags, one for each side of the vehicle. The airbags are stored in the ceiling above the side windows. The front and rear pillars are marked "SIDE CURTAIN AIRBAG" (see page 27 ).

20

# EXHIBIT   6

US005948031A

# United States Patent [19]

## Jinno et al.

[11] Patent Number: 5,948,031

[45] Date of Patent: *Sep. 7, 1999

[54] **VEHICLE PASSENGER SENSING SYSTEM AND METHOD**

[75] Inventors: **Kazunori Jinno**, Morrow, Ga.; **Saikichi Sekido**, Tokyo, Japan; **Philip H. Rittmueller**, St. Charles, Ill.

[73] Assignee: **NEC Technologies, Inc.**, Itasca, Ill.

[*] Notice: This patent issued on a continued prosecution application filed under 37 CFR 1.53(d), and is subject to the twenty year patent term provisions of 35 U.S.C. 154(a)(2).

[21] Appl. No.: 08/606,175

[22] Filed: **Feb. 23, 1996**

[51] Int. Cl.⁶ ............................................... B60R 21/00
[52] U.S. Cl. ....................................... 701/45; 280/735
[58] Field of Search ........................ 364/424.055, 424.056, 364/424.057; 280/732, 735, 734; 340/457.1; 701/45, 46, 47; 180/268, 271, 272

[56] **References Cited**

### U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 3,219,925 | 11/1965 | Borley et al. |
| 3,732,538 | 5/1973 | Gilhaud et al. .......... 340/457.1 |
| 3,740,567 | 6/1973 | Atkins ..................... 307/10 SB |
| 3,781,672 | 12/1973 | Maltby et al. |
| 3,843,924 | 10/1974 | Wahlgren |
| 3,863,209 | 1/1975 | Hollins ...................... 340/52 E |
| 4,136,291 | 1/1979 | Waldron |
| 4,614,937 | 9/1986 | Poujois |
| 4,688,141 | 8/1987 | Bernard et al. |
| 4,700,973 | 10/1987 | Gockmann et al. ............ 280/735 |
| 4,796,013 | 1/1989 | Yasuda et al. ............... 340/562 |
| 4,885,566 | 12/1989 | Aoki et al. ................ 340/457.1 |
| 4,887,024 | 12/1989 | Sugiyama et al. |
| 4,958,129 | 9/1990 | Poduje et al. |
| 4,972,154 | 11/1990 | Beckel et al. |
| 4,980,519 | 12/1990 | Matthews |
| 5,002,308 | 3/1991 | Lenzen et al. ............... 280/735 |
| 5,071,160 | 12/1991 | White et al. ................ 280/735 |
| 5,074,583 | 12/1991 | Fujita et al. ............... 280/735 |

5,087,825   2/1992   Ingraham .

(List continued on next page.)

### FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| 60025475 | 8/1985 | European Pat. Off. . |
| 63094102 | 4/1988 | European Pat. Off. . |
| 63241402 | 6/1988 | European Pat. Off. . |
| 0 302 727 A2 | 8/1989 | European Pat. Off. . |
| WO 90/16065 | 12/1990 | European Pat. Off. . |
| 0 441 381 A1 | 8/1991 | European Pat. Off. . |
| WO 92/09063 | 5/1992 | European Pat. Off. . |
| 0 609 021 A2 | 3/1994 | European Pat. Off. . |
| WO 94/23974 | 10/1994 | European Pat. Off. . |
| WO 95/21752 | 8/1995 | European Pat. Off. . |
| WO 96/09193 | 3/1996 | European Pat. Off. . |
| WO 96/36134 | 11/1996 | European Pat. Off. . |
| WO 97/31238 | 8/1997 | European Pat. Off. . |
| 44 17 827 A1 | 11/1995 | Germany . |
| 1573582 | 8/1980 | United Kingdom . |

### OTHER PUBLICATIONS

Thomas G. Zimmerman, et al. "Applying Electric Field Sensing To Human-Computer Interfaces" (8 pages) (Oct. 6, 1994).

Leonard M. Magid, "Electromagnetic Fields, Energy, And Waves" (2 pages) (1972).

*Primary Examiner*—William A. Cuchlinski, Jr.
*Assistant Examiner*—Edward J. Pipala
*Attorney, Agent, or Firm*—Brinks Hofer Gilson & Lione

[57] **ABSTRACT**

A vehicle passenger sensing system and method in which the presence and position of a passenger is determined by transmitting an electric field from a first electrode and measuring currents induced by the electric field in a plurality of receiver electrodes. The induced currents at the various receiver electrodes are then compared to determine the presence of an adult size passenger, to distinguish between front-facing and rear-facing child safety seats, and to detect when a passenger is out of position. A switching circuit is provided to selectively transmit the electric field from each of the plurality of electrodes.

**20 Claims, 8 Drawing Sheets**



ATI 5067

US006043743A

# United States Patent [19]

## Saito et al.

[11] Patent Number: **6,043,743**

[45] Date of Patent: **Mar. 28, 2000**

[54] PASSENGER DETECTING SYSTEM AND PASSENGER DETECTING METHOD

[75] Inventors: Takashi Saito, Osaka; Masahiro Otuji, Kanagawa; Kazunori Jinno, Osaka; Masanori Sugino, Kanagawa, all of Japan

[73] Assignee: NEC Corporation, Japan

[21] Appl. No.: 09/028,282

[22] Filed: Feb. 25, 1998

[30] Foreign Application Priority Data

| Feb. 26, 1997 | [JP] | Japan | 9-042649 |
| Feb. 26, 1997 | [JP] | Japan | 9-042650 |
| Feb. 26, 1997 | [JP] | Japan | 9-042651 |
| Feb. 26, 1997 | [JP] | Japan | 9-042652 |

[51] Int. Cl.$^7$ .......................................... G08B 13/26

[52] U.S. Cl. ..................... 340/562; 280/735; 180/271

[58] Field of Search .......................... 340/562, 573.4, 340/870.37; 280/728.1, 728.2, 734, 735; 180/271, 273

[56] **References Cited**

U.S. PATENT DOCUMENTS

| 4,887,024 | 12/1989 | Sugiyama et al. | 324/61 R |
| 5,446,391 | 8/1995 | Aoki et al. | 324/661 |
| 5,570,903 | 11/1996 | Meister et al. | 280/735 |
| 5,618,056 | 4/1997 | Schoos et al. | 280/735 |
| 5,722,686 | 3/1998 | Blackburn et al. | 280/735 |
| 5,724,024 | 3/1998 | Sonderegger et al. | 340/562 |
| 5,760,688 | 6/1998 | Kasai | 340/561 |
| 5,802,479 | 9/1998 | Kithil et al. | 701/45 |

FOREIGN PATENT DOCUMENTS

| 6-65532 | 8/1994 | Japan . |
| 9-509118 | 9/1997 | Japan . |
| 95 21752 | 8/1995 | WIPO . |

Primary Examiner—Jeffery A. Hofsass
Assistant Examiner—Toan N. Pham
Attorney, Agent, or Firm—Ostrolenk, Faber, Gerb & Soffen, LLP

[57] **ABSTRACT**

A passenger detecting system is disclosed, that comprises a seat, a plurality of electrodes disposed at predetermined intervals on at least the front surface of the seat, an oscillating circuit for generating a weak electric field between at least one particular electrode (referred to as a first type electrode) of the electrodes and the other electrodes (referred to as second type electrodes), a current/voltage converting circuit for detecting displacement currents that flow corresponding to the weak electric field and for converting the displacement currents into respective voltages, a controlling circuit for detecting a seating pattern of an passenger or the like on the seat corresponding to output signals of the current/voltage converting circuit, and an air bag device for inflating an air bag in case of a collision.

48 Claims, 26 Drawing Sheets







US006161070A

## United States Patent [19]

Jinno et al.

[11] Patent Number: 6,161,070

[45] Date of Patent: Dec. 12, 2000

[54] PASSENGER DETECTION SYSTEM

[75] Inventors: Kazunori Jinno, Tokyo; Masahiro Ohji, Kanagawa, both of Japan

[73] Assignee: NEC Home Electronics, Inc., Tokyo, Japan

[21] Appl. No.: 09/145,309

[22] Filed: Aug. 31, 1998

### Related U.S. Application Data

[63] Continuation-in-part of application No. 08/606,175, Feb. 23, 1996, Pat. No. 5,948,031.

[30]    Foreign Application Priority Data

Sep. 3, 1997 [JP] Japan ............................ 97-238272

[51] Int. Cl.$^7$ ........................................ B60R 21/00
[52] U.S. Cl. ............................ 701/45; 280/735
[58] Field of Search .................... 701/45, 46, 47;
280/728.1, 732, 734, 735; 180/268, 271,
272; 340/438, 457.1, 500

[56]            References Cited

### U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 3,219,925 | 11/1965 | Borley et al. . |
| 3,732,538 | 5/1973 | Gillund et al. . |
| 3,740,567 | 6/1973 | Atkins . |
| 3,781,672 | 12/1973 | Maltby et al. . |
| 3,843,924 | 10/1974 | Wahlgren . |
| 3,863,209 | 1/1975 | Hollins . |
| 5,002,308 | 3/1991 | Lenzen et al. . |

(List continued on next page.)

### FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| 0302727A2 | 2/1989 | European Pat. Off. . |
| 0443381A1 | 8/1991 | European Pat. Off. . |
| 0609021A2 | 8/1994 | European Pat. Off. . |
| 4417827A1 | 11/1995 | Germany . |
| 60025475 | 2/1985 | Japan . |
| 63094102 | 4/1988 | Japan . |
| 63241402 | 10/1988 | Japan . |
| 1573582 | 8/1980 | United Kingdom . |

| | | |
|---|---|---|
| WO90/16045 | 12/1990 | WIPO . |
| WO92/09063 | 5/1992 | WIPO . |
| WO94/23974 | 10/1994 | WIPO . |
| WO95/21752 | 8/1995 | WIPO . |

(List continued on next page.)

### OTHER PUBLICATIONS

Magid, L. M. *Electromagnetic Fields, Energy and Waves* (1972), p. 26, published in US.

Paradiso, J. and N. Gershenfeld. "Musical Applications of Electric Field Sensing" (Oct. 1995) to be submitted to Computer Music Journal, pp. 1–25, published in US.

Zimmerman, T. G. et al. "Applying Electric Field Sensing to Human–Computer Interfaces" (Oct. 6, 1994), 8 pages, published in US.

*Primary Examiner*—William A. Cuchlinski, Jr.
*Assistant Examiner*—Edward Pipala
*Attorney, Agent, or Firm*—Craig A. Summerfield; Brinks Hofer Gilson & Lione

[57]            ABSTRACT

A passenger detection system including a single antenna electrode mounted on a surface of a passenger seat in an automobile. An oscillator generates an AC current having a predetermined voltage amplitude that is transmitted to the antenna electrode to produce a minute electric field around the antenna electrode. An amplitude control circuit is used to control the voltage amplitude of the output signal from the oscillator. The electrical characteristics of an object on the passenger seat alter the current and phase of the signal in the antenna electrode. A current detection circuit detects the amount of current flowing from the oscillator to the antenna electrode. In addition, a phase differential detection circuit detects a phase differential between the output signal from the oscillator and the signal on the antenna electrode. A control circuit detects the presence or absence of a passenger seated in the seat based on a current signal output from the current detection circuit and a phase differential signal output from the phase differential detection circuit. A control unit including the oscillator, the amplitude control circuit, the current detection circuit, the phase differential detection circuit and the control circuit, is contained in a single housing that is mounted under the passenger seat.

18 Claims, 14 Drawing Sheets



US006208249B1

(12) **United States Patent**
Saito et al.

(10) Patent No.: **US 6,208,249 B1**
(45) Date of Patent: **Mar. 27, 2001**

(54) **PASSENGER DETECTION SYSTEM**

(75) Inventors: **Takashi Saito**, Osaka; **Masahiro Ofuji**, Kanagawa; **Kazunori Jinno**, Osaka, all of (JP)

(73) Assignee: **NEC Corporation**, Tokyo (JP)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **09/146,231**

(22) Filed: **Sep. 3, 1998**

(30) **Foreign Application Priority Data**

Sep. 3, 1997    (JP) .......................... 9-238272
Sep. 3, 1997    (JP) .......................... 9-238296

(51) Int. Cl.[7] .......................... G08B 13/26
(52) U.S. Cl. .......................... 340/561; 340/562; 340/573.1
(58) Field of Search .......................... 340/435, 561, 340/562, 565, 870.37, 573.4, 436; 324/663, 671, 687; 280/728.1, 728.2, 734, 735; 180/271, 273

(56) **References Cited**

U.S. PATENT DOCUMENTS

5,394,292 * 2/1995 Hayashida .......................... 340/435
5,760,688 * 6/1998 Kasai .......................... 340/561
5,845,000 * 12/1998 Breed et al. .......................... 382/100
6,066,954 * 5/2000 Gershenfeld et al. .......................... 324/671

FOREIGN PATENT DOCUMENTS

9-42650    2/1997 (JP) .

* cited by examiner

*Primary Examiner*—Vane T. Trieu
(74) *Attorney, Agent, or Firm*—Sughrue, Mion, Zinn, Macpeak & Seas, PLLC

(57) **ABSTRACT**

A passenger detection system comprises an antenna electrode, an oscillation circuit, a current detection circuit, a phase difference detection circuit, and a control circuit. The antenna electrode is placed on the upper side of a seat. The oscillation circuit generates a high frequency low voltage oscillation signal in order to generate a weak alternating electric field around the antenna electrode. The current detection circuit detects a transmission current which passes between the oscillation circuit and the antenna electrode according to the weak alternating electric field which is generated around the antenna electrode. The phase difference detection circuit detects the phase difference between the oscillation signal supplied from the oscillation circuit and an output signal which is supplied to the antenna electrode. And the presence or absence of a passenger seated on the seat is judged by the control circuit based on the outputs of the current detection circuit and the phase difference detection circuit. Especially, the passenger detection system needs only one antenna electrode, therefore judgment on the presence or absence of a passenger seated on the seat can be executed with simplified circuit composition and low cost.

27 Claims, 22 Drawing Sheets



US006263271B1

(12) **United States Patent**　　　　(10) **Patent No.:**　US 6,263,271 B1
Oka et al.　　　　　　　　　　　　　(45) **Date of Patent:**　Jul. 17, 2001

(54) **PASSENGER DETECTION SYSTEM COMPRISING SIDE AIRBAG WHICH IS DEPLOYABLE OR NON-DEPLOYABLE ACCORDING TO SEATING CONDITION**

(75) Inventors: **Yoshitaka Oka**, Osaka; **Tsutomu Fukui**, Wako; **Nobuhiro Koyota**, Wako; **Takashi Inou**, Wako; **Kazutomo Isonaga**, Wako, all of (JP)

(73) Assignees: **NEC Corporation**; **Honda Giken Kogyo Kabushiki Kaisha**, both of Tokyo (JP)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **09/394,005**

(22) Filed: **Sep. 10, 1999**

(30) **Foreign Application Priority Data**

Sep. 10, 1998　(JP) ............................................. 10-257122

(51) Int. Cl.⁷ .................................................. B60R 21/22
(52) U.S. Cl. ....................... 701/45; 307/9.1; 280/730.2; 280/735
(58) Field of Search ............................ 701/45, 46, 47; 307/9.1, 10.1; 280/730.1, 730.2, 734, 735, 733; 180/268, 271, 272, 273

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,464,246 | * 11/1995 | Castro et al. | 280/730.2 |
| 5,524,924 | * 6/1996 | Steffens, Jr. et al. | 280/730.2 |
| 5,525,843 | 6/1996 | Howing | 307/9.1 |

| | | | |
|---|---|---|---|
| 5,948,031 | * 9/1999 | Jinno et al. | 701/45 |
| 6,018,693 | * 1/2000 | Blackburn et al. | 701/45 |
| 6,126,194 | * 10/2000 | Yaniv et al. | 280/733 |
| 6,179,326 | * 1/2001 | Breed et al. | 280/735 |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| 6-065532 | 8/1994 | (JP) . |
| 9-509118 | 9/1997 | (JP) . |

* cited by examiner

*Primary Examiner*—Gary Chin
(74) *Attorney, Agent, or Firm*—Foley & Lardner

(57)　　　　**ABSTRACT**

A passenger detection system for precisely detecting the sitting condition of a passenger occupying a seat, who leans against the seat supporting section, and for suitably controlling the deployment/non-deployment of the side airbag based on the results of the detection process. The system comprises a seat having a seat supporting section in which an antenna electrode is provided; a voltage generation device for generating a high-frequency and low-voltage signal which induces a weak electric field around the antenna electrode; a current detection section for detecting a current which flows according to the generated weak electric field; and a control circuit for detecting a leaning condition of the passenger against the seat supporting section, based on a signal output from the current detection section; and an airbag apparatus including a side airbag unit positioned close to a door, the apparatus having a function of deploying the side airbag unit when a collision occurs. Data representing results detected by the control circuit is sent to the airbag apparatus so as to set the side airbag unit to one of the deployable and non-deployable states.

**4 Claims, 11 Drawing Sheets**





US006310407B1

(12) **United States Patent**
Saito et al.

(10) Patent No.: **US 6,310,407 B1**
(45) Date of Patent: **Oct. 30, 2001**

(54) PASSENGER DETECTING SYSTEM AND AIR BAG SYSTEM USING THE SAME

(75) Inventors: Takashi Saito; Kenji Kumagai; Kazunori Jinno; Satoshi Babe, all of Osaka; Masahiro Ofuji, Kanagawa; Tsutomu Fukui, Saitama; Nobuhiro Koyota, Saitama; Takashi Inou, Saitama; Kazutomo Isonaga, Saitama; Makoto Nagai, Saitama, all of (JP)

(73) Assignees: NEC Corporation; Hon-da Giken Kogyo Kabushiki Kaisha, both of Tokyo (JP)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: 09/345,404

(22) Filed: Jul. 1, 1999

(30) **Foreign Application Priority Data**

| | | |
|---|---|---|
| Jul. 13, 1998 | (JP) | 10-197669 |
| Jul. 13, 1998 | (JP) | 10-197670 |
| Jul. 13, 1998 | (JP) | 10-197671 |
| Aug. 31, 1998 | (JP) | 10-245893 |

(51) Int. Cl.⁷ ............................................. B60L 3/00
(52) U.S. Cl. .................. 307/10.1; 340/370.37; 324/663
(58) Field of Search ..................... 307/10.1; 324/663; 340/370.37; 219/217; 600/395

(56) **References Cited**

U.S. PATENT DOCUMENTS

3,954,100 * 5/1976 Sem-Jacobsen ................ 128/2.06

5,844,415  12/1998  Gershenfeld et al. .
5,936,412 *  8/1999  Gershenfeld et al. ........... 324/663
6,093,910 *  7/2000  McClintock et al. ............ 219/217

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| 0 838 697 A2 | 4/1998 | (EP) . |
| 61-113527 | 5/1986 | (JP) . |
| 3-52266 | 5/1991 | (JP) . |
| 4-46843 | 2/1992 | (JP) . |
| 9-509118 | 9/1997 | (JP) . |
| 11271463 | 10/1999 | (JP) . |
| WO 97/31238 | 8/1997 | (WO) . |

* cited by examiner

Primary Examiner—Josie Ballato
Assistant Examiner—Robert L. Deberadinis
(74) Attorney, Agent, or Firm—McGuireWoods LLP

(57) **ABSTRACT**

A passenger detecting system includes a plurality of antenna electrodes provided in a seat, a signal generating section, a detecting section, a switching circuit and a control unit. The signal generating section generates an electrode signal. The switching circuit sequentially supplies the electrode signal to the plurality of antenna electrodes one by one in response to a switching control signal. The detecting section detects change of the electrode signal to generate a detection signal when the electrode signal is supplied to each of the plurality of antenna electrodes. The control unit outputs the switching control signal to the switching circuit and generates a passenger data associated with a passenger on the seat based on the detection signal for each of the plurality of antenna electrodes.

43 Claims, 26 Drawing Sheets



US006325413B2

(12) **United States Patent**    (10) Patent No.: **US 6,325,413 B2**
Saito et al.                     (45) Date of Patent:    *Dec. 4, 2001

(54) PASSENGER DETECTION SYSTEM

(75) Inventors: Takashi Saito, Osaka; Masahiro Ofuji, Kanagawa, both of (JP)

(73) Assignee: NEC Corporation, Tokyo (JP)

(*) Notice: This patent issued on a continued prosecution application filed under 37 CFR 1.53(d), and is subject to the twenty year patent term provisions of 35 U.S.C. 154(a)(2).

Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: 09/191,387

(22) Filed: Nov. 13, 1998

(30) Foreign Application Priority Data

Nov. 17, 1997 (JP) .................... 9-315399

(51) Int. Cl.⁷ .................... B60R 21/32
(52) U.S. Cl. .................... 280/735; 701/45
(58) Field of Search .................... 280/734, 735; 701/45, 49; 343/711

(56) References Cited

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,370,658 | * 1/1983 | Hill | 343/713 |
| 5,061,939 | * 10/1991 | Nakase | 343/700 MS |
| 5,649,316 | * 7/1997 | Prudhomme et al. | 455/345 |
| 5,848,802 | * 2/1999 | Breed et al. | 280/735 |
| 5,868,423 | * 2/1999 | Takimoto et al. | 280/735 |
| 5,871,232 | * 2/1999 | White | 280/735 |
| 5,926,141 | * 7/1999 | Lindenmeier et al. | 343/713 |
| 5,948,031 | * 9/1999 | Jinno et al. | 701/45 |
| 5,954,360 | * 9/1999 | Griggs, III et al. | 280/735 |
| 5,964,478 | * 10/1999 | Stanley et al. | 280/735 |
| 5,997,033 | * 12/1999 | Gray et al. | 280/735 |
| 5,999,140 | * 12/1999 | Johnson | 343/909 |
| 6,018,693 | * 1/2000 | Blackburn et al. | 701/45 |

| | | | |
|---|---|---|---|
| 6,026,340 | * 2/2000 | Corrado et al. | 701/47 |
| 6,029,105 | * 2/2000 | Schweizer | 701/45 |
| 6,043,736 | * 3/2000 | Sawahata et al. | 340/438 |
| 6,043,743 | * 2/1999 | Saito et al. | 340/562 |
| 6,144,343 | * 11/2000 | Panya et al. | 343/713 |

FOREIGN PATENT DOCUMENTS

9-42650    2/1997 (JP) .

* cited by examiner

Primary Examiner—Eric Culbreth
Assistant Examiner—L. Lum
(74) Attorney, Agent, or Firm—Sughrue, Mion, Zinn, Macpeak & Seas, PLLC

(57) ABSTRACT

A passenger detection system comprises an antenna electrode which is provided to the dashboard of a car, an oscillation circuit for generating a high frequency low voltage oscillation signal in order to generate a weak alternating electric field around the antenna electrode, a current detection section for detecting a transmission current which passes between the oscillation circuit and the antenna electrode depending on the weak alternating electric field which is generated around the antenna electrode, a phase difference detection section for detecting the phase difference between the oscillation signal supplied from the oscillation circuit and an output signal which is supplied to the antenna electrode, and a control circuit for judging the presence or absence of a passenger seated on the seat based on the detected phase difference and judging the distance between the passenger and the dashboard based on the detected transmission current. The passenger detection system is connected with an air bag unit, and the air bag unit is set at a 'no deployment mode' if it is judged that no passenger is seated on the seat or the distance between the passenger and the dashboard is less than a minimum allowable distance, thereby the passenger who is close to the dashboard is protected from secondary injury due to strong deployment of the air bag.

25 Claims, 17 Drawing Sheets







US006329913B1

(12) **United States Patent**

Shieh et al.

(10) Patent No.: **US 6,329,913 B1**

(45) Date of Patent: **Dec. 11, 2001**

(54) **PASSENGER DETECTION SYSTEM AND METHOD**

(75) Inventors: **Shiuh-An Shieh**, Alpharetta; **Masanobu Shimura**, Stockbridge; **James Frederick Kirksey**, Conyers, all of GA (US)

(73) Assignee: **NEC Technologies, Inc.**, Itasca, IL (US)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **09/413,099**

(22) Filed: **Oct. 6, 1999**

(51) Int. Cl.[7] .................................... G08B 13/26

(52) U.S. Cl. ................. 340/561; 340/562; 340/438

(58) Field of Search ...................... 340/425.5, 436, 340/438, 551, 552, 561, 562, 573.1; 180/271, 273; 280/728.1, 728.2, 734, 735

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,404,128 | * 4/1995 | Ogino et al. | 340/425.5 |
| 5,602,734 | 2/1997 | Kithil | 701/45 |
| 5,691,693 | 11/1997 | Kithil | 340/439 |
| 5,724,024 | * 3/1998 | Sonderegger et al. | 340/562 |
| 5,732,375 | 3/1998 | Cashler | 701/45 |
| 5,802,479 | 9/1998 | Kithil et al. | 701/45 |
| 5,808,552 | * 9/1998 | Wiley et al. | 340/573.1 |
| 5,844,415 | 12/1998 | Gershenfeld et al. | 324/663 |
| 5,878,620 | 3/1999 | Gilbert et al. | 73/172 |
| 5,914,610 | 6/1999 | Gershenfeld et al. | 340/870.37 |

| | | | |
|---|---|---|---|
| 5,948,031 | 9/1999 | Jinno et al. | 701/45 |
| 6,012,007 | * 1/2000 | Fortune et al. | 340/436 |
| 6,014,602 | * 1/2000 | Kithil et al. | 701/45 |
| 6,043,743 | * 3/2000 | Saito et al. | 340/562 |

OTHER PUBLICATIONS

Joseph A. Paradiso and Neil Gershenfeld, Musical Applications of Electric Field Sensing; Oct. 1995; pp. 1–25.
National Highway Traffic Safety Administration; Docket No. NHTSA 98–4405; Notice 1.
National Highway Traffic Safety Administration; Docket No. NHTSA 98–3847; Aug. 4, 1998; vol. No. 63, No. 149.
Kazunori Jinno; Occupant Sensing Utilizing Perturbation of Electric Fields; Feb. 1997; pp. 117–129.
J. R. Smith; Field Mice: Extracting Hand Geometry From Electric Field Measurements; 1996; pp. 587–608.

* cited by examiner

*Primary Examiner*—Van T. Trieu
(74) *Attorney, Agent, or Firm*—Craig A. Summerfield; Brinks Hofer Gilson & Lione

(57) **ABSTRACT**

A passenger detection system is provided. The passenger detection system utilizes an oscillation circuit that causes an antenna electrode to emit an electric field that is disrupted by the electrical characteristics of an object placed on the seat. This disruption alters the current and phase of the signal in the antenna electrode. By comparing the current flowing in the antenna electrode and/or the difference between the phase of the signal in the antenna electrode and the oscillation circuit output signal with predetermined threshold values, it is possible to detect the presence of a passenger in a reliable and inexpensive manner.

**32 Claims, 9 Drawing Sheets**



US006329914B1

(12) **United States Patent**
Shieh et al.

(10) Patent No.: **US 6,329,914 B1**
(45) Date of Patent: *Dec. 11, 2001

(54) **THICKNESS MEASUREMENT SYSTEM AND METHOD FOR VEHICLE OCCUPANT DETECTION**

(75) Inventors: **Shih-An Shieh**, Alpharetta; **James Frederick Kirksey**, Conyers, both of GA (US)

(73) Assignee: **NEC Technologies, Inc.**, Itasca, IL (US)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **09/678,215**

(22) Filed: **Sep. 29, 2000**

**Related U.S. Application Data**

(63) Continuation-in-part of application No. 09/413,099, filed on Oct. 6, 1999.
(60) Provisional application No. 60/195,590, filed on Apr. 6, 2000.

(51) Int. Cl.[7] ............................................ G08B 13/26
(52) U.S. Cl. ...................... 340/561; 340/562; 280/735; 180/271
(58) Field of Search ...................... 340/425.5, 436, 340/438, 551, 552, 561, 562; 180/271, 273; 280/728.1, 728.2, 734, 735

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,366,241 | 11/1994 | Kithil | 280/735 |
| 5,404,128 | 4/1995 | Ogino et al. | 340/425.5 |
| 5,602,734 | 2/1997 | Kithil | 701/45 |
| 5,691,693 | 11/1997 | Kithil | 340/439 |
| 5,724,024 | 3/1998 | Sonderegger et al. | 340/562 |
| 5,802,479 | 9/1998 | Kithil et al. | 701/45 |
| 5,808,552 * | 9/1998 | Wiley et al. | 340/573.1 |

| | | | |
|---|---|---|---|
| 5,844,415 | 12/1998 | Gershenfeld et al. | 324/663 |

(List continued on next page.)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| 10-236271 | 11/2000 | (JP) . |
| WO 97/39920 | 10/1997 | (WO) . |
| WO 99/05008 | 2/1999 | (WO) . |
| WO 00/50261 | 8/2000 | (WO) . |

OTHER PUBLICATIONS

Joseph A. Paradiso and Neil Gershenfeld, Musical Applications of Electric Field Sensing; Oct. 1995; pp. 1–25.
National Highway Traffic Safety Administration; Docket No. NHTSA 98–4405; Notice 1.
National Highway Traffic Safety Administration; Docket No, NHTSA 98–3847; Aug. 4, 1998; vol. No. 63, No. 149.
Kazunori Jinno; Occupant Sensing Utilizing Perturbation of Electric Fields; Feb., 1997; pp. 117–129.
J. R. Smith; Field Mice: Extracting Hand Geometry From Electric Field Measurements; 1996; pp. 587–608.

*Primary Examiner*—Van T. Trieu
(74) *Attorney, Agent, or Firm*—Craig A. Summerfield; Brinks Hofer Gilson & Lione

(57) **ABSTRACT**

A passenger detection system is provided. The passenger detection system utilizes an oscillation circuit that causes an antenna electrode to emit an electric field that is disrupted by the electrical characteristics of an object placed on the seat. This disruption alters the current and phase of the signal in the antenna electrode. By comparing the current flowing in the antenna electrode and/or the difference between the phase of the signal in the antenna electrode and the oscillation circuit output signal with predetermined threshold values, it is possible to detect the presence of a passenger in a reliable and inexpensive manner. The determination is made with a two layer electrode arrangement, including smaller and larger electrodes. The two layers allow calculation of an amount of compression on the seat. The amount of compression is used to characterize the passenger.

35 Claims, 9 Drawing Sheets





US006356187B2

## (12) United States Patent
### Jinno et al.

(10) Patent No.: **US 6,356,187 B2**
(45) Date of Patent: **Mar. 12, 2002**

(54) **PASSENGER DETECTION SYSTEM**

(75) Inventors: **Kazunori Jinno**, Osaka; **Masanori Sugino**, Kanagawa, both of (JP)

(73) Assignee: **NEC Corporation**, Tokyo (JP)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **09/102,918**

(22) Filed: **Jun. 23, 1998**

(30) **Foreign Application Priority Data**

Jun. 23, 1997   (JP) .................................... 9-166207

(51) Int. Cl.⁷ ........................................... B60Q 1/00
(52) U.S. Cl. ................... 340/438; 340/561; 340/567; 701/45; 701/46; 701/47; 280/732; 280/734; 280/735; 180/271
(58) Field of Search ....................... 340/438, 561, 340/567; 701/45–47; 280/735, 732, 734; 180/268, 271, 272

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 4,796,013 A | * | 1/1989 | Yasuda | 340/562 |
| 4,885,566 A | * | 12/1989 | Aoki et al. | 340/457.1 |
| 5,871,232 A | * | 2/1999 | White | 280/735 |
| 5,914,610 A | * | 6/1999 | Gershenfeld et al. | 324/663 |
| 5,936,412 A | * | 8/1999 | Gershenfeld et al. | 324/663 |
| 5,948,031 A | * | 9/1999 | Jinno et al. | 701/45 |

FOREIGN PATENT DOCUMENTS

JP   9-42650   9/1998

| | | | | |
|---|---|---|---|---|
| JP | 10-236270 | | | 9/1998 |
| WO | WO-97/30864 | * | | 8/1997 |

* cited by examiner

*Primary Examiner*—Julie Lieu
(74) *Attorney, Agent, or Firm*—Sughrue Mion, PLLC

(57) **ABSTRACT**

A passenger detection system for detecting seating status of a passenger on a seat of a vehicle in which structure of electrodes placed on the seat is improved, is proposed. A plurality of electrodes are placed apart on the upper side of the seat, and a weak alternating electric field is generated between a transmission electrode, selected from the electrodes plurality of and reception electrodes other than the transmission electrode, and displacement currents passing in the reception plurality of electrodes, caused by the weak alternating electric field are detected. The seating status of the passenger on the seat is determined by analyzing the detected displacement currents. An electrode structure is preliminarily formed by fixing the electrodes apart on an electrical insulating base material, and the electrode structure is placed between a cushion material and a covering material of the seat. Preferably, the electrode structure is fixed to one or more components of the seat. For example, the electrodes are formed of electrically conductive fabric and the electrodes are fixed to the base material by means of bonding by heating of thermoplastic resin or thermosetting resin. According to the system, installation of the electrodes on the seat can be performed efficiently and the seating status can be detected precisely with constant distances between the electrodes.

**15 Claims, 7 Drawing Sheets**



US006404074B2

(12) **United States Patent**
Saito et al.

(10) Patent No.: **US 6,404,074 B2**
(45) Date of Patent: *Jun. 11, 2002

(54) PASSENGER DETECTING SYSTEM AND AIR BAG SYSTEM USING THE SAME

(75) Inventors: Takashi Saito; Kenji Kumagai; Kazunori Jinno; Satoshi Babe, all of Osaka; Masahiro Ohji, Kanagawa; Tsutomu Fukui, Saitama; Nobuhiro Koyota, Saitama; Takashi Inou, Saitama; Kazutomo Isonaga, Saitama; Makoto Nagai, Saitama, all of (JP)

(73) Assignee: NEC Corporation, Tokyo (JP)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: 09/925,602

(22) Filed: Aug. 10, 2001

**Related U.S. Application Data**

(62) Division of application No. 09/345,404, filed on Jul. 1, 1999, now Pat. No. 6,310,407.

(30) **Foreign Application Priority Data**

| | | |
|---|---|---|
| Jul. 13, 1998 | (JP) | 10/197669 |
| Jul. 13, 1998 | (JP) | 10/197670 |
| Jul. 13, 1998 | (JP) | 10/197671 |
| Aug. 31, 1998 | (JP) | 10/245893 |

(51) Int. Cl.7 .................................... B60L 3/00
(52) U.S. Cl. ............... 307/10.1; 340/370.37; 324/663
(58) Field of Search ................. 307/10.1; 340/370.37; 324/663; 219/217; 600/395

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 3,954,100 A | 5/1976 | Sem-Jacobbsen |
| 5,844,415 A | 12/1998 | Gershenfeld et al. |
| 5,936,412 A | 8/1999 | Gershenfeld et al. |
| 6,093,910 A | 7/2000 | McClintock et al. |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| EP | 0 838 697 A2 | 4/1998 |
| JP | 61-113527 | 5/1986 |
| JP | 3-52256 | 5/1991 |
| JP | 4-46843 | 2/1992 |
| JP | 9-509118 | 9/1997 |
| JP | 11271463 | 10/1999 |
| WO | WO 97/31238 | 8/1997 |

*Primary Examiner*—Stephen W. Jackson
*Assistant Examiner*—Robert Deberadinis
(74) *Attorney, Agent, or Firm*—Whitham, Curtis & Christofferson, PC

(57) **ABSTRACT**

A passenger detecting system includes a plurality of antenna electrodes provided in a seat, a signal generating section, a detecting section, a switching circuit and a control unit. The signal generating section generates an electrode signal. The switching circuit sequentially supplies the electrode signal to the plurality of antenna electrodes one by one in response to a switching control signal. The detecting section detects change of the electrode signal to generate a detection signal when the electrode signal is supplied to each of the plurality of antenna electrodes. The control unit outputs the switching control signal to the switching circuit and generates a passenger data associated with a passenger on the seat based on the detection signal for each of the plurality of antenna electrodes.

**18 Claims, 26 Drawing Sheets**



US006556137B1

(12) **United States Patent**     (10) Patent No.: **US 6,556,137 B1**
Oka et al.     (45) Date of Patent:     Apr. 29, 2003

(54) **PASSENGER DETECTING SYSTEM AND AIR BAG APPARATUS USING THE SAME**

(75) Inventors: Yoshitaka Oka, Osaka (JP); Satoshi Babe, Osaka (JP)

(73) Assignee: NEC Corp. (JP)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: 09/361,726

(22) Filed: Jul. 27, 1999

(30) **Foreign Application Priority Data**

Jul. 28, 1998 (JP) .......................................... 10-212949
Aug. 31, 1998 (JP) .......................................... 10-245894

(51) Int. Cl.⁷ ............................................. G08B 13/26
(52) U.S. Cl. .................. 340/561; 280/735; 307/9.1
(58) Field of Search ............................. 340/561, 562, 340/573.1; 701/45, 46, 47; 307/9.1; 280/730.2, 735

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 5,426,416 A | * | 6/1995 | Jefferies et al. | 340/664 |
| 5,844,415 A | | 12/1998 | Gershenfeld et al. | 324/663 |
| 5,948,031 A | * | 9/1999 | Jinno | 701/45 |
| 6,161,070 A | * | 12/2000 | Jinno | 701/45 |
| 6,208,249 B1 | * | 3/2001 | Saito | 340/561 |
| 6,283,271 B1 | * | 7/2001 | Oka | 701/41 |

FOREIGN PATENT DOCUMENTS

EP     0838697     4/1998

| | | | | |
|---|---|---|---|---|
| JP | 61-113527 | 5/1986 | | |
| JP | 3-52266 | 5/1991 | | |
| JP | 4-46843 | 2/1992 | | |
| JP | 4-49498 | 2/1992 | | |
| JP | 7-220541 | 10/1995 | | |
| JP | 10-236269 | * | 2/1997 | .................. 340/561 |
| JP | 9-509118 | 9/1997 | | |
| JP | 11-271463 | 10/1999 | | |
| WO | WO 9731238 | 8/1997 | | |

OTHER PUBLICATIONS

European Search Report issued Nov. 7, 2000 in a related application (in English).

* cited by examiner

*Primary Examiner*—Anh La
(74) *Attorney, Agent, or Firm*—Dickstein, Shapiro, Morin & Oshinsky, LLP.

(57)     **ABSTRACT**

A passenger detecting system includes an antenna electrode, a signal generating circuit, a detecting circuit, and a control circuit. The antenna electrode is provided in a seat to be occupied by a passenger. The signal generating circuit generates and supplies a supply signal to the antenna electrode through a resistor such that an electric field is generated around the antenna electrode. The detecting circuit includes the resistor, and detects a direct current data signal from a line voltage associated with a voltage drop across the resistor, wherein the line voltage changes depending upon an object on the seat. The control circuit determines from the detected direct current data signal, whether or not a passenger is present in the seat and whether the passenger is an adult or a child.

30 Claims, 26 Drawing Sheets





US006559555B1

(12) **United States Patent**
Saitou et al.

(10) Patent No.: **US 6,559,555 B1**
(45) Date of Patent: **May 6, 2003**

(54) **PASSENGER DETECTION SYSTEM AND DETECTION METHOD**

(75) Inventors: **Takashi Saitou**, Osaka (JP); **Masahiro Ohuji**, Yokohama (JP); **Yoshitaka Oka**, Osaka (JP); **Kazunori Jinno**, Osaka (JP)

(73) Assignee: **NEC Corporation** (JP)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **09/395,046**

(22) Filed: **Sep. 13, 1999**

(51) Int. Cl.⁷ ............................................. **B60R 21/01**
(52) U.S. Cl. ...................... 307/10.1; 307/121; 280/735
(58) Field of Search ........................... 307/9.1, 10.1, 307/121; 280/735; 340/573.1; 701/45

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,573,082 A | 2/1986 | Jeskey | 358/250 |
| 5,321,789 A | 6/1994 | Kida et al. | 385/133 |
| 5,844,415 A | 12/1998 | Smith et al. | |
| 5,877,492 A | 3/1999 | Fujieda et al. | 250/208.1 |
| 5,936,412 A | 8/1999 | Smith et al. | |
| 6,310,407 B1 * | 10/2001 | Saito et al. | 307/10.1 |
| 6,356,194 B1 | 3/2002 | Fukui et al. | |

FOREIGN PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| DE | 19900842 | 7/1999 | | |
| DE | 199 00 842 | 7/1999 | | |
| GB | 2333160 A * | 7/1999 | | B60N/2/00 |
| JP | 3-233391 | 10/1991 | | |
| JP | 4-303788 | 10/1992 | | |
| JP | 5-291924 | 11/1993 | | |
| JP | 5-291925 | 11/1993 | | |
| JP | 7-270541 | 10/1995 | | |
| JP | 9-509118 | 9/1997 | | |
| JP | 9-301119 | 11/1997 | | |

| | | |
|---|---|---|
| JP | 11-198705 | 7/1999 |
| JP | 11-281748 | 10/1999 |
| JP | 11-334451 | 12/1999 |
| JP | 11-351808 | 12/1999 |
| JP | 2000-38077 | 2/2000 |

OTHER PUBLICATIONS

European Search Report (in English) issued Feb. 14, 2000 in a related application.
Hardy L et al: "Flat Eddy–Current Matrix Sensor for Detecting Metallic Objects" Sensors and Actuators A, CH, Elsevier, Sequoia S.A., Lausanne, vol. A29, No. 1, Sep. 1, 1991, pp. 13–19, XP000230912, ISSN: 0924–4247 *the whole document*.

(List continued on next page.)

*Primary Examiner*—Fritz Fleming
(74) *Attorney, Agent, or Firm*—Dickstein, Shapiro, Morin & Oshinsky, LLP.

(57) **ABSTRACT**

A passenger detection system is presented so that the master control circuit in the system instructs the passenger airbag control circuit controlling the operation of the airbag designated for the passenger seat to be in the deployable state or not-deployable state, depending on the seating conditions of a passenger sitting on the passenger seat, for example whether the passenger is an adult or a child. The passenger detection system is operated by a plurality of antenna electrodes disposed on the passenger seat; an electric field generation device for generating an electric field around an antenna electrode; a switching circuit for connecting the electric field generation device to the various antenna electrodes; an information detection circuit for detecting information related to a current flowing in a particular antenna electrode selected by the switching circuit; a master control circuit for receiving signal data output from the information detection circuit, and judging passenger seating conditions according to the signal data; and an airbag apparatus for controlling the operation of an airbag designated for the driver seat and an airbag designated for the passenger seat.

**19 Claims, 78 Drawing Sheets**



US006960841B2

(12) **United States Patent**
Saitou et al.

(10) **Patent No.:** US 6,960,841 B2
(45) **Date of Patent:** Nov. 1, 2005

(54) **PASSENGER DETECTION SYSTEM AND DETECTION METHOD**

(75) Inventors: **Takashi Saitou**, Osaka (JP); **Masahiro Ofuji**, Yokohama (JP); **Yoshitaka Oka**, Osaka (JP); **Kazunori Jinno**, Osaka (JP)

(73) Assignee: **Honda Elesys Co., Ltd.** (JP)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 4 days.

(21) Appl. No.: 10/368,036

(22) Filed: **Feb. 19, 2003**

(65) **Prior Publication Data**

US 2003/0151240 A1 Aug. 14, 2003

**Related U.S. Application Data**

(62) Division of application No. 09/395,046, filed on Sep. 13, 1999, now Pat. No. 6,559,555.

(51) Int. Cl.7 .............................................. B60L 1/00
(52) U.S. Cl. ................................ 307/10.1; 340/370.37; 340/667; 324/663; 180/273
(58) Field of Search ........................ 307/10.1; 340/370.37, 340/667; 324/663; 180/273

(56) **References Cited**

U.S. PATENT DOCUMENTS

5,948,031 A  *  9/1999  Jinno et al. ........................ 701/45

6,208,249 B1  *  3/2001  Saito et al. ........................ 340/561

FOREIGN PATENT DOCUMENTS

WO    WO97/30864    8/1997

* cited by examiner

*Primary Examiner*—Robert L. DeBeradinis
(74) *Attorney, Agent, or Firm*—Dickstein, Shapiro, Morin & Oshinsky, LLP

(57)    **ABSTRACT**

A passenger detection system is presented so that the master control circuit in the system instructs the passenger airbag control circuit controlling the operation of the airbag designated for the passenger seat to be in the deployable state or not-deployable state, depending on the seating conditions of a passenger sitting on the passenger seat, for example whether the passenger is an adult or a child. The passenger detection system is operated by a plurality of antenna electrodes disposed on the passenger seat; an electric field generation device for generating an electric field around an antenna electrode; a switching circuit for connecting the electric field generation device to the various antenna electrodes; an information detection circuit for detecting information related to a current flowing in a particular antenna electrode selected by the switching circuit; a master control circuit for receiving signal data output from the information detection circuit, and judging passenger seating conditions according to the signal data; and an airbag apparatus for controlling the operation of an airbag designated for the driver seat and an airbag designated for the passenger seat.

**51 Claims, 78 Drawing Sheets**



US 20030204295A1

(19) **United States**

(12) **Patent Application Publication** (10) Pub. No.: **US 2003/0204295 A1**

Thompson et al. (43) Pub. Date: **Oct. 30, 2003**

(54) JUDGMENT LOCK FOR OCCUPANT DETECTION AIR BAG CONTROL

(76) Inventors: Gregory T. Thompson, Jonesboro, GA (US); Shiuh-An Shieh, Alpharetta, GA (US); Keiichi Hasegawa, Stockbridge, GA (US); Svetoslav G. Stoyanov, Atlanta, GA (US)

Correspondence Address:
BRINKS HOFER GILSON & LIONE
P.O. BOX 10395
CHICAGO, IL 60610 (US)

(21) Appl. No.: 10/133,970

(22) Filed: Apr. 26, 2002

**Publication Classification**

(51) Int. Cl.7 .................................................. B60R 21/00
(52) U.S. Cl. .................... 701/45; 180/271; 280/735

(57) **ABSTRACT**

Systems and methods for controlling the sensing of an occupant in a seating area are provided. The occupant is characterized as one of an adult, child or other category. One characterization change parameter, such as a hysteresis time period or thresholds for characterization, is applied for a first time period. After that time period, the characterization change parameter is changed. For example, if the characterization stays the same for ten seconds, the hysteresis is changed from five to ten seconds. As another example, if the characterization stays the same for one minute, the thresholds associated with that characterization are broadened to decrease the likelihood of a change in characterization. In some systems and methods, a confidence parameter or probability associated with the characterization is used to control the changes of the characterization change parameter. In some systems and methods, the characterization change parameter is reset in response to one of (a) a no occupant characterization or (b) characterizing the occupant as a different one of the at least two categories consecutively for a current hysteresis time period.



US 20040075259A1

(19) **United States**

(12) **Patent Application Publication** (10) Pub. No.: US 2004/0075259 A1
Baba et al. (43) Pub. Date: Apr. 22, 2004

(54) OCCUPANT DETECTING APPARATUS
CAPABLE OF IMPROVING DETECTION
ACCURACY

(75) Inventors: Satoshi Baba, Tokyo (JP); Kazunori
Jinno, Tokyo (JP); Hiroshi Oikawa,
Tokyo (JP); Takashi Saito, Tokyo (JP);
Naoki Saito, Tokyo (JP); Shingo
Nagai, Tokyo (JP); Yoshinori Masuda,
Tokyo (JP)

Correspondence Address:
YOUNG & THOMPSON
745 SOUTH 23RD STREET 2ND FLOOR
ARLINGTON, VA 22202

(73) Assignee: HONDA ELESYS CO., LTD.,
TOCHIGI (JP)

(21) Appl. No.: 10/682,991

(22) Filed: Oct. 14, 2003

Related U.S. Application Data

(62) Division of application No. 09/962,356, filed on Sep.
26, 2001, now Pat. No. 6,684,973.

(30) Foreign Application Priority Data

Sep. 29, 2000 (JP) .................... 2000-299047

Publication Classification

(51) Int. Cl.7 .................... B60R 21/32
(52) U.S. Cl. .................... 280/735

(57) ABSTRACT

In an occupant detecting apparatus for detecting an occupant
seated on a passenger seat of a vehicle with an airbag for the
occupant, a load sensor is provided in a bottom part of the
seat. A plurality of first electric field sensors are provided in
the bottom part of the seat, and a plurality of second electric
field sensors are provided in a rear part of the seat. An airbag
inflating permission control unit permits inflation of the
airbag in accordance with output signals of the load sensor
and the first and second electric field sensors.



US 20040111201A1

(19) **United States**
(12) **Patent Application Publication** (10) Pub. No.: US 2004/0111201 A1
Thompson et al. (43) Pub. Date: Jun. 10, 2004

(54) **WET SEAT PROTECTION FOR AIR BAG CONTROL OCCUPANT DETECTION**

(75) Inventors: Gregory T. Thompson, Jonesboro, GA (US); Shiuh-An Shieh, Alpharetta, GA (US); Philip Rittmueller, St. Charles, IL (US)

Correspondence Address:
Craig A. Summerfield
BRINKS HOFER GILSON & LIONE
P.O. BOX 10395
Chicago, IL 60610 (US)

(73) Assignee: Elesys North America, Inc.

(21) Appl. No.: 10/682,592

(22) Filed: Oct. 8, 2003

**Related U.S. Application Data**

(62) Division of application No. 10/033,585, filed on Nov. 2, 2001, now Pat. No. 6,696,948.

**Publication Classification**

(51) Int. Cl.7 .......................................... B60R 21/32
(52) U.S. Cl. .......................... 701/45; 701/46; 280/735

(57) **ABSTRACT**

A passenger detection system is provided. The passenger detection system utilizes an oscillation circuit that causes an antenna electrode to emit an electric field that is disrupted by the electrical characteristics of an object placed on the seat. This disruption alters the current and phase of the signal in the antenna electrode. By comparing the current flowing in the antenna electrode and/or the difference between the phase of the signal in the antenna electrode and the oscillation circuit output signal with predetermined threshold values, it is possible to detect the presence of a passenger in a reliable and inexpensive manner. Environmental sensors are used to make the determination more accurate. Humidity, moisture and/or grounding condition are detected and used to alter processing, values or calculations.



US 20040196150A1

(19) **United States**
(12) **Patent Application Publication** (10) Pub. No.: **US 2004/0196150 A1**
Shieh et al. (43) **Pub. Date: Oct. 7, 2004**

(54) MULTIPLE SENSOR VEHICLE OCCUPANT
     DETECTION FOR AIR BAG DEPLOYMENT
     CONTROL

(75) Inventors: **Shiuh-An Shieh**, Alpharetta, GA (US);
                **Gregory T. Thompson**, Johnsborough,
                GA (US)

     Correspondence Address:
     Craig A. Summerfield
     BRINKS HOFER GILSON & LIONE
     P.O. BOX 10395
     CHICAGO, IL 60610 (US)

(73) Assignee: **Elesys North America Inc.**

(21) Appl. No.: 10/422,329

(22) Filed: Apr. 23, 2003

          **Related U.S. Application Data**

(62) Division of application No. 09/798,788, filed on Mar.
     2, 2001.

          **Publication Classification**

(51) Int. Cl.$^7$ ................................. G08B 23/00
(52) U.S. Cl. ................. 340/501; 340/562; 701/45

(57)            **ABSTRACT**

A passenger detection system is provided. The passenger
detection system utilizes an oscillation circuit that causes an
antenna electrode to emit an electric field that is disrupted by
the electrical characteristics of an object placed on the seat.
This disruption alters the current and phase of the signal in
the antenna electrode. By comparing the current flowing in
the antenna electrode and/or the difference between the
phase of the signal in the antenna electrode and the oscil-
lation circuit output signal with predetermined threshold
values, it is possible to detect the presence of a passenger in
a reliable and inexpensive manner. Environmental sensors
are used to make the determination more accurate. Humid-
ity, moisture and/or grounding condition are detected and
used to alter processing, values or calculations.



US 20040199318A1

(19) **United States**
(12) **Patent Application Publication** (10) Pub. No.: **US 2004/0199318 A1**
Shieh et al. (43) Pub. Date: **Oct. 7, 2004**

(54) **MULTIPLE SENSOR VEHICLE OCCUPANT DETECTION FOR AIR BAG DEPLOYMENT CONTROL**

(75) Inventors: **Shiuh-An Shieh**, Alpharetta, GA (US); **Gregory T. Thompson**, Johnsborough, GA (US)

Correspondence Address:
Craig A. Summerfield
BRINKS HOFER GILSON & LIONE
P.O. BOX 10395
CHICAGO, IL 60610 (US)

(73) Assignee: **Elesys North America, Inc.**

(21) Appl. No.: 10/826,568

(22) Filed: Apr. 16, 2004

**Related U.S. Application Data**

(63) Continuation of application No. 09/798,788, filed on Mar. 2, 2001.

**Publication Classification**

(51) Int. Cl.7 ................................................. G05D 1/00
(52) U.S. Cl. ..................................... 701/45; 180/271

(57) **ABSTRACT**

A passenger detection system is provided. The passenger detection system utilized an oscillation circuit that causes an antenna electrode to emit an electric field that is disrupted by the electrical characteristics of n object placed on the seat. This disruption alters the current and phase of the signal in the antenna electrode. By comparing the current flowing in the antenna electrode and/or the difference between the phases of the signal is the antenna electrode and the oscillation circuit output signal with predetermined threshold values, it is possible to detect the presence of a passenger in a reliable and inexpensive manner. Environmental sensors are used to make the determination more accurate. Humidity, moisture and/or grounding condition are detected and used to alter processing, values or calculations.



US 20050121885A1

(19) **United States**

(12) **Patent Application Publication** (10) Pub. No.: **US 2005/0121885 A1**

Shieh (43) **Pub. Date:** **Jun. 9, 2005**

(54) VEHICLE OCCUPANT SENSING SYSTEM

(75) Inventor: Shiuh-An Shieh, Alpharetta, GA (US)

Correspondence Address:
Brinks Hofer Gilson & Lione
P.O. Box 10395
Chicago, IL 60610 (US)

(73) Assignee: Elesys North America, Inc.

(21) Appl. No.: 10/729,655

(22) Filed: Dec. 5, 2003

**Publication Classification**

(51) Int. Cl.$^7$ .................................... B60R 21/22

(52) U.S. Cl. .................................... 280/730.1

(57) **ABSTRACT**

A vehicle occupancy sensing system provides a mechanism for determining whether a child is present in a vehicle. The sensing system may determine that an occupied front or rear facing child seat is present in an automobile, for example. To that end, the sensing system may employ a reliable electrode sensing system that may be conveniently installed in one or more locations in the vehicle seats. The sensing system thereby helps reduce occurrences of the potentially devastating consequences of unintentionally leaving a child in a vehicle.




600

# EXHIBIT   7

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

AUTOMOTIVE TECHNOLOGIES
INTERNATIONAL, INC.,
a Delaware corporation,

       Plaintiff,

vs.

AMERICAN HONDA MOTOR COMPANY,
a California corporation,
ELESYS NORTH AMERICA, INC.,
a Georgia corporation, and
GENERAL MOTORS CORPORATION,
a Delaware corporation,

       Defendants.
_____/

Case No. 1:06-CV-00187-GMS
Hon. Judge Gregory M. Sleet

## DECLARATION OF ANDREW KOCHANOWSKI

I, Andrew Kochanowski, under penalty of perjury do testify as follows:

1.    I am the principal outside patent litigation attorney for Plaintiff ATI, Inc. I am a senior shareholder in Sommers Schwartz, P.C., a firm located in Southfield, Michigan. I have represented ATI in various patent-related matters since approximately 1999. I am familiar with all of the facts set forth in this Declaration.

2.    I have been the primary counsel of record for ATI in every patent infringement litigation filed by ATI to date. Each of the cases filed by ATI in the Eastern District of Michigan were filed between 1999 and 2003, while ATI had an office and employees within this District. For example, at one point, ATI had both administrative offices and a research and prototype facility in Auburn Hills, Michigan, which staffed several full time employees and which held computers, equipment, and other company property. A primary ATI employee responsible for

both technical and administrative matters, Ray Piirainen, was based in Michigan. However, prior to the filing of the present case, ATI closed its Michigan offices. To the best of my knowledge, ATI had no Michigan-based employee at the time of filing. To the best of my knowledge, ATI had no place of business within the Eastern District of Michigan, nor indeed within the State of Michigan as a whole, prior to filing.

3.    ATI's prior patent-related infringement cases concern technologies different from the one at issue in the present case. The first case filed involved an early ATI patent relating to side impact sensors. That case (Case No. 2:99-CV-75651) was initially filed in 1999. It was immediately voluntarily dismissed, and re-filed in May, 2000 as an omnibus case against virtually every automotive manufacturer OEM and numerous Tier I automotive suppliers based in the United States, Germany and Japan, captioned *ATI v BMW, et al*, Case No. 01-71700. A companion case arising out of a later single patent concerning the same technology, captioned *ATI v Delphi Automotive Systems Corporation, et al*, Case No. 04-72035 was filed in April, 2004. That case also has multiple parties, including United States, German and Japanese sensor suppliers. Neither of the patents in these cases is related to the patents in the present dispute before this Court. It should be noted that the omnibus case filed in 2000 was only decided on the District Court level in 2005 after five years of litigation, and is currently on appeal. The related matter filed in 2004, has been stayed pending that appeal, and is therefore not yet resolved. No discovery has taken place in that case.

4.    The third case filed by ATI in the Eastern District of Michigan is *ATI v TRW Vehicle Safety Systems, Inc.*, Case No. 02-73572, filed in September, 2002. That case is still pending at the District Court level. The technology at issue there is side curtain airbags, and the patent at issue is unrelated to the patents at issue in the present case.

2

5.     The fourth and last case filed for ATI in the Eastern District of Michigan involved a single patent for a bladder sensor, captioned *ATI v Delphi Corporation*, Case No. 03-71368. That case was filed April, 2003. The patent at issue in this litigation is mentioned by Defendants in their motion to transfer. It is one of at least 40 patents that relate to a common parent application, and is therefore only tangentially connected to the twelve patents at issue in the instant case. The technology in the *ATI/Delphi*, Case No. 03-71368, concerned a bladder sensor manufactured by Delphi Corporation. It does not concern the electric field sensors used by the Defendants in the present case.

6.     In each of the four cases filed for ATI in the Eastern District of Michigan, the bulk of the defendants were in fact located or doing business in the Eastern District of Michigan. The omnibus case named all three Detroit-area OEM's (Ford, DaimlerChrysler and GM) as well as Detroit-based suppliers Visteon Corporation and Delphi Corporation. Virtually every other named supplier also had a significant presence in Detroit, including Siemens, Takata, Bosch, and Denso Corporation. The *ATI/Delphi* bladder case named a Detroit-based defendant. The *ATI/TRW* matter involved a party with extensive Detroit facilities for the technology at issue.

7.     The *ATI/BMW*, et al litigation named General Motors and American Honda Motor Company, Inc., among many other parties, as Defendants. Both these parties hired counsel based in Washington, D.C., the law firm of Clifford Chance, LLP, as their lead defense counsel. I am familiar with the documents that were produced in that case and the document production practices employed by General Motors and Honda in that litigation. Documents were produced to us by Washington, D.C. counsel, in Washington, D.C. or by delivery by Federal Express or other overnight means from the Washington, D.C. law firm offices. These documents included documents collected in Japan and, to my understanding, in General Motors' Detroit-area

3

locations. Thus, these Defendants voluntarily assumed the cost of transporting documents from Detroit to Washington, D.C., only to have them shipped back to Detroit for document production.

8.      Although GM and Honda chose to employ paper production in that case, it is now a typical practice in patent-related litigation to make documents available to the other party by digitized means.    Typically a party collects documents responsive to particular document requests at whatever location and uses a local scanning service to make Adobe PDF or TIFF files of the scanned page. An electronic program typically places an electronic identification number on each page, and the collection is thereafter burned to a CD or DVD electronic media and produced to the other side by providing a copy of these CD's or DVD's rather than boxes and reams of paper. In that fashion, each side can see on a computer monitor each page and makes its own decision whether to physically print it out or not. This method has been used in every patent case that I have seen for several years. This is how ATI typically makes its documents available to opposing parties as well.

9.      I am familiar with the correspondence between ATI and American Honda Motor Co., Inc. (to William R. Willen and Koichi Kondo), and to Honda Motor Co., Ltd., Haga-Gun, Tochigi, Japan (to Takeo Oi). The individuals at American Honda Motor Co., Inc. are addressed in Torrence, California, and Takeo Oi in Japan.

10.      In every patent-infringement matter asserted on behalf of ATI, my firm has been joined by the Chicago law firm of Baniak, Pine & Gannon. That firm is again co-counsel with us in the present case. With respect to the present matter, Richard Herrmann of Morris, James, Hitchens & Williams, LLP, has also been retained to provide substantive advice and counsel.

Mr. Herrmann is viewed as a substantive and integral member of the team chosen to represent ATI in this multi-patent litigation.

FURTHER AFFIANT SAYETH NOT.

_____
ANDREW KOCHANOWSKI

June 20 , 2006

5

# EXHIBIT 8

US005901978A

# United States Patent [19]

## Breed et al.

[11] Patent Number: 5,901,978

[45] Date of Patent: *May 11, 1999

[54] **METHOD AND APPARATUS FOR DETECTING THE PRESENCE OF A CHILD SEAT**

[75] Inventors: **David S. Breed**, Boonton Township, Morris County, N.J.; **Wilbur E. DuVall**, Kimberling City, Mo.; **Wendell C. Johnson**, San Diego, Calif.

[73] Assignee: **Automotive Technologies International, Inc.**, Denville, N.J.

[*] Notice: This patent is subject to a terminal disclaimer.

[21] Appl. No.: 09/084,641

[22] Filed: May 26, 1998

### Related U.S. Application Data

[63] Continuation-in-part of application No. 09/047,704, Mar. 25, 1998, which is a continuation-in-part of application No. 08/640,068, Apr. 30, 1996, Pat. No. 5,829,782, which is a continuation of application No. 08/239,978, May 9, 1994, abandoned.

[51] Int. Cl.⁶ ............................................. B60R 21/32

[52] U.S. Cl. .................... 280/735; 180/272; 342/72; 701/45

[58] Field of Search ........................... 280/735, 734; 180/272; 342/72, 70; 701/45, 49

[56] **References Cited**

#### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,275,975 | 9/1966 | King | 340/1 |
| 3,974,350 | 8/1976 | Breed | 200/61.53 |
| 4,198,864 | 4/1980 | Breed | 734/62 |
| 4,284,863 | 8/1981 | Breed | 200/61.53 |
| 4,329,549 | 5/1982 | Breed | 200/61.45 M |
| 4,573,706 | 3/1986 | Breed | 280/734 |
| 4,683,373 | 7/1987 | Tupman | 180/272 |
| 4,900,880 | 2/1990 | Breed | 200/61.45 M |
| 4,933,515 | 6/1990 | Behr et al. | 200/61.45 M |
| 4,995,639 | 2/1991 | Breed | 280/735 |
| 5,071,160 | 12/1991 | White et al. | 280/735 |
| 5,074,583 | 12/1991 | Fujita et al. | 280/735 |
| 5,118,134 | 6/1992 | Mattes et al. | 280/735 |
| 5,330,226 | 7/1994 | Gentry et al. | 280/735 |
| 5,366,241 | 11/1994 | Kithil | 280/735 |
| 5,398,185 | 3/1995 | Omura | 280/735 |
| 5,413,378 | 5/1995 | Steffens, Jr. et al. | 280/735 |
| 5,446,661 | 8/1995 | Gioutsos et al. | 280/735 |

(List continued on next page.)

#### FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 0 669 227 | 8/1995 | European Pat. Off. . | |
| 3802159 | 8/1989 | Germany | 280/735 |
| 4023109 | 1/1992 | Germany . | |
| 1-197151 | 8/1989 | Japan | 180/287 |
| 3-42337 | 2/1991 | Japan | 180/273 |
| 3-159838 | 7/1991 | Japan . | |
| 94/22603 | 10/1994 | WIPO | 280/735 |
| 95/27635 | 10/1995 | WIPO . | |

#### OTHER PUBLICATIONS

"Trends in Sensing Frontal Impacts", D. Breed et al., SAE Paper No. 890750, Feb., 1989.

"A Critique of Single Point Sensing", D. Breed et al., SAE Paper No. 920124, Feb., 1992.

"Mechanism of Injury From Air Bag Deployment Loads", Lau et al., Accid. Anal. & Prev., vol. 25, No. 1, pp. 29–45, 1993.

Primary Examiner—Peter C. English
Attorney, Agent, or Firm—Samuel Shipkovitz

[57] **ABSTRACT**

Method and system for detecting the presence of the child seat on a seat in which information about contents of the seat is obtained and a signal is generated based on any contents of the seat, a different signal being generated for different contents of the seat when such contents are present on the seat. The signal is analyzed in order to determine whether the contents of the seat include a child seat, and in a preferred embodiment, a child seat in a rear-facing orientation. Another system within the vehicle may be affected or controlled based on the determination of whether a child seat is present on the seat. The analysis of the signal is preferably by pattern recognition techniques that can recognize and thus identify the contents of the seat.

21 Claims, 22 Drawing Sheets



US006242701B1

(12) **United States Patent**
Breed et al.

(10) Patent No.: **US 6,242,701 B1**
(45) Date of Patent: **Jun. 5, 2001**

(54) **APPARATUS AND METHOD FOR MEASURING WEIGHT OF AN OCCUPYING ITEM OF A SEAT**

(75) Inventors: **David S. Breed**, Boonton Township, Morris County, NJ (US); **Wilbur E. DuVall**, Kimberling City, MO (US); **Jeffrey L. Morin**, Grosse Ile, MI (US)

(73) Assignee: **Automotive Technologies International, Inc.**, Denville, NJ (US)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **09/193,209**

(22) Filed: **Nov. 17, 1998**

**Related U.S. Application Data**

(63) Continuation-in-part of application No. 09/128,490, filed on Aug. 4, 1998, now Pat. No. 6,078,854, which is a continuation-in-part of application No. 08/970,822, filed on Nov. 14, 1997, now Pat. No. 6,081,757, and a continuation-in-part of application No. 08/474,783, filed on Jun. 7, 1995, now Pat. No. 5,822,707.

(51) Int. Cl.[7] .................. B60R 21/22; B60R 21/32; G01G 19/52; G01G 3/14

(52) U.S. Cl. .............. 177/144; 177/210 R; 180/273; 280/735; 701/45

(58) Field of Search .................. 177/136, 144, 177/210 R, 254, 211; 180/273; 280/735; 701/45; 340/667

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,275,975 | 9/1966 | King | 180/272 |
| 4,519,652 | 5/1985 | Kamijo | 180/268 |
| 4,625,320 | 11/1986 | Ishikawa | 382/104 |
| 4,645,233 | 2/1987 | Brasc et al. | 280/753 |
| 4,698,571 | 10/1987 | Mizuta et al. | 318/466 |
| 4,811,226 | 3/1989 | Shinohara | 318/466 |

| | | | |
|---|---|---|---|
| 5,006,946 | 4/1991 | Ando | 180/167 |
| 5,071,160 | 12/1991 | White et al. | 280/735 |
| 5,074,583 | 12/1991 | Fujita | 280/735 |
| 5,086,652 | * 1/1992 | Kropp | 73/767 |
| 5,090,493 | * 2/1992 | Bergen et al. | 177/211 |
| 5,118,134 | 6/1992 | Mattes | 280/735 |
| 5,125,686 | 6/1992 | Yano | 280/801.2 |
| 5,155,685 | 10/1992 | Kishi et al. | 364/424.05 |
| 5,161,820 | 11/1992 | Vollmer | 280/730 |

(List continued on next page.)

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 950560 | * 10/1999 | (EP) | 177/144 |
| 2289332 | 11/1995 | (GB) | 280/735 |

*Primary Examiner*—Randy W. Gibson
(74) *Attorney, Agent, or Firm*—Brian Roffe

(57) **ABSTRACT**

An apparatus for measuring the weight of an occupying item of a seat including a support structure for mounting the seat to a substrate. The apparatus includes a strain gage transducer mounted on the support structure and arranged to provide a measurement of the strain of the support structure at the location at which it is mounted. A control system is coupled to the strain gage transducer for determining the weight of the occupying item of the seat based on the strain of the support structure measured by the strain gage transducer. The weight measuring apparatus is used in a seat adjustment apparatus for adjusting a seat in a passenger compartment of a vehicle including wave sensors for transmitting waves into the passenger compartment toward the seat, receiving reflected waves from the passenger compartment and generating an output representative of the reflected waves received by the wave sensors, and a processor for receiving the outputs from the wave sensors and the weight measuring apparatus and evaluating the seated-state of the seat based thereon. The processor, e.g., directs a control unit to cause a portion of the seat to move based on the evaluation of the seated-state of the seat or to affect the deployment of an airbag.

**40 Claims, 30 Drawing Sheets**



US006325414B2

(12) **United States Patent**
Breed et al.

(10) Patent No.: **US 6,325,414 B2**
(45) Date of Patent: ***Dec. 4, 2001**

(54) **METHOD AND ARRANGEMENT FOR CONTROLLING DEPLOYMENT OF A SIDE AIRBAG**

(75) Inventors: **David S. Breed**, Boonton Township, Morris County, NJ (US); **Wilbur E. DuVall**, Kimberling City, MO (US); **Wendell C. Johnson**, San Diego, CA (US)

(73) Assignee: **Automotive Technologies International Inc.**, Denville, NJ (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **09/737,138**

(22) Filed: **Dec. 14, 2000**

**Related U.S. Application Data**

(63) Continuation of application No. 09/437,535, filed on Nov. 10, 1999, which is a continuation-in-part of application No. 09/047,703, filed on Mar. 25, 1998, now Pat. No. 6,039,139, which is a continuation-in-part of application No. 08/640, 068, filed on Apr. 30, 1996, now Pat. No. 5,829,782, which is a continuation of application No. 08/239,978, filed on May 9, 1994, now abandoned, which is a continuation-in-part of application No. 08/040,978, filed on Mar. 31, 1993, now abandoned, said application No. 09/047,703, is a continuation-in-part of application No. 08/905,877, filed on Aug. 4, 1997, now Pat. No. 6,186,537, which is a continuation of application No. 08/505,036, filed on Jul. 21, 1995, now Pat. No. 5,653,462, which is a continuation of application No. 08/040,978.

(51) Int. Cl.⁷ ........................................ **B60R 21/32**

(52) U.S. Cl. .................. **280/735**; 180/271; 180/272; 180/273; 180/282

(58) Field of Search ........................ 280/735; 180/271, 180/272, 273

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 3,275,975 | 9/1966 | King .................. 340/1 |
| 3,974,350 | 8/1976 | Breed .................. 200/61 |
| 4,198,864 | 4/1980 | Breed .................. 73/492 |
| 4,284,863 | 8/1981 | Breed .................. 200/61.53 |
| 4,329,549 | 5/1982 | Breed .................. 200/61.45 M |
| 4,573,706 | 3/1986 | Breed .................. 280/734 |
| 4,683,373 | 7/1987 | Tupman .................. 180/272 |
| 4,900,880 | 2/1990 | Breed .................. 200/61.45 M |
| 4,933,515 | 6/1990 | Behr et al. .................. 200/61.45 M |
| 4,995,639 | * | 2/1991 | Breed .................. 280/735 |
| 5,071,160 | * | 12/1991 | White et al. .................. 280/735 |
| 5,074,583 | * | 12/1991 | Fujita et al. .................. 280/735 |
| 5,118,134 | 6/1992 | Mattes .................. 280/735 |
| 5,222,761 | 6/1993 | Kaji et al. .................. 280/735 |
| 5,322,323 | 6/1994 | Ohno et al. .................. 280/735 |
| 5,330,226 | 7/1994 | Gentry et al. .................. 280/735 |
| 5,366,241 | 11/1994 | Kithil .................. 280/735 |

(List continued on next page.)

*Primary Examiner*—Lanna Mai
*Assistant Examiner*—Toan To
(74) *Attorney, Agent, or Firm*—Brian Roffe

(57) **ABSTRACT**

Arrangement and method for controlling deployment of a side airbag to protect a vehicular occupant during a crash. The presence and/or position of the occupant is/are determined and deployment of the airbag is controlled based thereon. A transducer receives waves from a space above a seat portion of the seat and a signal representative of the presence and/or position of the occupant is generated based on the received waves. The transducer may transmits waves into the space above the seat portion. The transducer may be mounted in a door of the vehicle and possibly adjacent the airbag module. Deployment of the airbag can be suppressed, the time at which deployment of the airbag starts, the rate of gas flow into the airbag, the rate of gas flow from the airbag and/or the rate of deployment of the airbag is/are controlled based on the presence and/or position of the occupant.

**41 Claims, 22 Drawing Sheets**



US006397136B1

## (12) United States Patent
Breed et al.

(10) Patent No.: **US 6,397,136 B1**
(45) Date of Patent: **May 28, 2002**

(54) **SYSTEM FOR DETERMINING THE OCCUPANCY STATE OF A SEAT IN A VEHICLE**

(75) Inventors: **David S. Breed**, Boonton Township, Morris County, NJ (US); **Wendell Johnson**, San Diego, CA (US); **Wilbur E. Duvall**, Kimberling City, MO (US); **Jeffrey L. Morin**, Grosse Ile, MI (US); **Kunhong Xu**, Rochester Hills, MI (US); **Andrew J. Varga**, Farmington Hills, MI (US)

(73) Assignee: **Automotive Technologies International Inc.**, Denville, NJ (US)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **09/474,147**

(22) Filed: **Dec. 29, 1999**

(Under 37 CFR 1.47)

### Related U.S. Application Data

(63) Continuation-in-part of application No. 09/382,406, filed on Aug. 24, 1999, which is a continuation-in-part of application No. 08/919,823, filed on Aug. 28, 1997, now Pat. No. 5,943,295, which is a continuation-in-part of application No. 08/798,029, filed on Feb. 6, 1997, now abandoned.

(60) Provisional application No. 60/136,163, filed on May 27, 1999.

(51) Int. Cl.⁷ ............................................. B60R 21/22
(52) U.S. Cl. .................... 701/45; 280/735; 180/273
(58) Field of Search ..................... 701/45, 46, 47, 701/49; 280/734, 735; 180/268, 271, 273; 318/286, 466, 467, 468

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,275,975 A | 9/1966 | King | 180/98 |
| 4,691,569 A | 9/1987 | Sato et al. | 73/596 |
| 4,881,270 A | 11/1989 | Knecht et al. | 382/17 |
| 4,906,940 A | 3/1990 | Greene et al. | 382/16 |
| 5,008,946 A | 4/1991 | Ando | 382/2 |
| 5,031,154 A | 7/1991 | Watanabe | 367/8 |
| 5,071,160 A | 12/1991 | White et al. | 280/735 |
| 5,074,583 A | 12/1991 | Fujita et al. | 280/735 |
| 5,118,134 A | 6/1992 | Mattes et al. | 280/735 |
| 5,161,254 A | 1/1993 | Schweizer et al. | 382/1 |

(List continued on next page.)

FOREIGN PATENT DOCUMENTS

EP    0669227    8/1995

OTHER PUBLICATIONS

Integrated CAE Modeling of Intelligent Restraint Systems, M. Murad et al., SAE Technical Paper Series No. 2000-01-0606, Mar. 6-9, 2000.

*Primary Examiner*—William A. Cuchlinski, Jr.
*Assistant Examiner*—Gertrude Arthur
(74) *Attorney, Agent, or Firm*—Brian Roffe

(57) **ABSTRACT**

System for determining the occupancy of a seat in a vehicle using a variety of transducers and pattern recognition technologies and techniques that applies to any combination of transducers that provide information about seat occupancy. These include weight sensors, capacitive sensors, inductive sensors, ultrasonic, optical, electromagnetic, motion, infrared, and radar among others. The system includes a processor coupled to the transducers for receiving the data from the transducers and processing the data to obtain an output indicative of the current occupancy state of the seat. An algorithm is resident in the processor and is created from a plurality of data sets, each representing a different occupancy state of the seat and being formed from data from the transducers while the seat is in that occupancy state. The algorithm produces the output indicative of the current occupancy state of the seat upon inputting a data set representing the current occupancy state of the seat and being formed from data from the transducers. The algorithm may be a neural network or neural fuzzy algorithm generated by an appropriate algorithm-generating program.

**70 Claims, 12 Drawing Sheets**



US006422595B1

(12) **United States Patent**
Breed et al.

(10) Patent No.: **US 6,422,595 B1**
(45) Date of Patent: **\*Jul. 23, 2002**

(54) OCCUPANT POSITION SENSOR AND METHOD AND ARRANGEMENT FOR CONTROLLING A VEHICULAR COMPONENT BASED ON AN OCCUPANT'S POSITION

(75) Inventors: **David S. Breed**, Boonton Township, Morris County, NJ (US); **Wendell Johnson**, San Diego, CA (US); **Wilbur E. Duvall**, Kimberling City, MO (US)

(73) Assignee: **Automotive Technologies International, Inc.**, Denville, NJ (US)

(\*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **09/639,299**

(22) Filed: **Aug. 15, 2000**

**Related U.S. Application Data**

(63) Continuation-in-part of application No. 09/448,338, filed on Nov. 23, 1999, which is a continuation-in-part of application No. 09/448,337, filed on Nov. 23, 1999, which is a continuation-in-part of application No. 09/409,625, filed on Oct. 1, 1999, which is a continuation-in-part of application No. 08/905,877, filed on Aug. 4, 1997, now Pat. No. 6,186,537, which is a continuation of application No. 08/505,036, filed on Jul. 21, 1995, now Pat. No. 5,653,462, which is a continuation of application No. 08/040,978, filed on Mar. 31, 1993, now abandoned, which is a continuation-in-part of application No. 07/878,571, filed on May 5, 1992, now abandoned.

(51) Int. Cl.[7] .............................. B60R 21/32; B60K 28/00
(52) U.S. Cl. .............................. 280/735; 180/272; 701/45
(58) Field of Search .............................. 280/735; 180/272; 701/45

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,275,975 A | 9/1966 | King | 340/1 |
| 3,974,350 A | 8/1976 | Breed | 200/61 |

(List continued on next page.)

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| DE | 3737554 | 5/1989 | |
| DE | 3802159 | 8/1989 | 280/735 |

(List continued on next page.)

OTHER PUBLICATIONS

"Trends in Sensing Frontal Impacts", D. Breed et al., SAE Paper No. 890750, Feb., 1989.

(List continued on next page.)

Primary Examiner—Paul N. Dickson
Assistant Examiner—Joselyn Y Sliteris
(74) Attorney, Agent, or Firm—Brian Roffe

(57) **ABSTRACT**

Arrangement and method in a vehicle for identifying an occupying item in which information or data about the occupying item is obtained and a pattern recognition system analyzes this information or data with respect to size, position, shape and/or motion to determine what the occupying item is whereby a distinction can be made as to whether the occupying item is human or an inanimate object. The information or data may be obtained by one or more receiver arrays which converts electromagnetic radiation into electrical signals such that the information or data about the occupying item is in the form of one or more electrical signals representative of an image of the occupying item. The same information or data may be used in arrangements and methods for controlling a vehicular component which also include a pattern recognition system for receiving and analyzing the information or data and a control unit for controlling the vehicular component based on the analysis of the information or data about the occupying item with respect to the size, position, shape and/or motion by the pattern recognition system.

**42 Claims, 8 Drawing Sheets**



US006869100B2

(12) **United States Patent**
Breed et al.

(10) Patent No.: **US 6,869,100 B2**
(45) Date of Patent: *Mar. 22, 2005

(54) **METHOD AND APPARATUS FOR CONTROLLING AN AIRBAG**

(75) Inventors: David S. Breed, Boonton Township, Morris County, NJ (US); Wilbur E. DuVall, Kimberling City, MO (US); Wendell C. Johnson, Signal Hill, CA (US)

(73) Assignee: Automotive Technologies International, Inc., Denville, NJ (US)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 76 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: 10/234,067

(22) Filed: **Sep. 3, 2002**

(65) **Prior Publication Data**

US 2003/0001368 A1 Jan. 2, 2003

**Related U.S. Application Data**

(63) Continuation-in-part of application No. 09/778,137, filed on Feb. 7, 2001, now Pat. No. 6,513,830, which is a continuation of application No. 08/905,877, filed on Aug. 4, 1997, now Pat. No. 6,186,537, which is a continuation of application No. 08/505,036, filed on Jul. 21, 1995, now Pat. No. 5,653,462, which is a continuation of application No. 08/040,978, filed on Mar. 31, 1993, now abandoned, which is a continuation-in-part of application No. 07/878,571, filed on May 5, 1992, now abandoned.

(51) Int. Cl.[7] .................................................. B60R 21/32
(52) U.S. Cl. ................................................ 280/735
(58) Field of Search .............................. 280/734, 735; 701/45

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,275,975 A | 9/1966 | King | 340/1 |
| 3,974,350 A | 8/1976 | Breed | 200/61 |
| 4,198,864 A | 4/1980 | Breed | 73/492 |
| 4,284,863 A | 8/1981 | Breed | 200/61.53 |
| 4,329,549 A | 5/1982 | Breed | 200/61.45 M |
| 4,573,706 A | 3/1986 | Breed | 280/734 |
| 4,625,329 A | 11/1986 | Ishikawa et al. | 382/1 |
| 4,683,373 A | 7/1987 | Tupman | 180/272 |

(List continued on next page.)

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| DE | 3737554 | 5/1989 | |
| DE | 4112579 | 10/1991 | |
| DE | 4023109 | 1/1992 | |
| JP | 3-159838 | 7/1991 | |
| WO | 94/22693 | 10/1994 | 280/735 |
| WO | 01/04648 | 1/2001 | |

*Primary Examiner*—Ruth Ilan
(74) *Attorney, Agent, or Firm*—Brian Roffe

(57) **ABSTRACT**

Method and system for controlling deployment of an airbag in which the position of an occupant to be protected by deployment of the airbag is determined, the probability that a crash requiring deployment of the airbag is occurring is assessed and deployment of the airbag enabled in consideration of the determined position of the occupant and the assessed probability that a crash is occurring. Deployment of the airbag may be enabled by analyzing the assessed probability relative to a pre-determined threshold whereby deployment of the airbag is enabled only when the assessed probability is greater than the threshold. The threshold may be adjusted based on the determined position of the occupant.

**62 Claims, 9 Drawing Sheets**



US006757602B2

(12) **United States Patent** (10) Patent No.: **US 6,757,602 B2**
Breed et al. (45) Date of Patent: **Jun. 29, 2004**

(54) **SYSTEM FOR DETERMINING THE OCCUPANCY STATE OF A SEAT IN A VEHICLE AND CONTROLLING A COMPONENT BASED THEREON**

(75) Inventors: **David S. Breed**, Boonton Township, Morris County, NJ (US); **Wilbur E. DuVall**, Kimberling City, MO (US); **Wendell C. Johnson**, Signal Hill, CA (US); **Jeffrey L. Morin**, Lincoln Park, MI (US); **Kunhong Xu**, Rochester Hills, MI (US); **Michael E. Kussul**, Kyiv (UA); **Tie-Qi Chen**, Windsor (CA)

(73) Assignee: **Automotive Technologies International, Inc.**, Denville, NJ (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 29 days.

(21) Appl. No.: **10/234,436**

(22) Filed: **Sep. 3, 2002**

(65) **Prior Publication Data**

US 2003/0036835 A1 Feb. 20, 2003

**Related U.S. Application Data**

(63) Continuation-in-part of application No. 09/853,118, filed on May 10, 2001, now Pat. No. 6,445,988, which is a continuation-in-part of application No. 09/382,406, filed on Aug. 24, 1999, now Pat. No. 6,529,809, which is a continuation-in-part of application No. 09/474,147, filed on Dec. 29, 1999, now Pat. No. 6,397,136, which is a continuation-in-part of application No. 08/798,029, filed on Feb. 6, 1997, now abandoned, which is a continuation-in-part of application No. 08/919,823, filed on Aug. 28, 1997, now Pat. No. 5,943,295.

(60) Provisional application No. 60/136,163, filed on May 27, 1999.

(51) Int. Cl.[7] .................................................. G06F 7/00

(52) U.S. Cl. ...................... 701/45; 180/268; 180/271; 280/735

(58) Field of Search ........................... 701/45, 46, 47; 180/268, 271, 272, 273; 280/735

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 5,482,314 A | * | 1/1996 | Corrado et al. | 280/735 |
| 5,528,698 A | * | 6/1996 | Kamei et al. | 382/100 |
| 6,324,453 B1 | * | 11/2001 | Breed et al. | 701/45 |
| 6,445,988 B1 | * | 9/2002 | Breed et al. | 701/45 |

OTHER PUBLICATIONS

Breed et al.; Audio reception control arrangement and method for a vehicle; U.S. 2001/0038698, Nov. 8, 2001.*

* cited by examiner

*Primary Examiner*—Gertrude A. Jeanglaude
(74) *Attorney, Agent, or Firm*—Brian Roffe

(57) **ABSTRACT**

Method for controlling an occupant protection device in a vehicle in which data is acquired from at least one sensor relating to an occupant in a seat to be protected by the occupant protection device, the type of occupant is classified based on the acquired data and when the occupant is classified as an empty seat or a rear-facing child seat, deployment of the occupant protection device is disabled or adjusted. Otherwise, the size of the occupant is classified based on the acquired data, the position of the occupant is determined by one of a plurality of algorithms selected based on the classified size of the occupant using the acquired data, each algorithm being applicable for a specific size of occupant. Deployment of the occupant protection device is disabled or adjusted when the determined position of the occupant is more likely to result in injury to the occupant if the occupant protection device were to deploy. The algorithms may be pattern recognition algorithms such as neural networks.

**56 Claims, 50 Drawing Sheets**





US006712387B1

(12) **United States Patent**
Breed et al.

(10) Patent No.: **US 6,712,387 B1**
(45) Date of Patent: **\*Mar. 30, 2004**

(54) **METHOD AND APPARATUS FOR CONTROLLING DEPLOYMENT OF A SIDE AIRBAG**

(75) Inventors: **David S. Breed**, Boonton Township, Morris County, NJ (US); **Wilbur E. DuVall**, Kimberling City, MO (US); **Wendell C. Johnson**, San Diego, CA (US)

(73) Assignee: **Automotive Technologies International, Inc.**, Denville, NJ (US)

(\*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: 09/437,535

(22) Filed: **Nov. 10, 1999**

**Related U.S. Application Data**

(63) Continuation-in-part of application No. 09/047,703, filed on Mar. 25, 1998, now Pat. No. 6,039,139, which is a continuation-in-part of application No. 08/905,876, filed on Aug. 4, 1997, now Pat. No. 5,848,802, which is a continuation of application No. 08/505,036, filed on Jul. 21, 1995, now Pat. No. 5,653,462, and a continuation-in-part of application No. 08/640,068, filed on Apr. 30, 1996, now Pat. No. 5,829,782, which is a continuation of application No. 08/239,978, filed on May 9, 1994, now abandoned, which is a continuation-in-part of application No. 08/040,978, filed on Mar. 31, 1993, now abandoned, which is a continuation-in-part of application No. 07/878,571, filed on May 5, 1992, now abandoned.

(51) Int. Cl.[7] .................................. B60R 21/32

(52) U.S. Cl. ................... 280/735; 180/272; 180/273

(58) Field of Search ................. 280/735; 180/271, 180/272, 273

(56) **References Cited**

U.S. PATENT DOCUMENTS

3,275,975 A   9/1966 King .......................... 340/1

(List continued on next page.)

FOREIGN PATENT DOCUMENTS

DE      3802159   8/1989 .......................... 280/735

(List continued on next page.)

OTHER PUBLICATIONS

"Trends in Sensing Frontal Impacts", D. Breed et al., SAE Paper No. 890750, Feb., 1989.

(List continued on next page.)

Primary Examiner—Paul N. Dickson
Assistant Examiner—Toan C To
(74) Attorney, Agent, or Firm—Brian Roffe

(57) **ABSTRACT**

An arrangement and method for controlling deployment of a side airbag from an airbag module to protect an occupant in a seat of a vehicle in a crash. The presence of an occupant and/or position of the occupant or a part thereof is/are determined and deployment of the side airbag is controlled based thereon. To determine the presence of the occupant and/or position of the occupant or part thereof, a transducer is arranged to receive waves from a space above a seat portion of the seat and a signal representative of the presence and/or position of the occupant is generated based on the waves received by the transducer. The transducer can be designed to transmit waves into the space above the seat portion of the seat which are also receivable thereby. The transducer may be mounted in a door of the vehicle to enable the distance between the occupant and the door to be determined, i.e., to determine whether the occupant is leaning against the door, and possibly adjacent the airbag module if it is situated in the door. In these cases, deployment of the side airbag can be suppressed. In the alternative the time at which deployment of the side airbag starts, the rate of gas flow into the side airbag, the rate of gas flow out of the side airbag and/or the rate of deployment of the side airbag is/are controlled.

**38 Claims, 22 Drawing Sheets**



US006942248B2

(12) **United States Patent**    (10) Patent No.:    **US 6,942,248 B2**
Breed et al.                      (45) Date of Patent:    Sep. 13, 2005

(54) **OCCUPANT RESTRAINT DEVICE CONTROL SYSTEM AND METHOD**

(75) Inventors: **David S. Breed**, Boonton Township, Morris County, NJ (US); **Wilbur E. DuVall**, Kimberling City, MO (US); **Wendell C. Johnson**, Signal Hill, CA (US)

(73) Assignee: **Automotive Technologies International, Inc.**, Denville, NJ (US)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 302 days.

(21) Appl. No.: **10/114,533**

(22) Filed: **Apr. 2, 2002**

(65)        **Prior Publication Data**

US 2002/0140214 A1 Oct. 3, 2002

        **Related U.S. Application Data**

(63) Continuation-in-part of application No. 10/058,706, filed on Jan. 28, 2002, which is a continuation-in-part of application No. 09/891,432, filed on Jun. 26, 2001, now Pat. No. 6,513,833, which is a continuation-in-part of application No. 09/838,920, filed on Apr. 20, 2001, now Pat. No. 6,778,672, which is a continuation-in-part of application No. 09/563,556, filed on May 3, 2000, now Pat. No. 6,474,683, which is a continuation-in-part of application No. 09/437,535, filed on Nov. 10, 1999, now Pat. No. 6,712,387, which is a continuation-in-part of application No. 09/047,703, filed on Mar. 25, 1998, now Pat. No. 6,039,139, which is a continuation of application No. 08/640,068, filed on Apr. 30, 1996, now Pat. No. 5,829,782, which is a continuation of application No. 08/239,978, filed on May 9, 1994, now abandoned, which is a continuation-in-part of application No. 08/040,978, filed on Mar. 31, 1993, now abandoned, which is a continuation-in-part of application No. 07/878,571, filed on May 5, 1992, now abandoned, said application No. 09/047,703, is a continuation-in-part of application No. 08/905,876, filed on Aug. 4, 1997, now Pat. No. 5,848,802, which is a continuation of application No. 08/505,036, filed on Jul. 21, 1995, now Pat. No. 5,653,462, which is a continuation of application No. 08/040,978, filed on Mar. 31, 1993, now abandoned, which is a continuation-in-part of

application No. 07/878,571, filed on May 5, 1992, now abandoned, said application No. 10/058,706, is a continuation-in-part of application No. 09/639,299, filed on Aug. 15, 2000, which is a continuation-in-part of application No. 09/505,877, filed on Aug. 4, 1997, now Pat. No. 6,186,537, which is a continuation of application No. 08/505,036, said application No. 09/639,299, is a continuation-in-part of application No. 09/409,625, filed on Oct. 1, 1999, now Pat. No. 6,270,116, which is a continuation-in-part of application No. 08/905,877, said application No. 09/639,299, is a continuation-in-part of application No. 09/448,337, filed on Nov. 23, 1999, now Pat. No. 6,283,503, which is a continuation-in-part of application No. 08/905,877, said application No. 09/639,299, is a continuation-in-part of application No. 09/448,338, filed on Nov. 23, 1999, now Pat. No. 6,158,186, which is a continuation-in-part of application No. 08/905,877, said application No. 10/058,706, is a continuation-in-part of application No. 09/543,678, filed on Apr. 7, 2000, which is a continuation-in-part of application No. 09/047,704, filed on Mar. 25, 1998, now Pat. No. 6,116,638, which is a continuation-in-part of application No. 08/640,068, said application No. 09/047,704, is a continuation-in-part of application No. 08/905,876, filed on Aug. 4, 1997, now Pat. No. 5,848,802, which is a continuation-in-part of application No. 08/505,036.

(51) Int. Cl.7 .................................. B60R 21/32
(52) U.S. Cl. ................. 280/735; 180/272; 701/45
(58) Field of Search .................... 280/735, 734; 180/272; 701/45, 49

(56)        **References Cited**

        U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,275,975 A | 9/1966 | King | 340/1 |
| 3,974,350 A | 8/1976 | Breed | 200/61 |
| 4,198,864 A | 4/1980 | Breed | 73/492 |
| 4,284,863 A | 8/1981 | Breed | 200/61.53 |
| 4,329,549 A | 5/1982 | Breed | 200/61.45 M |
| 4,573,706 A | 3/1986 | Breed | 280/734 |
| 4,683,373 A | 7/1987 | Tupman | 180/272 |
| 4,732,157 A | 3/1988 | Kaplan et al. | 128/696 |
| 4,900,880 A | 2/1990 | Breed | 200/61.45 M |
| 4,933,515 A | 6/1990 | Behr et al. | 200/61.45 M |
| 4,984,651 A | 1/1991 | Grosch et al. | 180/268 |
| 4,995,639 A | 2/1991 | Breed | 280/735 |
| 5,071,160 A | 12/1991 | White et al. | 280/735 |
| 5,074,583 A | 12/1991 | Fujita et al. | 280/735 |
| 5,101,831 A | 4/1992 | Koyama et al. | 128/687 |
| 5,118,134 A | 6/1992 | Mattes et al. | 280/735 |
| 5,161,820 A | 11/1992 | Vollmer | 280/730 |



US006958451B2

(12) **United States Patent**　　　　　　(10) Patent No.:　US 6,958,451 B2
Breed et al.　　　　　　　　　　　　　　　(45) Date of Patent:　Oct. 25, 2005

(54) **APPARATUS AND METHOD FOR MEASURING WEIGHT OF AN OCCUPYING ITEM OF A SEAT**

(75) Inventors: **David S. Breed**, Boonton Township, Morris County, NJ (US); **Wilbur E. Du Vall**, Kimberling City, MO (US); **Wendell C. Johnson**, Signal Hill, CA (US)

(73) Assignee: **Automotive Technologies International, Inc.**, Denville, NJ (US)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 67 days.

(21) Appl. No.: **10/174,803**

(22) Filed: **Jun. 19, 2002**

(65) **Prior Publication Data**

US 2003/0056997 A1 Mar. 27, 2003

**Related U.S. Application Data**

(63) Continuation-in-part of application No. 09/901,879, filed on Jul. 9, 2001, now Pat. No. 6,555,766, which is a continuation of application No. 09/849,559, filed on May 4, 2001, which is a continuation-in-part of application No. 09/193,209, filed on Nov. 17, 1998, now Pat. No. 6,242,701, which is a continuation-in-part of application No. 09/128,490, filed on Aug. 4, 1998, now Pat. No. 6,078,854, which is a continuation-in-part of application No. 08/474,783, filed on Nov. 14, 1997, now Pat. No. 6,081,757, and a continuation-in-part of application No. 08/474,783, filed on Jan. 7, 1995, now Pat. No. 5,822,701, application No. 10/174,803, which is a continuation-in-part of application No. 09/849,559, which is a continuation-in-part of application No. 09/193,209, which is a continuation-in-part of application No. 09/128,490, which is a continuation-in-part of application No. 08/970,822, and a continuation-in-part of application No. 08/474,783, application No. 10/174,803, which is a continuation-in-part of application No. 09/849,598, filed on May 4, 2001, now Pat. No. 6,653,577, which is a continuation-in-part of application No. 09/193,209, which is a continuation-in-part of application No. 09/128,490, which is a continuation-in-part of application No. 08/970,822, and a continuation-in-part of application No. 08/474,783, application No. 10/174,803, which is a continuation-in-part of application No. 09/770,974, filed on Jan. 26, 2001, now Pat. No. 6,648,367, and a continuation-in-part of application No. 09/767,020, filed on Jan. 23, 2001, now Pat. No. 6,533,316, and a continuation-in-part of application No. 09/753,186, filed on Jan. 2, 2001, now Pat. No. 6,484,080, application No. 10/174,803, which is a continuation-in-part of application No. 09/500,346, filed on Feb. 8, 2000, now Pat. No. 6,442,504, which is a continuation-in-part of application No. 09/128,490, which is a continuation-in-part of application No. 08/970,822, and a continuation-in-part of application No. 08/474,783.

(51) Int. Cl.⁷ ............................................. B60R 21/32
(52) U.S. Cl. ..................... 177/1; 177/144; 702/101; 180/273; 280/735; 701/45
(58) Field of Search ........................ 701/45; 702/101; 702/102; 180/273; 280/735; 177/136, 144, 210 R, 1

(56) **References Cited**

U.S. PATENT DOCUMENTS

| 3,275,975 A | 9/1966 | King | 180/272 |
| 4,519,652 A | 5/1985 | Kamijo | 180/268 |

(Continued)

FOREIGN PATENT DOCUMENTS

| EP | 950560 | 10/1999 | 177/144 |
| EP | 0990565 | 4/2000 | |

(Continued)

*Primary Examiner*—Randy W. Gibson
(74) *Attorney, Agent, or Firm*—Brian Roffe

(57) **ABSTRACT**

Arrangement and method for determining weight of an occupying item in a seat including one or more weight sensors arranged to obtain a measurement of the force applied to the seat, a forcing function determination arrangement for measuring a forcing function of the seat and a processor coupled to the weight sensor(s) and forcing function determination arrangement for receiving the measurement of the force applied to the weight sensor(s) and the measurement of the forcing function from the forcing function measurement system and determining the weight of the occupying item based thereon. The forcing function determination arrangement may include an accelerometer and measures effects on the seat caused by load of a seatbelt associated with the seat and/or effects on the seat of road roughness, steering maneuvers, and a vehicle suspension system.

**39 Claims, 36 Drawing Sheets**



US006484080B2

(12) **United States Patent**
Breed

(10) Patent No.: **US 6,484,080 B2**
(45) Date of Patent: *Nov. 19, 2002

(54) **METHOD AND APPARATUS FOR CONTROLLING A VEHICULAR COMPONENT**

(75) Inventor: **David S. Breed**, Boonton Township, Morris County, NJ (US)

(73) Assignee: **Automotive Technologies International Inc.**, Denville, NJ (US)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 45 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **09/753,186**

(22) Filed: **Jan. 2, 2001**

(65) **Prior Publication Data**

US 2001/0002451 A1 May 31, 2001

**Related U.S. Application Data**

(63) Continuation-in-part of application No. 09/437,918, filed on Aug. 20, 1998, now Pat. No. 6,175,787, which is a continuation-in-part of application No. 08/476,077, filed on Jun. 7, 1995, now Pat. No. 5,809,437.

(60) Provisional application No. 60/231,378, filed on Sep. 8, 2000.

(51) Int. Cl.⁷ .................................................. **G06F 7/00**

(52) U.S. Cl. ............................ **701/34; 701/29; 701/34**

(58) Field of Search ....................... 701/29, 30, 34, 701/36, 45; 340/438, 439; 307/9.1

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,128,005 A | 12/1978 | Arnston et al. | 73/117.3 |
| 4,418,388 A | 11/1983 | Allgor et al. | 364/431.11 |
| 4,817,418 A | 4/1989 | Asami et al. | 73/118.1 |
| 4,989,146 A | 1/1991 | Imajo | 701/29 |
| 5,041,976 A | 8/1991 | Marko et al. | 364/424.03 |
| 5,123,017 A | 6/1992 | Simpkins et al. | 714/26 |
| 5,164,901 A | 11/1992 | Blackburn et al. | 701/47 |
| 5,219,407 A | 6/1993 | Tiemen et al. | 364/506 |
| 5,325,082 A | 6/1994 | Rodriguez | 340/438 |
| 5,532,340 A | 7/1994 | Matsumoto et al. | 701/20 |
| 5,400,018 A | 3/1995 | Scholl et al. | 340/825.54 |
| 5,806,502 A | 4/1995 | Hannaby et al. | 364/551.01 |
| 5,920,794 A | 3/1995 | James | 701/117 |
| 5,442,553 A | 8/1995 | Parrillo | 364/424.04 |
| 5,481,906 A | 10/1996 | Nagayoshi et al. | 73/116 |
| 5,594,740 A | 1/1997 | LaDue | 829/59 |
| 5,754,965 A | 5/1998 | Hagenbuch | |

(List continued on next page.)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| WO | 00/29257 | 5/2000 |

OTHER PUBLICATIONS

Liubakka et al., "Failure Detection Algorithm Applied To Control System Design For Improved Diagnosis And Reliability", SAE Technical Paper Series, 03–29 To 04–04, 1988, pp. 1–7.

(List continued on next page.)

*Primary Examiner*—Yonel Beaulieu
(74) *Attorney, Agent, or Firm*—Brian Roffe

(57) **ABSTRACT**

Control system and method for controlling a part of the vehicle in which sensor systems are mounted at different locations in the vehicle, each sensor system providing a measurement related to a state of the sensor system or a measurement related to a state of the mounting location. A processor coupled to the sensor systems diagnoses the state of the vehicle based on the measurements of the sensor system, e.g., by the application of a pattern recognition technique. The processor controls the part based at least in part on the diagnosed state of the vehicle. At least one of the sensor systems may be a high dynamic range accelerometer, a sensor selected from a group consisting of a single axis acceleration sensor, a double axis acceleration sensor, a triaxial acceleration sensor and a gyroscope, and may optionally include an RFID response unit.

62 Claims, 7 Drawing Sheets



www.freepatentsonline.com

ATI06138



US006850824B2

(12) **United States Patent**   (10) Patent No.: **US 6,850,824 B2**
Breed   (45) Date of Patent: **Feb. 1, 2005**

(54) **METHOD AND APPARATUS FOR CONTROLLING A VEHICULAR COMPONENT**

(75) Inventor: **David S. Breed**, Boonton Township, Morris County, NJ (US)

(73) Assignee: **Automotive Technologies International, Inc.**, Denville, NJ (US)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **10/613,453**

(22) Filed: **Jul. 3, 2003**

(65) **Prior Publication Data**

US 2004/0039509 A1 Feb. 26, 2004

**Related U.S. Application Data**

(63) Continuation of application No. 10/188,673, filed on Jul. 3, 2002, now Pat. No. 6,738,697, which is a continuation-in-part of application No. 10/174,709, filed on Jun. 19, 2002, now Pat. No. 6,715,806, which is a continuation-in-part of application No. 09/753,186, filed on Jan. 2, 2001, now Pat. No. 6,484,080, which is a continuation-in-part of application No. 09/137,918, filed on Aug. 20, 1998, now Pat. No. 6,175,787, which is a continuation-in-part of application No. 08/476,077, filed on Jun. 7, 1995, now Pat. No. 5,809,437, and a continuation-in-part of application No. 10/079,065, filed on Feb. 19, 2002, now Pat. No. 6,662,642, which is a continuation-in-part of application No. 09/765,558, filed on Jan. 19, 2001, now Pat. No. 6,748,797.

(60) Provisional application No. 60/231,378, filed on Sep. 8, 2000, provisional application No. 60/269,415, filed on Feb. 16, 2001, provisional application No. 60/291,511, filed on May 16, 2001, and provisional application No. 60/304,013, filed on Jul. 9, 2001.

(51) Int. Cl.⁷ ................................. G06F 7/00

(52) U.S. Cl. .................. 701/36; 701/29; 701/34

(58) Field of Search ..................... 701/29, 34, 36, 701/45; 307/9.1

(56) **References Cited**

U.S. PATENT DOCUMENTS

| 4,128,005 A | 12/1978 | Arnston et al. ........... 73/117.3 |
| 4,418,388 A | 11/1983 | Allgor et al. ........... 364/431.01 |

| 4,817,418 A | 4/1989 | Asami et al. ........... 73/118.1 |
| 4,986,146 A | 1/1991 | Imajo ........... 701/29 |
| 5,041,976 A | 8/1991 | Marko et al. ........... 364/424.03 |
| 5,123,017 A | 6/1992 | Simpkins et al. ........... 714/25 |
| 5,164,901 A | 11/1992 | Blackburn et al. ........... 701/47 |
| 5,313,407 A | 5/1994 | Tiernan et al. ........... 364/508 |
| 5,325,082 A | 6/1994 | Rodriguez ........... 340/439 |
| 5,333,240 A | 7/1994 | Matsumoto et al. ........... 706/20 |
| 5,400,018 A | 3/1995 | Scholl et al. ........... 340/825.54 |
| 5,406,502 A | 4/1995 | Haramaty et al. ........... 364/551.01 |

(List continued on next page.)

FOREIGN PATENT DOCUMENTS

| DE | 3839959 | 11/1988 |
| WO | 0028257 | 5/2000 |

OTHER PUBLICATIONS

Linkabits et al., "Failure Detection Algorithms Applied To Control System Design For Improved Diagnostics And Reliability", SAE Technical Paper Series, 02–29 To 04–04, 1988, pp. 1–7.

James et al., "Microprocessor Based Data Acquisition for Analysis Of Engine Performance", SAE Technical Paper Series, Feb, 23–27, 1987, pp. 1–9.

Engine Monitoring Based on Normalized Vibration Spectra, NASA Tech Briefs, MFS–26529, 1994.

(List continued on next page.)

*Primary Examiner*—Yonel Beaulieu
(74) *Attorney, Agent, or Firm*—Brian Roffe

(57) **ABSTRACT**

Control system and method for controlling an occupant restraint system in which a plurality of electronic sensors are mounted at different locations on the vehicle, each sensor providing a measurement related to a state thereof or a measurement related to a state of the mounting location. A processor is coupled to the sensors and diagnoses the state of the vehicle based on the measurements of the sensors. The processor controls the occupant restraint system based at least in part on the diagnosed state of the vehicle in an attempt to minimize injury to an occupant.

**31 Claims, 39 Drawing Sheets**



# EXHIBIT 9



## SCIENCE NEWS Online

THE WEEKLY NEWSMAGAZINE OF SCIENCE

Search _____ GO



⊞Print Article

⊞E-mail Article

Week of June 19, 2004; Vol. 165, No. 25, p. 392

Subs

1·

# Sixth Sense

## Probing the world by means of electric auras

**Peter Weiss**



*Science News* Books.

### audible.com®

Subscribe to *Science News* in an audio format.



Science News for Kids



- **Math Trek**
  Earth Hole

- **Food for Thought**
  Coming Soon—
  Spud Lite

- **Science Safari**
  Backyard Nature

- **TimeLine**
  70 Years Ago in
  *Science News*



*Science News* e-

A decade ago, Philip H. Rittmueller was a man on a mission. By the early 1990s, the automobile industry knew that airbags, while successful at saving lives in crashes, could also prove deadly to children and small adults (SN: 9/26/98, p. 206: http://www.sciencenews.org/pages/sn_arc98/9_26_98/bob3.htm). As an engineer with NEC Technologies Automotive Electronics Division at that time, Rittmueller was looking for a technological fix for this lethal threat. Yet none of the approaches Rittmueller knew about for the automatic sizing up of car seat occupants—including weight sensing, ultrasonic scanning, and optical imaging—seemed good enough. "I was looking under all sorts of rocks," Rittmueller recalls.

Then, in the fall of 1994 at the Massachusetts Institute of Technology, Rittmueller found the right rock. He was visiting the university's hotbed of invention, known as the Media Lab, when he saw what looked like a throne flanked by two lighted Plexiglas poles, and he viewed a startling video showing how such a "spirit chair" was used in magic shows by the famous duo Penn and Teller.

In the video, Penn sat in the chair. As he gestured wildly with both hands and feet, drums, trumpets, cymbals, and other musical sounds blared out. No wires linked Penn to the synthesizers making the sounds, yet the device sensed his every move.

When Rittmueller tried the gadget in the lab, its speed and three-dimensional awareness were "amazing," he recalls. If such a wireless-sensing system could be adapted to track an occupant of an automobile, he figured, he would be on his way to a superior airbag-controller that could determine the size and position of a passenger or driver and then judge whether it was dangerous to fire the airbag to its full extent.

On the spot, Rittmueller and the chair's designers started sketching possible airbag-related designs. Today, that collaboration between MIT and Rittmueller's Suwanee, Ga.–based automotive-electronics company, now called Elesys North America, is bearing its first fruit—an airbag controller that's already in some cars and soon to be introduced in many more.

ATI3915

LETTER.


Archives

New Science News
pdf Archive,
1993-2000

Science News is
published by


Firefox 1.5
Rediscover the web

The commercial use of the technology is expected to mushroom beyond the airbag niche, say developers of electric field imaging, the heart of the new technology. "We're letting objects know what's around them," says Media Lab physicist Neil A. Gershenfeld. In this increasingly automated world, any technology that can do that reliably, cheaply, and autonomously could be useful in many places.

## Taking charge

Imaging things in the world by means of electric fields actually started out as nature's own technology.

Several species of fish in South America and Africa generate and detect weak electric fields. Because small fish, larvae, and other prey perturb the electric fields around the field-generating fish, voltage-sensitive cells in their skin can detect these objects. Weakly electric fish, as they are called, also use electric signals to recognize and attract potential mates.


*E-FISH. This elephant nose, a human hand-size Congo River fish of the Campylomormyrus genus, generates weak electric fields for detecting prey and mates.*
C. Hopkins

Electric field sensing has made it into the technoscape too. Anyone who has pushed one of those elevator buttons that responds to a finger's touch without itself moving has triggered an electric field sensor. A weak electric field continuously emanates from such buttons. When a finger contacts the button, that field becomes distorted. This causes an electric current increase in the button's circuit that's then interpreted by the elevator's control circuitry as, say, the "go to floor 10" command.

Similar ways of using electric fields to sense nearby objects have been in use for roughly a century. Back in the 1920s, the Russian inventor Leon Theremin created one of the first electronic musical instruments, and it was based on electric field sensing.

Today, in addition to elevators, electric field sensing shows up in touch screens and pads on computers and stud finders that locate wooden supports in walls. Still, "That's the old-fashioned measurement," notes Media Lab physicist Joseph A. Paradiso.

Media Lab researchers in the early 1990s realized that it might be possible to use electric fields to image objects, not just to detect their presence. The scientists weren't looking for crisp optical imaging, but rather a fuzzier result that would be good enough to make out sizes, shapes, and positions of objects. This imprecise approach saves processing time and resources, says Joshua R. Smith of Intel Research in Seattle.

In 1991, the MIT researchers began adding electronics to conventional musical instruments, such as cellos and violins, so that computers could detect players' bowing or other movements and produce electronic sounds to accompany the natural tones of the instrument. Tod Machover, a Media Lab composer and electronic-instrument developer, and Gershenfeld built the first such

Ads

Imp
ins
for
con
www

Air
Sen
All
Tac
On
(80
www

Po
Tra
Fin
You
Co
& S
www

Ge
Ext
Tra
Pla
Foo
oth
gen

Adv


Muse
and M


Sho

hyperinstrument, a hypercello for Yo-Yo Ma.

Working on a wireless bow for a hyperviolin in 1993, Gershenfeld, Paradiso, and their colleagues ran into some puzzling observations stemming from unexpected ways that objects, including people, can perturb electric fields.

In some configurations, for example, part of a person or object would intercept a portion of a field emanating from an electrode. "It's like you're casting a shadow," Paradiso notes.

In other configurations, some conductive object—for instance, a person—would effectively meld with the field-emitting electrode, thereby changing the geometry of the system. "You're like the antenna. You're like a piece of metal," Paradiso adds.



HOLD THE LINE. Objects and electric fields interact in ways that are proving useful for recognizing and tracking things and people. An electrically conductive body, such as a person, near an electric-field source (above) can become a source itself. A conductive intruder who touches the ground (below) will shadow or shunt away some field.
Dean MacAdam

What might have loomed as engineering annoyances, however, instead became new opportunities to gather information about the sizes, shapes, conductivities, masses, and positions of objects in a field-filled space. The Media Lab researchers designed and built arrays of electrodes and associated circuitry, as well as mathematical models and computer algorithms, to analyze the signals. "People started doing electric field interfaces all over [at the Media Lab]," Paradiso recalls. In honor of the natural masters of electric field sensing, the researchers gave their equipment names such as Smart Fish, Lazy Fish, Scan Fish, and School of Fish.



Dean MacAdam

**Fields of dreams**

By the mid-1990s, the MIT team had developed not only the spirit chair but other gadgets that responded to gestures: electrode-equipped tubular frames and a field-sensing wall, for example. These converted arm and body motions into signals that drove music synthesizers. Other efforts led to musical toys for children, though they're not yet on the market.

In another development, a stage backdrop for the juggling troupe The Flying Karamazov Brothers used electric field sensing of the performers to create the illusion that unlikely objects were being juggled though they were merely images projected on a screen in response to the performers' movements.

Along less-theatrical lines, electrodes hidden in a table monitored hand positions and motions to determine how best to display information on screens projected on the table. As part of a 1999 architectural exhibit at the Museum of Modern Art in New York City, the table provided details about the exhibit.

In each of these devices, the MIT researchers implemented crude imaging. A long-term goal for the imaging technology, they say, is to create more detailed representations of three-dimensional contours of people or objects within a particular space.

Although images derived from electric field data will always be "kind of blurry," the technique can pinpoint objects in space, Smith says. Some devices that locate the center of a hand or other object "can be precise to millimeters, or even better," he notes.

The MIT team hasn't been alone in devising prototypes in which spatial awareness derives from electric fields. In 1990, for instance, scientists at Bell Laboratories in Murray Hill, N.J., patented a music-making baton that sends radio signals to electrodes linked to a synthesizer.

"There are pieces of [electric-field imaging] that are new and pieces that are based on preexisting and familiar technologies," but the end result is new,

Smith notes. Until recently, the benefits of using arrays of electrodes in the shadow and antenna configurations had been largely overlooked, he says.

Because electric field interactions are so complex, the math needed to extract actual images of objects from electric-field data is trickier than the already-challenging calculations needed to make pictures from the data collected in computer assisted tomography scans or magnetic resonance images.

As a MIT graduate student, Smith worked out ways to simplify that math so that computers could carry it out in reasonable amounts of time. He has used this achievement in his Field Mouse, a prototype computer-input device that recognizes the gestures of a person's hand.

## Fish in chips

In 1999, only a few years after Rittmueller waded into the creative tumult at MIT with his quest for an airbag controller, Honda began rolling out models equipped with side airbags controlled by the electric field imaging systems. This was a voluntary step on Honda's part, since the U.S. government doesn't regulate deployment of side airbags.

As of last year, however, front airbags on more and more cars sold in the United States have to distinguish small drivers and passengers from big ones. Most carmakers now pass the new standards by means of mechanical weight-sensing systems in the cars' seats. Starting this summer, however, two General Motors models will feature electric field sensing systems. A French car seat maker, Faurecia, has also demonstrated an electric field–based system.

Working together with MIT and Rittmueller's group, electronics giant Motorola has developed an electric field imaging microchip. It went into production for automotive use in 2002. The device takes the place of about 90 discrete electronic components, says electrical engineer Kevin S. Anderson of Freescale, a Phoenix-based Motorola spin-off.

Since February 2003, the chip has also been on the market for general-purpose electric field imaging beyond automotive applications. In January, the chip won a "Product of the Year" award from *Electronic Products* magazine.

The availability of the chip appears to be creating ferment among technology developers. "We've shipped millions of the devices," mostly for the automotive market, Anderson says. Twenty products incorporating the chip are imminent, and hundreds more are in the conceptual stage, he adds.

"People are finding a lot of neat things to apply [the chip] to—things we never thought of ourselves," says Ron DeLong, a recently retired engineer who led the development of the chip for Motorola. Although companies aren't yet revealing these products, the Media Lab developments over the past decade hint at what's in store.

Also, a contest last year by electronics magazine *Circuit Cellar* suggests other potential uses of the new chip. Winning entries included an antitheft briefcase, a sleep-monitoring system, and an electronic whoopee cushion. Other products might rely on electric fields to detect water from leaky pipes or a pot boiling

over.

Meanwhile, an architectural firm in Los Angeles has revealed plans to use the chip in the pavement of a building's courtyard to detect passersby as part of a public-art installation. The system will control an electronic-lighting display depicting faux shadows of passersby moving across the face of the building.

As popular as the chip is, it implements only some of the capabilities explored by the MIT team. A next-generation device will provide more-refined measurements, DeLong says. Microchips connected to advanced electrodes in walls and floors could locate and count people as they move, says Anderson.

By then, the human technology may finally rival nature's. As DeLong puts it, "We're trying to get to where we're as good as those fish."



If you have a comment on this article that you would like considered for publication in *Science News*, send it to editors@sciencenews.org. Please include your name and location.

To subscribe to *Science News* (print), go to https://www.kable.com/pub/scnw/ subServices.asp.

To sign up for the free weekly e-LETTER from *Science News*, go to http://www.sciencenews.org/pages/subscribe_form.asp.



## References:

Cantrell, T. 2003. Good vibrations. *Circuit Cellar* 155(June):79-80. Available at http://www.circuitcellar.com/library/print/0603/cantrell155/index.htm.

DeLong, R. In press. Imaging with electric fields. *IEEE Spectrum*.

DeLong, R., C. Booth, and B. Thorsen. In press. Designing a non-contact appliance control panel. *Appliance*.

DeLong, R. 2003. Easy e-field imaging. *Machine Design* (May 22):S16-S18. Available at http://www.machinedesign.com/asp/viewSelectedArticle.asp? strArticleId=55767&strSite=MDSite.

Eady, F. 2003. E-field evaluation module. *Circuit Cellar* 155(June):60-64. Available at http://www.circuitcellar.com/library/print/0603/eady155/.

## Further Readings:

Undated. Motorola 3D imaging chip to change the car, home and workplace. Motorola Corp. Multi-media news release. Available at http://www.motorola.com/content/1,3306,1708,00.html.

# EXHIBIT  10

Elesys North America Inc.                                          Page 1 of 2

HOME          PRODUCTS/SERVICES          CORPORATE          CAREER



THE LATEST

> Product Announcements

NEWS

> Recent News Coverage
> Press Releases

EVENTS

> Conferences
> Trade Shows
> Webcast

COMMITMENT TO SAFETY

> Understanding Occupant
  Sensing and Seat Belts

> SeatSentry™ Occupant
  Sensing System

> Product Presentations
  and Multimedia
  Links/Downloads

> Site Map

Our Locations

**Suwanee, Georgia USA**



**Elesys North America Inc.
Headquarters**

Elesys North America Inc.
70 Crestridge Dr, Suite 150
Suwanee, GA, 30024
Phone: 770-904-3400
Contact: Tomoko Rider
Email: tomoko.rider@elesys-na.com
Directions: Please click here

**Plymouth, Michigan USA**



**Elesys North America Inc.
Detroit Safety Center
Sales/Marketing
Program Management
Engineering Support**

Elesys North America Inc.
44191 Plymouth Oaks Blvd, Suite 1200
Plymouth, MI 48170
Phone: 734-453-2270
Contact: Kristy Nyquist
Email: kristy.nyquist@elesys-na.com

Elesys North America Inc.                                                Page 2 of 2

Directions: Please click here

**Yokohama City, Japan**



**Honda Elesys Co., Ltd.**
**Corporate Headquarters**

Yokohama Business Park
Hightech Center
134 Godo-cho
Hodogaya-ku
Yokohama Cty, Kanagwa 240-0005
Phone: 011-81-45-338-7350
Contact: Tashihiko Kono
Email: toshihiko.kono@elesys.co.jp
Web Address: www.elesys.co.jp

**Utsunomiya City, Japan**



**Honda Elesys Co., Ltd.**
**Honda Development Office**

Utsunomiya Office
18-7
Hiraide Kogyo Danchi
Utsunomiya City, Tochigi 321-0905
Phone: 011-81-28-662-5941
Contact: Tashihiko Kono
Email: tashihiko.kono@elesys.co.jp
Fax: 011-81-28-689-1012
Web Address: www.elesys.co.jp

© 2006 ELESYS North America Inc., ALL RIGHTS RESERVED.

# EXHIBIT  11



**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |  |
|---|---|---|
| AUTOMOTIVE TECHNOLOGIES INTERNATIONAL, INC., a Delaware corporation, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) | C.A. No.  0 6 - 3 9 1 |
| HYUNDAI MOTOR AMERICA, a Delaware corporation, BMW OF NORTH AMERICA, LLC, a Delaware limited liability company and KIA MOTORS AMERICA, INC., a Delaware corporation, | ) ) ) ) ) ) ) | **JURY TRIAL DEMANDED** |
| Defendants. | ) ) ) | |

FILED
2006 JUN 16  PM 4: 27
CLERK U.S. DISTRICT COURT
DISTRICT OF DELAWARE

## COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff, Automotive Technologies International, Inc., as its Complaint against Defendants Hyundai Motor America, a Delaware Corporation, BMW of North America, LLC, a Delaware limited liability company, and Kia Motors America, Inc., a Delaware Corporation, alleges as follows:

## PARTIES, JURISDICTION AND VENUE

1.    Plaintiff Automotive Technologies International, Inc. ("ATI") is a Delaware corporation.

2.    Defendant Hyundai Motors America ("Hyundai") is a Delaware corporation based in California. Hyundai is a manufacturer and importer of vehicles in the United States.

3.    Defendant BMW of North America, LLC, ("BMW") is a Delaware limited liability company. BMW is a manufacturer and importer of vehicles in the United States.

4.    Defendant Kia Motors America, Inc., ("Kia") is a Delaware corporation based in California. Kia is a manufacturer and importer of vehicles in the United States.

5.    This is an action for patent infringement. All of the acts of patent infringement complained of in this Complaint occurred, among other places, within this judicial district.

6.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. §1338(a) and 28 U.S.C. §1331 over this infringement action, arising under the Patent Act, 35 U.S.C. §1 et seq., including §§ 271 and 281-285.

7.    Venue is proper in this Court pursuant to 28 U.S.C. §1391(b), (c) and 28 U.S.C. §1400(b). The Court has personal jurisdiction over each of the parties.

## GENERAL ALLEGATIONS

8.    The following patents have been issued duly and legally to Plaintiff ATI on the following dates:

   a.    U.S. Patent No. 5,901,978 entitled "Method and Apparatus for Detecting the Presence of a Child Seat," issued May 11, 1999. (Exhibit 1)

   b.    U.S. Patent No. 6,325,414 entitled "Method and Arrangement for Controlling Deployment of a Side Airbag," issued December 4, 2001. (Exhibit 2)

   c.    U.S. Patent No. 6,422,595 entitled "Occupant Position Sensor and Method and Arrangement for Controlling a Vehicular Component Based on an Occupant's Position," issued July 23, 2002. (Exhibit 3)

   d.    U.S. Patent No. 6,484,080 entitled "Method and Apparatus for Controlling a Vehicular Component," issued November 19, 2002. (Exhibit 4)

   e.    U.S. Patent No. 6,712,387 entitled "Method and Apparatus for Controlling Deployment of a Side Airbag," issued March 30, 2004. (Exhibit 5)

   f.    U.S. Patent No. 6,757,602 entitled "System For Determining the Occupancy State of a Seat in a Vehicle and Controlling a Component Based Thereon," issued June 29, 2004. (Exhibit 6)

2

g.     U.S. Patent No. 6,833,516 entitled "Apparatus and method for controlling a vehicular component," issued December 21, 2004. (Exhibit 7)

h.     U.S. Patent No. 6,850,824 entitled "Method and Apparatus for Controlling a Vehicular Component," issued February 1, 2005. (Exhibit 8)

i.     U.S. Patent No. 6,869,100 entitled "Method and Apparatus for Controlling an Airbag," issued March 22, 2005. (Exhibit 9)

j.     U.S. Patent No. 6,942,248 entitled "Occupant Restraint Device Control System and Method," issued September 13, 2005. (Exhibit 10)

k.     U.S. Patent No. 6,958,451 entitled "Apparatus and Method for Measuring Weight of an Occupying Item of a Seat," issued October 25, 2005. (Exhibit 11)

9.     All of the patents set forth in paragraph 8, a-k (collectively, "the ATI Patents"), are valid, subsisting, enforceable, and are presently owned by ATI and have been owned by ATI for all times relevant hereto.

10.     The general subjects covered by the ATI Patents include, but are not limited to occupant sensing, position sensing, weight sensing, child seat sensing, rear-facing child seat sensing, airbag deployment, airbag suppression, and related systems as used in a vehicle containing airbags.

11.     Defendant Hyundai makes, uses, imports and/or sells vehicles with certain occupant presence and/or detection and/or position systems and/or child seat presence detection systems, including, upon information and belief, systems made by IEE Automotive, Inc., including the Passenger Presence Detection ("PPD") system made by IEE. In certain vehicles the PPD system works in conjunction with seat track sensors. In all vehicles the system comprises and controls, or works in conjunction with an electronic controller for, among other things, suppressing or allowing the deployment of side airbags and side curtain airbags in a vehicle equipped with the system(s). Upon information and belief, the PPD system has been used by Hyundai at least in the following models:

3

| Year | Model |
|------|-------|
| 2000 | Hyundai Sonata |
| 2001 | Hyundai Sonata |
| 2002 | Hyundai Sonata |
| 2003 | Hyundai Sonata |
| 2004 | Hyundai Sonata |
| 2006 | Hyundai Sonata |
| 2001 | Hyundai Elantra |
| 2002 | Hyundai Elantra |
| 2003 | Hyundai Elantra |
| 2004 | Hyundai Elantra |
| 2005 | Hyundai Elantra |
| 2006 | Hyundai Elantra |
| 2001 | Hyundai XG300 |
| 2004 | Huyndai Santa Fe |

12.     Each of the vehicles listed above, and those vehicles not specifically listed but which use the system(s) described above, infringe the ATI Patents.  Defendant Hyundai markets and sells these models to the public.  Defendant will continue to do so unless enjoined by this Court.

13.     Defendant Kia makes, uses, and sells vehicles with certain occupant presence and/or detection and/or position systems and/or child seat presence detection systems, which, upon information and belief, are made by or employ the IEE system set forth above in paragraph 11, including specifically the PDD and Occupant Classification ("OC") systems made by IEE. The system in Kia vehicles comprises and controls, or works in conjunction with an electronic controller for, among other things, suppressing or allowing the deployment of side airbags and side curtain airbags in a vehicle equipped with the system(s).  Upon information and belief the IEE systems are supplied in at least the following Kia vehicles:

4

| Year | Model |
|------|-------|
| 2002 | Kia Optima |
| 2004 | Kia Sedona |
| 2005 | Kia Sorento |
| 2002 | Kia Sportage |
| 2004 | Kia Amanti |
| 2005 | Kia Spectra |
| 2005 | Kia Spectra5 |
| 2006 | Kia Rio |
| 2006 | Kia Rio5 |

14.    Upon information and belief, Kia makes and sells other models than those listed in Paragraph 13 with an occupant sensing system using IEE products. Each of the vehicles listed above, and those vehicles not specifically listed but which use the system described above, infringe the ATI Patents set forth in paragraph 8. Defendant Kia markets and sells these models to the public. Defendant will continue to do so unless enjoined by this Court.

15.    Defendant BMW makes, uses, and sells vehicles with certain occupant presence and/or detection and/or position systems and/or child seat presence detection systems, which, upon information and belief, are made by or employ the IEE system set forth above in paragraph 11, including specifically the PDD and OS systems. These are referred to as "occupant sensor intelligent," or "SBE" or similar name by BMW. The system in BMW vehicles comprises and controls, or works in conjunction with an electronic controller for, among other things, suppressing or allowing the deployment of side airbags and side curtain airbags in a vehicle equipped with the system(s). Upon information and belief the IEE systems are supplied in at least the following BMW vehicles:

5

| Year | Model |
|------|-------|
| 2003-6 | 3-series |
| 2003-6 | 5-series |
| 2003-6 | 7-series |
| 2003-6 | Z4 |
| 2004-6 | 6-series |
| 2003-6 | X3 and X5 |

16.     Upon information and belief, BMW makes and sells other models than those listed in Paragraph 15 with an occupant sensing system using IEE products. Each of the vehicles listed above, and those vehicles not specifically listed but which use the system described above, infringe the ATI Patents set forth in paragraph 8. Defendant BMW markets and sells these models to the public. Defendant will continue to do so unless enjoined by this Court.

## DAMAGES

17.     As a result of the above infringement, ATI has been damaged, and will continue to be damaged unless the infringement is enjoined by this Court.

## RELIEF REQUESTED

Wherefore, Plaintiff Automotive Technologies International, Inc. prays for relief against the Defendants as follows:

1.     That U.S. Patent No. 5,901,978 be adjudged infringed by the Defendants, and that the infringement be held to be willful;

2.     That U.S. Patent No. 6,325,414 be adjudged infringed by the Defendants, and that the infringement be held to be willful;

3.     That U.S. Patent No. 6,422,595 be adjudged infringed by the Defendants, and that the infringement be held to be willful;

4.     That U.S. Patent No. 6,484,080 be adjudged infringed by the Defendants, and that the infringement be held to be willful;

5.    That U.S. Patent No. 6,712,387 be adjudged infringed by the Defendants, and that the infringement be held to be willful;

6.    That U.S. Patent No. 6,757,602 be adjudged infringed by the Defendants, and that the infringement be held to be willful;

7.    That U.S. Patent No. 6,833,516 be adjudged infringed by the Defendants, and that the infringement be held to be willful;

8.    That U.S. Patent No. 6,850,824 be adjudged infringed by the Defendants, and that the infringement be held to be willful;

9.    That U.S. Patent No. 6,869,100 be adjudged infringed by the Defendants, and that the infringement be held to be willful;

10.    That U.S. Patent No. 6,942,248 be adjudged infringed by the Defendants, and that the infringement be held to be willful;

11.    That U.S. Patent No. 6,958,451 be adjudged infringed by the Defendants, and that the infringement be held to be willful;

12.    That Plaintiff be awarded compensatory damages for past infringement by the Defendants in an amount no less than a reasonable royalty, and a sum to be determined at trial, and that said damages be trebled in view of the wilful and deliberate nature of the infringement;

13.    That all Defendants, their officers, agents, servants, employees and attorneys, and other persons in active concert or participation with them be preliminarily and then permanently enjoined from further infringement of the patents-in-suit;

14.    That all Defendants be ordered to deliver to Plaintiff for destruction all infringing products and systems in their possession;

7

15.    That this case be declared an exceptional case under 35 U.S.C. §285 as to each Defendant and that Plaintiff be awarded its attorney fees incurred in this action;

16.    For an award of Plaintiff's costs of this action, interest on the award and other charges to the maximum extent permissible; and

17.    For such other further relief as the Court deems just and proper under the circumstances.

### DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury.

Dated: June 16, 2006

Richard K. Herrmann #405
MORRIS, JAMES, HITCHENS & WILLIAMS, LLP
222 Delaware Avenue, 10th Floor
Wilmington, Delaware 19801
(302) 888-6800
rherrmann@morrisjames.com

Attorneys for Plaintiff
AUTOMOTIVE TECHNOLOGIES
INTERNATIONAL, INC.

SOMMERS SCHWARTZ, P.C.
Andrew Kochanowski
Attorneys for Plaintiff
2000 Town Center, Suite 900
Southfield, MI 48075
(248) 355-0300

BANIAK PINE & GANNON
Michael H. Baniak
Attorneys for Plaintiff
150 N. Wacker Drive, Suite 1200
Chicago, IL 60606
(312) 673-0360

8

# EXHIBIT  12



Slip Copy                                                                    Page 1
Slip Copy, 2005 WL 1240181 (D.Del.)
(Cite as: Slip Copy)

Briefs and Other Related Documents
Only the Westlaw citation is currently available.
        United States District Court,D. Delaware.
    Arlin M. ADAMS, Chapter 11 Trustee of the Post-
     Confirmation Bankruptcy Estates of Coram
  Healthcare Corporation, a Delaware Corporation, and
    of Coram, Inc., a Delaware corporation, Plaintiff,
                           v.
    Daniel D. CROWLEY; Donald J. Amaral; William J.
     Casey; L. Peter Smith; and Sandra L. Smoley,
                       Defendants.
                  No. Civ. 04-1565-SLR.

                    May 25, 2005.

Rolin P. Bissell, Glenn Christopher Mandalas,
Young, Conaway, Stargatt & Taylor, Wilmington,
DE, for Plaintiff.
Jeffrey C. Wisler, Connolly, Bove, Lodge & Hutz,
Peter J. Walsh, Jr., Potter Anderson & Corroon, LLP,
Wilmington, DE, for Defendants.

             MEMORANDUM ORDER

ROBINSON, J.
*1 At Wilmington this 25th day of May, 2005, having
reviewed defendants' motions to transfer, and the
papers submitted in connection therewith;

IT IS ORDERED that said motions (D.I.3, 15) are
denied, for the reasons that follow:

1. Background facts. On August 8, 2000, Coram
Healthcare Corporation and Coram, Inc. (hereafter
"Coram") filed a Chapter 11 petition in the United
States Bankruptcy Court for the District of Delaware,
together with a proposed plan of reorganization. In
December 2000, the bankruptcy court denied
confirmation of the plan, based in part on the fact that
defendant Crowley had a conflict of interest by
reason of his position as CEO of Coram and his
contractual relationship with one of Coram's three
major lenders.FN1 After denying confirmation of
Coram's second proposed plan of reorganization, FN2
the bankruptcy court entered an order appointing
plaintiff Chapter 11 Trustee of Coram. On October
27, 2004, the bankruptcy court confirmed the
Trustee's plan of reorganization, which plan was
implemented on December 1, 2004. Coram is now a

private company owned by its former lenders. Under
the Trustee's plan as approved by the bankruptcy
court, the right to pursue causes of action against
Coram's former directors was reserved to the Trustee
for the benefit of Coram's former unsecured trade
creditors and its former common shareholders.

        FN1. It is alleged that between November
        30, 1999, when Crowley became CEO, and
        July 31, 2000, Crowley caused Coram to
        pay certain lenders approximately $60
        million.

        FN2. The bankruptcy court found in this
        regard that the Outside Directors, the
        remaining defendants herein, had done
        nothing in response to the court's order
        denying confirmation of the first plan of
        reorganization.

2. Standard of review. Under 28 U.S.C. § 1404(a), a
district court may transfer any civil action to any
other district where the action might have been
brought for the convenience of parties and witnesses
and in the interests of justice. Congress intended
through § 1404 to place discretion in the district
court to adjudicate motions to transfer according to
an individualized, case-by-case consideration of
convenience and the interests of justice. Stewart
Org., Inc. v. Ricoh Corp., 487 U.S. 22, 29, 108 S.Ct.
2239, 101 L.Ed.2d 22 (1988); Affymetrix, Inc. v.
Synteni, Inc., 28 F.Supp.2d 192, 208 (D.Del.1998).

3. The burden of establishing the need to transfer
rests with the movant "to establish that the balance of
convenience of the parties and witnesses strongly
favors the defendants." Bergman v. Brainin, 512
F.Supp. 972, 973 (D.Del.1981) (citing Shutte v.
Armco Steel Corp., 431 F.2d 22, 25 (3d Cir.1970).
"Unless the balance is strongly in favor of a transfer,
the plaintiff's choice of forum should prevail". ADE
Corp. v. KLA-Tencor Corp., 138 F.Supp.2d 565, 567
(D.Del.2001); Shutte, 431 F.2d at 25.

4. The deference afforded plaintiff's choice of forum
will apply as long as a plaintiff has selected the
forum for some legitimate reason. C.R. Bard, Inc. v.
Guidant Corp., 997 F.Supp. 556, 562 (D.Del.1998);
Cypress Semiconductor Corp. v. Integrated Circuit
Systems, Inc., 2001 WL 1617186 (D.Del. Nov.28,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2005 WL 1240181 (D.Del.)
(Cite as: Slip Copy)

2001); _Continental Cas. Co. v. American Home Assurance Co._, 61 F.Supp.2d 128, 131 (D.Del.1999). Although transfer of an action is usually considered as less inconvenient to a plaintiff if the plaintiff has not chosen its " 'home turf' or a forum where the alleged wrongful activity occurred, the plaintiff's choice of forum is still of paramount consideration, and the burden remains at all times on the defendants to show that the balance of convenience and the interests of justice weigh strongly in favor of transfer." _In re M.L.-Lee Acquisition Fund II, L.P._, 816 F.Supp. 973, 976 (D.Del.1993).

**\*2 5.** The Third Circuit Court of Appeals has indicated that the analysis for transfer is very broad. _Jumara v. State Farm Ins. Co._, 55 F.3d 873, 879 (3d Cir.1995). Although emphasizing that "there is no definitive formula or list of factors to consider," _id.,_ the Court has identified potential factors it characterized as either private or public interests. The private interests include: "(1) plaintiff's forum preference as manifested in the original choice; (2) defendant's preference; (3) whether the claim arose elsewhere; (4) the convenience of the parties as indicated by their relative physical and financial condition; (5) the convenience of the witnesses but only to the extent that the witnesses may actually be unavailable for trial in one of the fora; and (6) location of books and records (similarly limited to the extent that the files could not be produced in the alternative forum)." _Id._ (citations omitted).

6. The public interests include: "(1) the enforceability of the judgment; (2) practical considerations that could make the trial easy, expeditious or inexpensive; (3) the relative administrative difficulty in the two fora resulting from court congestion; (4) the local interest in deciding local controversies at home; (5) the public policies of the fora; and (6) the familiarity of the trial judge with the applicable state law in diversity cases." _Id._ (citations omitted).

7. Analysis. Defendants move to transfer this case to the District of Colorado. In support of their motions, defendants recite several facts. First, none of the defendants live in or near Delaware.[FN3] Coram, now a private company, is incorporated in Delaware with its principal place of business in Denver, Colorado. Coram's employees and business records are located as well in Denver, Colorado. Plaintiff, Coram's Chapter 11 Trustee, resides in Philadelphia. According to defendants, these facts compel the transfer of this case to Colorado because no one involved in the litigation has a direct connection to the District of Delaware.

FN3. Three of the defendants, Mr. Casey, Mr. Crowley and Ms. Smoley, live in California, while Mr. Amaral lives in Nevada and Mr. Smith lives in Illinois.

8. I respectfully disagree. Coram (through its directors) chose Delaware as its place of incorporation and chose to file for bankruptcy protection in Delaware's bankruptcy court. The bankruptcy court appointed plaintiff the Chapter 11 Trustee and gave him the authority to commence the instant proceedings against the company's former fiduciaries. These facts demonstrate a substantial connection to Delaware. Moreover, given the fact that most discovery will be taken in the same fashion regardless of where trial may proceed,[FN4] the convenience of the defendants is not a compelling factor. For these reasons, and consistent with my practice, I decline to transfer this case on the record presented.[FN5]

FN4. Depositions generally do not last more than 7 hours; the parties should be able to work out convenient places for their location. Document production may well be in electronic format.

FN5. Employees of parties must make themselves available for purposes of depositions and trial. It is not apparent to me whether the employees of Coram (in its present corporate form) are subject to this court's jurisdiction. However, neither is it apparent at this stage of the proceedings whether they will voluntarily appear as witnesses, under the circumstances at bar. Therefore, I will reconsider my decision not to transfer only if specifically identified, critical witnesses decline to testify in Delaware and cannot be compelled to do so.

D.Del.,2005.
Adams v. Crowley
Slip Copy, 2005 WL 1240181 (D.Del.)

Briefs and Other Related Documents (Back to top)

• 2006 WL 1199915 (Trial Motion, Memorandum and Affidavit) Plaintiff's Brief in Support of Motion to Vacate Order and Lift Stay (Mar. 9, 2006) Original Image of this Document (PDF)
• 1:04cv01565 (Docket) (Dec. 29, 2004)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2005 WL 1240181 (D.Del.)
(Cite as: Slip Copy)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Slip Copy                                                                          Page 1
Slip Copy, 2005 WL 2786691 (D.Del.)
**(Cite as: Slip Copy)**

Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court,D. Delaware.
ARROW COMMUNICATION LABORATORIES,
INC., Plaintiff,
v.
JOHN MEZZALINGUA ASSOCIATES, INC.,
Defendant.
JOHN MEZZALINGUA ASSOCIATES, INC.,
Counterclaim Plaintiff,
v.
ARROW COMMUNICATION LABORATORIES,
INC., and Tresness Irrevocable Patent Trust,
Counterclaim Defendants.
**No. Civ. 05-357-SLR.**

Oct. 26, 2005.

Richard D. Kirk, of the Bayard Firm, Wilmington, Delaware. for Arrow Communication Laboratories, Inc., and Tresness Irrevocable Patent Trust. R. Terrance Rader, Charles W. Bradley, Glenn E. Forbis, Linda D. Kennedy, and Shelly L. Hokenstad, of Rader, Fishman & Grauer PLLC, Bloomfield Hills, Michigan, and Lawrence P. Trapani, of Manlius, New York, of Counsel.
Jeffrey B. Bove, and Kevin M. Baird, of Connolly Bove Lodge & Hutz LLP, Wilmington, Delaware. for John Mezzalingua Associates, Inc. James R. Muldoon, and John A. Wasleff, of Wall, Marjama & Bilinski, LLP, Syracuse, New York. of Counsel.

MEMORANDUM OPINION

ROBINSON, Chief J.

I. INTRODUCTION

*1 On June 3, 2005, plaintiff Arrow Communication Laboratories, Inc. ("plaintiff") filed a complaint in the United States District Court for the District of Delaware alleging patent infringement by defendant John Mezzalingua Associates, Inc. ("defendant"). (D.I.1) Plaintiff claims to be the lawful owner of all right, title and interest in U.S. Patent No. 5,745,838 ("the '838 patent"). (Id.) Plaintiff alleges that defendant is infringing the '838 patent by manufacturing, selling and offering for sale in the United States, and by importing into the United States, electronic filters covered by one or more of the claims of the '838 patent. (Id.) Plaintiff further alleges that defendant is actively inducing others to infringe the '838 patent. (Id.)

On June 6, 2005, defendant filed an action for declaratory judgment of patent non-infringement and invalidity in the United States District Court for the Northern District of New York. (D.I.9, ex. A) On August 11, 2005, plaintiff's infringement suit was referred to the Magistrate Judge of the District of Delaware for the purpose of exploring alternative dispute resolution. (D.I.29) Trial is scheduled for November 2006. (Id.)

II. BACKGROUND

Plaintiff is a corporation organized under the laws of the State of New York with its principal place of business in Syracuse, New York. Defendant is a corporation organized under the laws of the State of Delaware with its principal place of business in East Syracuse, New York.

III. STANDARD OF REVIEW

Defendant moves the court to transfer this matter, pursuant to 28 U.S.C. § 1404(a), to the United States District Court for the Northern District of New York. (D.I.6) Section 1404(a) provides: "For the convenience of the parties and witnesses, in the interests of justice, a district court may transfer any civil action to any other district or division where it might have been brought." 28 U.S.C. § 1404(a) (2003). A plaintiff's choice of forum is to be accorded substantial weight and courts should only transfer venue if the defendant is truly regional in character. See Bergman v. Brainin, 512 F.Supp. 972, 973 (D.Del.1981) (citing Shutte v. Armco Steel Corp., 431 F.2d 22, 25 (3d Cir.1970)). A defendant has the burden of establishing that "the balance of convenience of the parties and witnesses strongly favors" transfer. Id. Accordingly, "defendants brought into suit in Delaware must prove that litigating in Delaware would pose a 'unique or unusual burden' on their operations" for a Delaware court to transfer venue. See Wesley-Jessen Corp. v. Pilkington Visioncare, Inc., 157 F.R.D. 215 (D.Del.1993). A motion to transfer venue may also

Slip Copy                                                                                                          Page 2
Slip Copy, 2005 WL 2786691 (D.Del.)
**(Cite as: Slip Copy)**

be granted if there is a related case which has been first filed or otherwise is the more appropriate venue in which to litigate the issues between the parties. *See American Bio Medica Corp. v. Peninsula Drug Analysis Co., Inc., 1999 WL 615175, *5 (D.Del.1999).*

**\*2** In reviewing a motion to transfer venue, courts have not limited their consideration to the three factors enumerated in § 1404(a) (i.e., convenience of parties, convenience of witnesses, and interests of justice). The Third Circuit, in fact, has indicated that the analysis for transfer is very broad and has urged consideration of "all relevant factors to determine whether on balance the litigation would more conveniently proceed and the interests of justice be better served by transfer to a different forum." *Jumara v. State Farm Ins. Co.,* 55 F.3d 873, 879 (3d Cir.1995) (internal quotations and citation omitted). These factors entail six private and five public interests. Private interests include: (1) the plaintiff's forum preference as manifested by the plaintiff's original forum choice; (2) the defendant's forum preference; (3) whether the claim arose elsewhere; (4) the convenience of the parties as indicated by their relative physical and financial condition; (5) the convenience of the witnesses to the extent that the witnesses may actually be unavailable for trial in one of the fora; and (6) the location of the books and records to the extent that the files could not be produced in the alternative forum. *Id.* Public interests include: (1) the enforceability of the judgment; (2) practical considerations that could make the trial easy, expeditious, or inexpensive; (3) the relative administrative difficulty in the two fora resulting from court congestion; (4) the local interest in deciding local controversies at home; and (5) the familiarity of the trial judge with the applicable state law in diversity cases. *Id.*

In considering the private interest factors under *Jumara,* the court, consistent with Third Circuit precedent, adheres to the notion that transfer is not to be liberally granted and plaintiff's choice of forum is a paramount consideration. The deference afforded plaintiff's choice of forum will apply as long as a plaintiff has selected the forum for some legitimate reason. *C.R. Bard, Inc. v. Guidant Corp.,* 997 F.Supp. 556, 562 (D.Del.1998); *Cypress Semiconductor Corp. v. Integrated Circuit Systems, Inc.,* 2001 WL 1617186 (D.Del. Nov. 28, 2001); *Cont'l Cas. Co. v. Am. Home Assurance Co.,* 61 F.Supp.2d 128, 131 (D.Del.1999). Although transfer of an action is usually regarded as less inconvenient to a plaintiff if the plaintiff has not chosen its "home turf" or a forum

where the alleged wrongful activity or injury occurred, the "plaintiff's choice of forum is still of paramount consideration, and the burden remains at all times on the defendants to show that the balance of convenience and the interests of justice weigh strongly in favor of transfer." *In re ML-Lee Acquisition Fund II, L.P.,* 816 F.Supp. 973, 976 (D.Del.1993).

## IV. DISCUSSION

As an initial matter, the court notes that venue is proper in Delaware as defendant is incorporated under the laws of the State of Delaware. Nevertheless, the District of Delaware is not plaintiff's "home turf," since it maintains its principal place of business in New York. In this sense, it appears to be more convenient to both the plaintiff and defendant to try the instant litigation in the Northern District of New York. Indeed, this court previously recognized that,
**\*3** [w]hen the plaintiff has chosen to bring suit in a district that is not plaintiff's "home turf" and that has no connection to any acts giving rise to the lawsuit, convenience to the plaintiff is not as great as it would be were plaintiff litigating at or near plaintiff's principal place of business or at the site of activities at issue in the lawsuit.

*Burstein v. Applied Extrusion Techs. Inc.,* 829 F.Supp. 106, 110 (D.Del.1992) (citing *Sports Eye, Inc. v. Daily Racing Form, Inc.,* 565 F.Supp. 634, 637 (D.Del.1983) (internal citations omitted)). Moreover, the locus of the alleged infringement occurred in Syracuse, New York. If defendant has infringed the '838 patent, such infringement was done primarily in Syracuse, where the accused products were developed, manufactured and sold. Based on the evidence offered, the majority of the witnesses with discoverable information also are located in and around Syracuse, New York. In addition, most of defendant's documents relating to the production, promotion, marketing and sales of the accused product are maintained in central New York. On this basis, the court concludes that the private factors under *Jumara* weigh in favor of transferring the case at bar to the United States District Court for the Northern District of New York.

One of the public interest factors under *Jumara* involves the administrative considerations of the courts. More than fifty years ago, the Third Circuit Court of Appeals adopted the "first-filed rule" where "in all cases of federal concurrent jurisdiction the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                    Page 3
Slip Copy, 2005 WL 2786691 (D.Del.)
(Cite as: Slip Copy)

court which first had possession of the subject must decide it." *Crosley Corp. v. Hazeltine Corp.*, 122 F.2d 925, 929 (3d Cir.1941) (quoting *Smith v. M'Iver*, 22 U.S. (9 Wheat.) 532, 6 L.Ed. 152 (1824)). Consequently, the second-filed action is usually stayed or transferred to the court where the first-filed action is pending. *Peregrine Corp. v. Peregrine Indus., Inc.*, 769 F.Supp. 169, 171 (E.D.Pa.1991); *Dippold-Harmon Enterprises, Inc. v. Lowe's Companies, Inc.*, 2001 U.S. Dist. LEXIS 18547, Civil Action No. 01-532-GMS, 2001 WL 1414868 (D.Del.2001). The rule "encourages sound judicial administration and promotes comity among federal courts of equal rank." *E.E.O.C. v. University of Pennsylvania*, 850 F.2d 969, 971 (3d Cir.1988). The decision to transfer or stay the second action is within the discretion of the trial court. *Id. at 972, 977.* Invocation of the rule will usually be the norm, not the exception. Courts presented with exceptional circumstances may exercise their discretion to depart from the first-filed rule. *Id. at 979.* In this case, it is undisputed that the present patent infringement suit in the District of Delaware was first filed and involves the same patent and the same issues as the declaratory judgment action filed thereafter by defendant in the Northern District of New York. Therefore, the burden is on defendant to present some exceptional circumstances why the court should depart from the first-filed rule.

*4 In support of its argument supporting transfer, defendant states that all of its relevant witnesses reside in New York, all the documents and records related to the accused product are in New York, and the subject matter of the lawsuit has significant local interest in New York. (D.I. 7 at 1-3) In contrast, evidence suggests that the District of Delaware has no connection to the subject matter of plaintiff's lawsuit, except that defendant is incorporated there. Defendant contends that pursuing the lawsuit in the District of Delaware will generate "significant expenses and other burdens" to the parties. (*Id.* at 3-4) Given this evidence and noting the regional character of the parties, with the primary business operations of each party located in the Northern District of New York, there are exceptional circumstances present which require the court to depart from the first-filed rule.

In considering the other public interest factors under *Jumara*, the court notes that the parties have taken significant steps to advance the instant litigation in the District of Delaware. The parties have exchanged initial disclosures, are set to explore settlement with the magistrate judge, and have arranged a schedule

for litigation, with trial set to occur in about one year. These factors weigh in favor of maintaining the litigation in the District of Delaware. However, factors are also present which weigh in favor of transferring the case to the Northern District of New York. First, defendant's declaratory judgment action, which involves the same subject matter as this case, is currently pending in the United States District Court for the Northern District of New York.[FN1] In addition, both parties are regional in character and operate their businesses out of central New York, suggesting that the Northern District of New York is the most appropriate venue for the parties to litigate. Although a suit in this matter was first filed in Delaware, the public interest factors weighing in favor of keeping the litigation in the District of Delaware are not compelling. The court, therefore, concludes that the public interest factors under *Jumara* favor transferring venue to the Northern District of New York.

> FN1. By stipulation of the parties, that case has been stayed pending this court's decision on defendant's motion to transfer venue. (N.D. N.Y., Case No. 05-CV-703 (NAM/DEP), D.I. 6) The court has no reason to believe that, once the stay is lifted, the declaratory judgment action in the Northern District of New York will move forward with any less swiftness than that with which the instant case has progressed in the District of Delaware. The familiarity with the parties and subject matter possessed by the Northern District of New York will certainly promote expeditiousness in handling the case.

### V. CONCLUSION

On balance, the court finds that the public interest factors and private interest factors weigh strongly in favor of transferring venue in this case. The court, as a result, concludes that defendant has sufficiently proven that litigating in the District of Delaware would pose a unique burden which merits transfer of venue. For the reasons stated, defendant's motion to transfer is granted. An order consistent with this memorandum opinion shall issue.

### ORDER

At Wilmington this 26th day of October, 2005, consistent with the memorandum opinion issued this

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2005 WL 2786691 (D.Del.)
**(Cite as: Slip Copy)**

Page 4

same date;

END OF DOCUMENT

IT IS ORDERED that:

1. Defendant's motion to transfer (D.I.6) is granted.

2. The above-captioned action shall be transferred to the United States District Court for the Northern District of New York.

D.Del.,2005.
Arrow Communication Laboratories, Inc. v. John Mezzalingua Associates, Inc.
Slip Copy, 2005 WL 2786691 (D.Del.)

Briefs and Other Related Documents (Back to top)

• 2005 WL 3667196 (Trial Pleading) Plaintiff Arrow Communication Laboratories, Inc.'s and Counterclaim Defendant Tresness Irrevocable Patent Trust'S (Oct. 25, 2005) Original Image of this Document (PDF)
• 2005 WL 3667190 (Trial Pleading) Answer to First Amended Complaint of Arcom and Counterclaims (Oct. 18, 2005) Original Image of this Document (PDF)
• 2005 WL 3667193 (Trial Pleading) Reply to the First Amended Counterclaims of Tresness Irrevocable Patent Trust (Oct. 18, 2005) Original Image of this Document (PDF)
• 2005 WL 2868155 (Trial Motion, Memorandum and Affidavit) Supplemental Brief in Further Support of Defendant's Motion to Transfer Venue Pursuant to 28 U.S.C. | 1404(a) (Oct. 5, 2005) Original Image of this Document (PDF)
• 2005 WL 2868149 (Trial Pleading) First Amended Complaint (Oct. 3, 2005) Original Image of this Document (PDF)
• 2005 WL 2868151 (Trial Pleading) Tresness Irrevocable Patent Trust's First Amended Counterclaim (Oct. 3, 2005) Original Image of this Document (PDF)
• 2005 WL 2868153 (Trial Pleading) Second Amended Answer and Counterclaims (Oct. 3, 2005) Original Image of this Document (PDF)
• 2005 WL 1529914 (Trial Pleading) Complaint (Jun. 3, 2005) Original Image of this Document (PDF)
• 1:05cv00357 (Docket) (Jun. 03, 2005)
• 2005 WL 3667183 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Support of Defendant's Motion to Dismiss State Law Claims under ¢ yFed. R. Civ. P. 12(b)(6)¢ y¢ r;0001;;LQ;USFRCPR12;1004365;¢   r   (2005) Original Image of this Document (PDF)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 1728354 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

Only the Westlaw citation is currently available.
United States District Court, D. Delaware.
ASTEN INC., Plaintiff,
v.
WEAVEXX CORPORATION, Defendant.
No. 99-593 GMS.

Feb. 11, 2000.

George H. Seitz, III, Seitz, Van Ogtrop & Green,
P.A., Wilmington, for Asten Inc., plaintiffs.
Thomas C. Grimm, Morris, Nichols, Arsht &
Tunnell, Wilmington, for Weavexx Corporation,
defendants.

ORDER

SLEET, J.

## I. INTRODUCTION

*1 On September 3, 1999, Plaintiff Asten, Inc.
("Asten") filed a complaint alleging patent
infringement by Defendant Weavexx Corp.
("Weavexx"). The complaint was not served until
September 24, 1999. In the interim, on September 10,
1999, Weavexx filed and served a "mirror image"
action in the United States District Court for the
Eastern District of North Carolina. In that action,
Weavexx seeks a declaration that Asten's patent is
invalid and/or not infringed by Weavexx.

Before the court is Weavexx's motion to transfer this
case to the Eastern District of North Carolina, or in
the alternative, to stay proceedings here pending
resolution of the North Carolina declaratory
judgment action. Weavexx argues that the case
should be transferred pursuant to the "first filed" rule,
or, alternatively, pursuant to 28 U.S.C. § 1404.[FN1]
For the reasons that follow, the court will deny
Weavexx's motion.

FN1. Weavexx's motion requests a transfer
pursuant to § 1404 or a stay pursuant to the
first-filed rule. See Mot. to Transfer or Stay,
at 1. In its briefing, however, Weavexx
appears to request only a transfer, pursuant
to either § 1404 or the first-filed rule. See
Opening Br. at 2, 5, 18. As discussed below,

the court has concluded that the first-filed
rule does not operate in Weavexx's favor.
The rule, therefore, provides no more basis
for a stay than it does for a transfer.

## II. BACKGROUND

Asten and Weavexx both design and manufacture
certain fabrics used on papermaking machines. Both
companies are incorporated in Delaware, but neither
company maintains a physical presence in this state.
Asten is headquartered in Charleston, South Carolina
and maintains its primary manufacturing facility in
Appleton, Wisconsin. Weavexx is headquartered and
maintains a major manufacturing facility in Wake
Forest, North Carolina. It also has manufacturing
facilities in several other southern states and in
Canada, [FN2] and sells its products in the United
States, Canada, and Mexico.

FN2. In addition to its Wake Forest location,
Weavexx maintains U.S. manufacturing
facilities in Florida, Tennessee, Mississippi
and Virginia, and Canadian facilities in
Ontario (administrative offices), Nova
Scotia and Quebec. See Opp'n Br. at Ex. B.

Asten is the assignee of U.S. Patent No. 5,025,839
("the '839 patent"), entitled "Two-Ply Papermakers
Forming Fabric with Zig-Zagging MD Yarns." Asten
contends that Weavexx's "Design 2895" forming
fabrics infringe the '839 patent. Weavexx states that it
"principally designed" these fabrics at its Wake
Forest plant, and that it markets and sells these
products out of that facility. The products are
manufactured, however, by a "sister-company" of
Weavexx that is located in Brazil.

The inventor of the '839 patent, Walter Wright, is
employed by Asten at its Appleton, Wisconsin
facility. Asten manufactures its "Style 866" forming
fabric, based on the '839 patent, at the Appleton
plant. The documents relating to the design and
development of the '839 patent are also located in
Appleton.

## III. DISCUSSION

As previously noted, Weavexx seeks to transfer this

action pursuant to the "first-filed" rule, or, alternatively, pursuant to 28 U.S.C. § 1404(a).

### A. The First-Filed Rule

The first-filed rule is a judicially created doctrine that is designed to avoid concurrent litigation of the same issues, between the same parties, in more than one federal court. *See EEOC v. University of Pennsylvania, 850 F.2d 969, 971-72 (3d Cir.1988).* As its name implies, the rule generally provides that a later filed action should be stayed pending resolution of an earlier filed action, or transferred to the court in which the earlier filed action is pending. *See Peregrine Corp. v. Peregrine Indus., Inc., 769 F.Supp. 169 (E.D.Pa.1991).*

**\*2** Since Asten filed its complaint in this court seven days before Weavexx filed its federal declaratory judgment action in North Carolina, the rule would not seem to provide a basis for transfer. Weavexx, however, claims that in the Third Circuit, the "first-filed" rule would more accurately be described as the "first-served" rule. It contends that under Third Circuit case law, "the 'first-filed' of two parallel actions is the one in which the district court first obtains jurisdiction of the parties and issues." Opening Br. at 6. Weavexx argues that in Delaware, personal jurisdiction over a defendant does not arise until a complaint is served. Consequently, Weavexx contends that the earlier-*served* North Carolina action should have priority over this earlier-*filed* Delaware action. The court disagrees.

Weavexx correctly notes that the Third Circuit Court of Appeals has at times articulated the rule as giving priority to the court "first obtaining jurisdiction of the parties and issues." *See, e .g., Crosley Corp. v. Westinghouse Elec. & Mfg. Co., 130 F.2d 474, 475 (3d Cir.1942).* But Weavexx places too much significance on this language. In applying the rule, the Third Circuit has never focused on the dates that complaints were served, or, more generally, the dates on which personal jurisdiction was established. In this court's view, the "parties and issues" language just quoted was merely intended to signify that the first-filed rule should only apply when the competing actions involve the same parties and issues. *See University of Pennsylvania, 850 F.2d at 971-72* (noting that the rule gives a court the power to enjoin the "subsequent prosecution of *proceedings involving the same parties and the same issues* already before another district court" (emphasis added)).

Indeed, the rule is often articulated without language that might suggest a focus on personal jurisdiction. For example, the rule has been described as giving priority to "the court which first has possession *of the subject.* " *University of Pennsylvania, 850 F.2d at 971* (emphasis added) (citing *Crosley Corp. v. Hazeltine Corp., 122 F.2d 925, 929 (3d Cir.1941)).* In first adopting the rule, the Third Circuit explained that the party who "first *brings a controversy into a court of competent jurisdiction* for adjudication should ... be free from the vexation of subsequent litigation over the same subject matter." *Crosley Corp. v. Hazeltine Corp., 122 F.2d 925, 930 (3d Cir.1941)* (emphasis added). The *Hazeltine* court, therefore, concluded that the lower court had erred in refusing to enjoin later-filed patent infringement actions in the Southern District of Ohio, "when the *jurisdiction of the district court of Delaware has already been invoked* to determine the validity and infringement of all of these patents." *Id.* at 930 (emphasis added). These articulations suggest that the inquiry should focus on the date on which the jurisdiction of *the court* is invoked-i.e., through the filing of a complaint-rather than the date on which personal jurisdiction over the parties is perfected.

**\*3** The only case from this circuit to squarely address the issue concluded that the first-filed rule gives priority to an earlier filed complaint even if a later filed complaint is first served. *See Peregrine Corp. v. Peregrine Indus., Inc., 769 F.Supp. 169, 171-72 (E.D.Pa.1991); but see Osteotech, Inc. v. Gensci Regeneration Sciences, Inc., 6 F.Supp.2d 349, 357 n. 4 (D.N.J.1998)* (stating, *in dicta*, that a "persuasive argument can be made" that a later filed but first served complaint takes priority in this circuit).[FN3] This court agrees with the conclusion reached in *Peregrine*, which also appears to be the majority view in other circuits.[FN4]

> FN3. Though not addressing the "first-filed" vs. "first-served" issue, the court in *Jefferson Ward Stores, Inc. v. Doody Co., 560 F.Supp. 35 (E.D.Pa.1983)*, also placed great emphasis on the "first obtaining jurisdiction of the parties and the issues" language quoted above. *See id. at 36-37.* That court permitted a later filed Pennsylvania action to proceed because personal jurisdiction was being contested in an earlier filed Ohio action. Because the district court in Ohio had not yet ruled on a motion to dismiss for lack of personal jurisdiction, the district court in

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 1728354 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

Pennsylvania concluded that the Ohio court had not yet "obtained jurisdiction of the parties." *See id.* The Pennsylvania court did, however, note that it would reconsider the question of transfer if the Ohio court were to rule that it did have jurisdiction over the parties. *Id.*

Despite its focus on personal jurisdiction, however, *Jefferson Ward* is not helpful to Weavexx's position. In Weavexx's declaratory judgment action in North Carolina, Asten moved for dismissal based on, *inter alia,* lack of personal jurisdiction. As that motion is still outstanding, it might be said that the district court in North Carolina has not yet "obtained jurisdiction" over the parties. Because personal jurisdiction is not contested in the instant action, transfer might be inappropriate even if the court were to construe the rule as focusing on the time at which personal jurisdiction is established.

FN4. *See, e.g., Pacesetter Sys., Inc. v. Medtronic, Inc.,* 678 F.2d 93, 96 n. 3 (9th Cir.1982), *Hospah Coal Co. v. Chaco Energy Co.,* 673 F.2d 1161, 1163 (10th Cir.1982); *Barber-Greene Co. v. Blaw-Knox Co.,* 239 F.2d 774, 778 (6th Cir.1957); *Med-Tec Iowa, Inc. v. Nomos Corp.,* 1999 WL 1084253, at *6 (N.D.Iowa 1999); *Fat Possum Records Ltd. v. Capricorn Records, Inc.,* 909 F.Supp. 442, 446 (N.D.Miss.1995); *but see Northwest Airlines, Inc. v. Astraea Aviation Serv., Inc.,* 930 F.Supp. 1317, 1327 n. 9 (suggesting that first-served action may take priority).

In the present case, this conclusion is fully consistent with the concerns that gave rise to the rule. In *University of Pennsylvania,* the court noted that the rule "encourages sound judicial administration and promotes comity among federal courts of equal rank." 850 F.2d at 971. In Weavexx's declaratory judgment action in North Carolina, the district court recently granted Asten's motion to stay proceedings pending this court's consideration of the instant motion. In so doing, the court stated: "Moreover, the Delaware complaint was filed, if not served, first. This Court sees no reason why the Delaware Court should not be allowed to determine whether to retain jurisdiction before the instant action is allowed to proceed." In light of that ruling, allowing this case to proceed in Delaware would not result in duplicative litigation, and would not undermine comity between

federal courts of equal rank.

Finally, it should be noted that in response to the court's inquiry, counsel for Weavexx conceded that at the time Weavexx filed its declaratory judgment action in North Carolina, it was aware that Asten had already filed its complaint here in Delaware. Weavexx offers no explanation as to what function its declaratory judgment action could serve that a counterclaim in the instant action could not. Under these circumstances, the court concludes that the first-filed rule does not provide a basis for staying these proceedings or transferring this case to the Eastern District of North Carolina.

B. Transfer Pursuant to 28 U.S.C. § 1404

The first-filed rule does not, of course, preclude Weavexx's motion for transfer pursuant to 28 U.S.C. § 1404. That section provides as follows:

For the convenience of parties and witnesses, in the interests of justice, a district court may transfer any civil action to any other district or division where it may have been brought.

Although the decision to transfer a case is subject to the court's discretion, a plaintiff's choice of forum is a "paramount" consideration that is not to be "lightly disturbed." *Schutte v. Armco Steel Corp.,* 431 F.2d 22, 25 (3d Cir.1970); *see also Jumara v. State Farm Ins. Co.,* 55 F.3d 873, 879-80 (3d Cir.1995). As such, Weavexx has a heavy burden to carry. The court should not grant a transfer unless the "balance of convenience" weighs strongly in favor of transfer. *See Schutte,* 431 F.2d at 25.[FN5]

FN5. Weavexx attempts to incorporate its position regarding the first-filed rule into its § 1404 analysis, arguing that Asten has the burden of establishing that the balance of convenience strongly favors Delaware. Opening Br. at 9. Since the court has already rejected Weavexx's position that the North Carolina action was "first-filed," it need not decide whether a contrary conclusion would have reversed the burden of persuasion in a § 1404 analysis, as Weavexx contends. The court does note, however, that the case Weavexx cites for that proposition, *Ballard Medical Products v. Concord Lab., Inc.,* 700 F.Supp. 796 (D.Del.1988), does not support Weavexx's view. Rather, the earlier filed action in *Ballard* was simply considered as a

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 1728354 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

factor favoring transfer-it did not reverse the burden of persuasion. *See id.* at 800-01.

**\*4** In *Jumara*, the Third Circuit Court of Appeals identified a nonexclusive list of factors that have been used to guide courts in the exercise of their discretion in ruling on requests for transfer. *See Jumara*, 55 F.3d at 879-80; *see also Affymetrix, Inc. v. Synteni, Inc.*, 28 F.Supp.2d 192, 196-97 (D.Del.1998). The factors most relevant to this case are discussed below.[FN6]

> FN6. As a threshold matter, this action could have been brought in the Eastern District of North Carolina. *See* 28 U.S.C. § § 1391(b), 1400(b). The court can, therefore, proceed to weighing the factors for and against transfer.

### 1. The Convenience of the Parties

Litigating this case in North Carolina would be more convenient for Weavexx. Weavexx is headquartered in Wake Forest, which is within the Eastern District of North Carolina. Weavexx has identified six employees likely to testify at trial, each of whom resides within the Eastern District. The accused product was designed in Wake Forest, and Weavexx contends that the vast majority of its documents and records relating to the accused product are maintained at its Wake Forest headquarters.

Weavexx also claims that litigating this case in North Carolina would be more convenient for Asten. The entirety of Weavexx's "proof" in this regard is the fact that Asten is headquartered in Charleston, South Carolina. Asten does not vigorously contend, however, that Delaware is more convenient. Although Asten notes that its relevant documents and at least one of its testifying employees are located in Appleton, Wisconsin, it has done little to establish that these facts make Delaware any less inconvenient than North Carolina.

The court, therefore, concludes that North Carolina would be more convenient than Delaware for Weavexx, and no more inconvenient than Delaware for Asten. While this factor therefore favors transfer, it does so only slightly. Weavexx concedes that it is financially able to shoulder the expense of litigating this case in Delaware. Further, Weavexx has not established that its business would be disrupted if the employees that are expected to testify at trial must do so in Delaware. Weavexx maintains manufacturing facilities in several southern states and in Canada. It

is likely that the six employees Weavexx identifies-upper level management including the company's president and three vice-presidents-are sometimes called upon to travel for company business. Finally, Weavexx has managed to survive two previous lawsuits filed in Delaware *by Weavexx* against Asten.

### 2. The Convenience and Availability of the Witnesses

The convenience of witnesses is often an important factor in a transfer inquiry. *See* 15 CHARLES ALAN WRIGHT, ARTHUR R. MILLER & EDWARD H. COOPER, FEDERAL PRACTICE AND PROCEDURE: JURISDICTION AND RELATED MATTERS § 3851, at 415 (2d ed.1986) [hereinafter WRIGHT & MILLER] (describing this factor as "[p]robably the most important factor, and the factor most frequently mentioned, in passing on a motion to transfer"). The convenience of witnesses is only considered, however, "to the extent that the witnesses may actually be unavailable for trial in one of the fora." *Jumara*, 55 F.3d at 879 (citing WRIGHT & MILLER § 3851, at 420-22). Thus, for example, the convenience of witnesses that are employees of a party carries no weight because the parties are obligated to procure their attendance at trial. *See Affymetrix*, 28 F.Supp.2d at 203.

**\*5** Weavexx claims that North Carolina is a more convenient forum than Delaware for most of both parties' witnesses. But Weavexx has failed to sufficiently identify any witnesses that "may actually be unavailable for trial" in Delaware. Indeed, the six "primary anticipated fact witnesses" that Weavexx identifies are all upper level Weavexx employees. As such, Weavexx should be able to assure their attendance at trial.[FN7]

> FN7. Weavexx appears to contend that one of its employee witnesses-the inventor of the accused product-should be treated as a non-party witness because he is scheduled to retire from Weavexx before the anticipated trial date. Opening Br. at 11. Weavexx, however, provides no information-by affidavit or otherwise-to suggest that this witness may be unavailable for trial in Delaware (or, for that matter, that he plans to remain within the subpoena power of the Eastern District of North Carolina after his retirement). The court is, therefore, not persuaded that this employee's anticipated

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 1728354 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

retirement should have a significant impact on the transfer inquiry.

Weavexx also claims that three of the four "major domestic manufacturers of papermaking fabric" are headquartered in either North or South Carolina. Therefore, it asserts that "it is clearly more likely that witnesses having knowledge regarding relevant prior art would be within the subpoena power of the North Carolina Court." Opening Br. at 11. While this may or may not be a reasonable assumption,[FN8] such unsupported speculation about unspecified witnesses does not carry much weight in a transfer analysis. *Affymetrix,* 28 F.Supp.2d at 205. Further, two of the three "major domestic manufacturers" headquartered in the Carolinas are Asten and Weavexx themselves. As already noted, the convenience of party witnesses generally receives no weight in a transfer analysis. *Id.* at 203.

> FN8. For example, although Asten is headquartered in South Carolina, its employee that is apparently most knowledgeable about the prior art of the '839 patent is located at Asten's manufacturing facility in Appleton, Wisconsin.

As such, to the extent that the convenience and availability of witnesses weighs at all in favor of transfer, it does so only slightly.

### 3. Other Factors

Although Weavexx principally relies on the two factors discussed above, it recites several other factors that supposedly favor transfer. For example, Weavexx notes that since 1996, the average time from filing to trial for civil actions is 19.3 months in Delaware as compared to 16.5 months in North Carolina. But for the most recent period-the year ending June 30, 1999-Weavexx's statistics show that the average time to trial was one month longer in North Carolina than in Delaware. Virtually all of the other statistics provided by Weavexx (but not cited in its brief) suggest that court congestion is actually worse in the Eastern District of North Carolina than in the District of Delaware. Moreover, Magistrate Judge Thynge of this district served as a mediator in both of the prior Delaware actions between the parties. Judge Thynge will again be available in the present action. It appears, therefore, that administrative considerations and judicial economy actually weigh against transfer.[FN9]

> FN9. As already noted, the district court in North Carolina has granted Asten's motion to stay proceedings in the declaratory judgment action pending this court's decision on Weavexx's motion to transfer. Therefore, there does not appear to be a risk of duplicative litigation if this motion is denied.

Next, Weavexx attempts to characterize this action as a "local controversy" that should be decided close to home. *See Jumara,* 55 F.3d at 879. The court fails to see how a patent infringement action involving two large companies that (1) are incorporated in Delaware; (2) are headquartered in different states; and (3) maintain manufacturing facilities in various states and Canada can be considered a "local" North Carolina controversy. Such characterization seems particularly inappropriate where, as here, the competing products at issue are manufactured in Wisconsin and Brazil.

*6 The court finds that the other factors referred to by Weavexx, including those not discussed herein, do not weigh significantly, if at all, in favor of transfer.

### 4. Weighing of Factors

The court recognizes that the ties between this litigation and the state of Delaware are not substantial. Nevertheless, Asten's choice of this forum is a "paramount" consideration that is not to be "lightly disturbed." *Schutte v. Armco Steel Corp.,* 431 F.2d 22, 25 (3d Cir.1970). After weighing the factors discussed above, the court finds that Weavexx has failed to meet its heavy burden of establishing that the "balance of convenience" tips strongly in favor of transfer. As such, Weavexx has failed to establish that transfer is appropriate pursuant to 28 U.S.C. § 1404.

### IV. CONCLUSION

For the foregoing reasons, IT IS HEREBY ORDERED that:

1. Weavexx's motion to transfer this case to the United States District Court for the Eastern District of North Carolina is DENIED; and

2. Weavexx's alternative request to stay these

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 1728354 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 6

proceedings pending resolution of Weavexx's declaratory judgment action in the Eastern District of North Carolina is DENIED.

D.Del.,2000.
Asten Inc. v. Weavexx Corp.
Not Reported in F.Supp.2d, 2000 WL 1728354 (D.Del.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.
Not Reported in F.Supp., 1998 WL 24354 (D.Del.)
**(Cite as: Not Reported in F.Supp.)**

Page 1

Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court, D. Delaware.
BERING DIAGNOSTICS GMBH and Behring
Diagnostics, Inc., PLAINTIFFS,
v.
BIOSITE DIAGNOSTICS, INC., Defendant.
No. Civ.A. 97-501 MMS.

Jan. 6, 1998.

David J. Baldwin, and Joanne Ceballos, of Potter
Anderson & Corroon, Wilmington, Delaware; of
counsel, Herbert F. Schwartz, Kenneth B. Herman,
Marta E. Gross, and Keith D. Agisim, of Fish &
Neave, New York City, for plaintiffs.
Jeffrey Bove, of Connolly, Bove, Lodge & Hutz,
Wilmington, Delaware; of counsel: Richard G.
Greco, and Deborah A. Marrone, of Kaye, Scholer,
Fierman, Hays & Handler, LLP, New York City, for
defendants.

**OPINION**

SCHWARTZ, Senior J.

**I. Introduction**

*1 Behring Diagnostics GmbH, Behring Diagnostics,
Inc., and their parent company, Dade International,
Inc. (collectively "Behring") brought this patent
infringement action against Biosite Diagnostics, Inc.
("Biosite") for infringing Behring GmbH's U.S.
Patent No. 4,336,241 (the " '241 Patent"). [FN1]
Biosite answered this complaint and counterclaimed
seeking a declaratory judgment that the '241 Patent is
invalid, unenforceable, and not infringed. The
product accused of infringement is Biosite's Triage
Panel For Drugs of Abuse ("Triage DOA"), which is
an immunoassay device which is used for the
detection of drugs of abuse in urine.

FN1. Initially, on September 2, 1997, this
action was commenced in the name of
Behringwerke GmbH and Behring
Diagnostics, Inc.; but this complaint was
never served. On September 9, 1997,
Behring Diagnostics GmbH and Behring

Diagnostics, Inc. refiled and served this
present complaint.
In addition, Dade International, Inc., is in
the process of changing its name to Dade
Behring, Inc., effective January 1, 1998. At
that time, Dade Behring, Inc. will be
substituted as a party for Dade International,
Inc.

Pending before the Court now is Biosite's motion to
transfer this action to the United States District Court
for the Southern District of California ("Southern
District of California"). The Court has jurisdiction
over this action under 28 U.S.C. § 1338(a). The
motion to transfer will be denied.

**II. Factual Background**

**A. *The Parties***

Biosite is a Delaware Corporation with its principal,
and only, place of business in San Diego, California.
Founded in 1988, Biosite develops, manufactures and
markets diagnostics products to detect, *inter alia,* the
presence in urine of commonly abused substances.
Biosite has currently 210 employees and a market
capitalization of $100 million, with approximately
$28 million in gross sales. All of its management,
scientists, and other employees (except for 20 sales
people) are located at the San Diego facility. The
accused product, the Triage DOA, was invented and
developed in Biosite's San Diego facility and is
manufactured at the same San Diego facility.

The Behring companies are a subsidiary of Hoechst
AG and also develop, manufacture, and market
diagnostics products to detect, *inter alia,* the presence
in urine of commonly abused substances. Behring
Diagnostics GmbH is a German corporation with its
principal place of business in Marburg, Germany.
Behring Diagnostics Inc. is at present a Delaware
Corporation with its principal place of business in
Westwood, Massachusetts. It is currently
responsible for being the United States marketer of
products manufactured by Behring GmbH. Behring
Diagnostics GmbH became the current assignee of
the '241 Patent when the Behring companies acquired
Syva Company ("Syva") in 1995.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1998 WL 24354 (D.Del.)
(Cite as: Not Reported in F.Supp.)

Dade International, Inc., a Delaware corporation, is the owner of Behring Diagnostics GmbH and is also the owner, through a holding company, of Behring Diagnostics, Inc. On January 1, 1998, Dade International Inc. intends to change its name to Dade Behring Inc. It will be the same corporate entity it is now, with only a name change. The new entity will also be a Delaware corporation with its principal place of business in Deerfield, Illinois. Dade Behring will be owned in part by Hoescht AG. Dade International Inc., soon to be Dade Behring Inc., has a branch office in Glasgow, Delaware which employs approximately 1000 people and has 25 sales and service offices throughout Delaware.

### B. Subject Matter of this Lawsuit

**\*2** Behring's '241 Patent, which was initially issued on December 28, 1982, to Henry K. Tom ("Tom") and Gerald L. Rowley ("Rowley"), is entitled "Concentrating Zone Method in Heterogeneous Immunoassays". The patent was subsequently assigned to Syva. The '241 Patent is directed to an assay device which can identify the presence of specific antigens in a sample solution such as urine or blood. Such devices are used for, among other things, the detection of drugs of abuse including cocaine and marijuana. Behring asserts Biosite's Triage DOA infringes upon the '241 Patent. The Triage DOA is a diagnostic device capable of detecting, in urine, a broad spectrum of commonly overdosed prescription and illicit drugs. Triage DOA is used by over 2,600 hospitals across the country, including hospitals in Delaware. Over 4.6 million Triage DOA devices have been sold worldwide since the product's introduction.

### III. Standards for Motion to Transfer

28 U.S.C. § 1404(a) provides "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." 28 U.S.C. § 1404(a) (1993). The parties concede that this action could have been brought in the Southern District of California.[FN2] See D.I. 28, at 11 n. 2.

FN2. A civil action for patent infringement "may be brought in the judicial district where the defendant resides, or where the defendant has committed acts of

infringement and has a regular and established business." 28 U.S.C. § 1400(b). Since Biosite is not only headquartered in San Diego, and its only facility is located there, there is no question that the Southern District of California, in which San Diego lies, is an appropriate venue.

As the text of § 1404(a) indicates, the Court must examine (1) the convenience of the parties, (2) the convenience of the witnesses, and (3) the interests of justice, in determining whether transfer is proper. The Court of Appeals for the Third Circuit has emphasized this is a broad inquiry: a district court must examine "all relevant factors to determine whether on balance the litigation would more conveniently proceed and the interests of justice be better served by transfer to a different forum." Jumara v. State Farm Ins. Co., 55 F.3d 873, 879 (3d Cir.1995). While cautioning "there is no definitive formula or list of factors to consider," id., the court identified potential factors which it characterized as either private or public interests.

The private interests include: (1) plaintiff's forum preference as manifested in the original choice, (2) the defendant's preference, (3) whether the claim arose elsewhere, (4) the convenience of the parties as indicated by their relative physical and financial condition, (5) the convenience of the witnesses-but only to the extent that the witnesses may actually be unavailable for trial in one of the fora, (6) the location of books and records (similarly to the extent that the files could not be produced in the alternative forum). See id. (citations omitted).

Among the public interests are: (1) the enforceability of the judgment, (2) practical considerations that could make the trial easy, expeditious, or inexpensive, (3) the relative administrative difficulty in the two fora resulting from court congestion, (4) the local interest in deciding local controversies at home, and (5) the public policies of the fora. See id. (citations omitted).

**\*3** Although the factors listed by the Jumara Court are merely illustrative and by no means exhaustive, the Court will address the Jumara factors which are applicable to the facts of this case as they represent a good point of departure for considering Biosite's motion to transfer. Omnipresent in a transfer analysis is the fact that Biosite bears the heavy burden of establishing the need for transfer. See Shutte v. Armco Steel Corp., 431 F.2d 22, 25 (3d Cir.1970), cert. denied, 401 U.S. 910, 91 S.Ct. 871,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1998 WL 24354 (D.Del.)
(Cite as: Not Reported in F.Supp.)

Page 3

27 L.Ed.2d 808 (1971); *Sunds Defibrator, Inc. et. al. v. Durametal Corp., 1997 WL 74660, at \*2 (D.Del. January 31, 1997)*. The *Shutte* Court further stated: "[U]nless the balance of convenience of the parties is *strongly* in favor of defendant, the plaintiff's choice of forum should prevail." *Shutte*, 431 F.2d at 25 (emphasis added); *see also Critikon v. Becton Dickinson Vascular Access, Inc., 821 F.Supp. 962, 964 (D.Del.1993)* ("[T]ransfer will be denied if the factors are evenly balanced or weigh only slightly in favor of transfer.").

### IV. Discussion

### A. *Private Interests*

### 1. Plaintiffs' Forum Preference

A plaintiff's choice of forum is entitled to substantial deference and "should not be lightly disturbed." *Shutte*, 431 F.2d at 25. This deference is particularly due when the plaintiffs have chosen their forum because of "legitimate, rational concerns." *Waste Distillation Tech., Inc. v. Pan Am. Resources, Inc., 775 F.Supp. 759, 764 (D.Del.1991)*.

Biosite contends that there are no rational factors that weigh in favor of Behring's choice of forum. Biosite points out that Delaware is not the home of Behring Diagnostics GmbH, nor is it the physical home of the soon to be formed Dade Behring, Inc., which is based in Illinois. Moreover, Biosite cites the "home turf" rule for the proposition that because Delaware is not Behring's "home turf," the Court should accord less weight to Behring's choice of forum. Lastly, Biosite maintains that a statutory place of incorporation is entitled to less weight than if the physical presence of the company was in the selected jurisdiction. Biosite concludes that even though Delaware is the place of incorporation of Behring Diagnostics, Inc. and will be for the newly-formed Dade Behring, that fact has no practical bearing on the logistics of trial, and is entitled to little weight.

Behring, on the other hand, asserts that even though Delaware is not its principal place of business, its choice of forum is entitled to deference, and should not be upset unless the defendant can show the balance of convenience strongly favors transfer. Behring contends that its choice of forum is legitimate and rational because Syva is, and Dade Behring will be, a Delaware corporation, Biosite is a Delaware corporation, Biosite pursues business activities in Delaware, Behring's counsel would like to pursue mediation with Magistrate Judge Trostle of this District because of past satisfying experiences, and because Biosite is selling the infringing product in Delaware and is actively inducing infringement of the '241 Patent by such sales in Delaware.

\*4 The Delaware district court has not always been consistent as to what level of deference a plaintiffs' status as a Delaware corporation should play in the motion to transfer calculus. *Compare Joint Stock Soc'y v. Heublein, Inc., 936 F.Supp. 177, 187 (D.Del.1996)* ("[Plaintiff's] mere status as a plaintiff Delaware corporation is not entitled to great weight in determining whether to grant a motion to transfer, especially because [plaintiff's] principal place of business is elsewhere."), *with Critikon, 821 F.Supp. at 965* ("[T]he fact that [plaintiff] incorporated in Delaware should not be taken lightly. By incorporating in Delaware, it can be assumed that [plaintiff] desired the benefits it believed Delaware provides to chartered corporations."). Suffice it to say that, "[i]t is legitimate and rational ... for a plaintiff to choose to litigate in a forum in which it is incorporated." *See Joint Stock Soc'y, 936 F.Supp. at 187*.

Moreover, Biosite's reliance on the "home turf" rule is misplaced. Although the vitality of the home turf rule has recently been put in doubt, *see Sunds Defibrator, 1997 WL 74660, at \*2 n. 2*, to date it has not received a formal internment. To the extent, if any, that weak vital signs remain, it would not be applicable on the presented facts. The home turf rules applies when the forum closest to a plaintiff's principal place of business is selected in order that personal service over the defendant can be obtained.[FN3] This is simply not the situation in this case.

> FN3. This Court has recently cast doubt on this rule's existence in *Sunds Defibrator*, in which the Court stated: "[A] strong argument can be made that the 'home turf rule' is now subsumed in the *Jumara* private interest factor with emphasis on 'plaintiff's forum preference.' " *Sunds Defibrator, 1997 WL 74660, at \*2 n. 2*.

Lastly, the Court finds that the other factors identified by Behring for bringing this case in Delaware are legitimate and rational reasons for Delaware to be the plaintiff's choice of forum. *See Waste Distillation,*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1998 WL 24354 (D.Del.)
(Cite as: Not Reported in F.Supp.)

Page 4

775 F.Supp. at 764 ("[S]uffcient that the forum is near the plaintiff's principal place of business and/or that it is consistent with the plaintiff's legitimate concerns."). The fact that Biosite conducts a substantial amount of business in Delaware and that the infringing product continues to be sold in Delaware counsels in favor of Behring picking Delaware as its forum of choice. *See In re ML-Lee Acquisition Fund II, L.P., 816 F.Supp. 973, 976 (D.Del.1991); Willemijn Houdstermaatschaapij BV v. Apollo Computer, Inc., 707 F.Supp. 1429, 1437 (D.Del.1989).* In addition, in cases where a plaintiff, like Biosite, is itself a Delaware corporation, the Court has stated: "[Where defendant] chose Delaware as its legal home ..., [it] should not now complain that another corporation has decided to sue [it] in Delaware." *Critikon, 821 F.Supp. at 965.* Further, the fact that Behring's counsel has had previously good experiences with mediation in this district with Magistrate Judge Trostle, cannot be said to be an illegitimate or irrational reason to pick the Delaware forum. For all these reasons, Delaware is a choice of forum based on the rational and legitimate concerns of Behring and plaintiff's selection is due substantial deference.

## 2. Convenience of the Parties

**\*5** Biosite contends that there is no practical or logical reason for this case to be tried in Delaware because the named parties do not have their operations in Delaware. Biosite also maintains the presence of key personnel at litigation on the East Coast would disrupt the companies' operations. Lastly, Biosite asserts Behring Diagnostics, Inc., will no longer be an existing entity after the merger with Dade International and in any event, because Behring Diagnostics, Inc. was never alleged to be the owner or exclusive licensee of the '241 Patent, it has no standing to sue. Biosite therefore alleges that the convenience of the parties strongly favors transferring this litigation to the California forum.

Behring, on the other hand, argues that Delaware is not an inconvenient forum for Biosite. Behring points out that Biosite is a national company with thousands of Triage DOA units sold in Delaware every year. In addition, Behring challenges Biosite's contention that loss of key personnel would disrupt its operations, as only four witnesses from Biosite have been identified. Behring also contends that Biosite is not a small company and would have no problem trying this case in Delaware. Lastly, Behring asserts that Delaware is a convenient forum

in which to litigate because Behring's three offices that are most involved in this dispute-the Behring Diagnostics, Inc. office in San Jose, California, soon to be a Dade Behring office, the Dade Behring headquarters in Deerfield, Illinois, and Behring Diagnostics GmbH in Marburg, Germany-are all approximately equidistant to Delaware.

The Court finds that the convenience of the parties factor does not militate strongly in favor of either of the parties and this factor therefore does not strongly favor transfer. First, both parties are national corporations with revenues in the millions of dollars. *See The Media Group, Inc. et. al. v. Turtle Wax, Inc. et. al., 1996 WL 756760, at \*5 (D.Del. December 23, 1996).* As such, the relative economic burden to Biosite in litigating in Delaware is minimal. *See id.* Second, although it is true that Biosite has its business operations in San Diego and it would be more convenient for key personnel to attend trial in the Southern District of California, it is also true that Delaware represents a good compromise for Behring since its relevant companies are located anywhere between San Jose and Germany. Third, Biosite's contention that Behring Diagnostic does not have standing to sue is not properly before this Court on a motion to transfer. As such, the Court declines to address that issue at this time.

Given the above analysis, the convenience of the parties does not strongly weigh in favor of transferring this action to the Southern District of California.

## 3. Convenience of the Witnesses

Under § 1404(a), "the Court must determine whether the convenience to all witnesses weighs strongly in favor of a transfer." *Pursuit Athletic Footwear v. Save Power Ltd.,* 1996 U .S.Dist. LEXIS 8158, at \*22 (D.Del. June 7, 1996). "While convenience of the witnesses is a factor, it is important only to the extent the witnesses would be unavailable for trial in one of the fora. Each party is able to procure the attendance of its own employees for trial." *Sunds Defibrator, 1997 WL 74660, at \*3.*

**\*6** Biosite contends that the convenience of the witnesses "entirely" favors the Southern District of California. Biosite argues that all of the most likely witnesses are in California, and many of the most important witnesses-including the two inventors and two attorneys that prosecuted the patent-are third parties and could only be compelled to appear in

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1998 WL 24354 (D.Del.)
(Cite as: Not Reported in F.Supp.)

Page 5

California. Behring, on the other hand, asserts that as the inventors, Tom and Rowley, are now consultants for Behring, these witnesses have agreed to testify in Delaware. In addition, Behring maintains that Dr. Ullman, another third-party witness identified by Biosite, is also employed as a consultant for Behring and has agreed to appear in Delaware. As for the two patent attorneys, Dr. Leitereg and Betrand Rowland, Behring avers that Rowland will voluntarily appear in Delaware and because Dr. Leitereg is sick, he would probably be unable to appear in California or Delaware.

The Court does not find that convenience of the witnesses strongly favors transfer. It is true that mere assurances that a witness has agreed to testify in the fora is not equivalent to having the actual subpoena power of assuring a witnesses' presence. See *Schering Corp. v. Amgen Inc.*, 969 F.Supp. 258, 269 (D.Del.1997) (citing *Sherwood Medical Co. v. IVAC Medical Systems, Inc.*, 1996 WL 700261, at *5 (D.Del. November 25, 1996)). While counsel for Behring cannot guarantee that these witnesses will appear in Delaware, they would all certainly be within the subpoena power of the Southern District of California as California citizens.

However, both parties at oral argument conceded that if it became clear shortly before trial that one of these critical witnesses, i.e ., Tom, Rowley, Ullman or Rowland, refused to come to Delaware, and was capable testifying live in California, it would be in the Court's power to transfer the case to the Southern District of California. Biosite points out, however, that such a late transfer may not be practical and may cause significant delay. Be that as it may, to the extent that the convenience of the witnesses weighs in favor of Biosite, it does not do so strongly given the option available to the Court to transfer this case later in the proceedings should it appear necessary to defendant.

### 4. Location of Documents

Biosite makes much of the argument that most of the relevant documents are located in California. But as Behring correctly observes, "transferring documents form the West Coast to Delaware poses no large obstacle." See *Schering*, 969 F.Supp. at 269. Further, this factor is only relevant to the extent that files could not be produced in the alternative forum. See *Jumara*, 55 F.3d at 879. Because there has been no showing that any relevant document could not be produced in Delaware or that transferring documents

to Delaware would pose a significant burden, the Court concludes that this factor does not strongly favor transfer.

Thus, although one of the private factors considered above, namely the convenience of the witnesses, may weigh to some extent in favor of transfer, when construed in light of the strong deference paid to plaintiff's choice of forum, the private interests do not **strongly** favor transfer to the Southern District of California.

### B. Public Interests

### 1. Practical Considerations of Efficiency and Expense

*7 Biosite asserts the relative congestion of the courts does not favor Delaware over the Southern District of California. To support its argument, Biosite cites court statistics that show the mean time from filing to disposition is slightly shorter in the Southern District of California than in the District of Delaware. Biosite also observes that since Syva previously brought an action for infringement of the same '241 Patent against Hybritech, Inc., *see Syva Company, Inc. v. Hybritech Inc.*, 1989 U.S.Dist. LEXIS 16678 (S.D.Cal.1989), the California forum would be more appropriate for this litigation. Behring, on the other hand, contends that one of the reasons it chose to litigate in Delaware was because of the relatively light docket and speedy disposition of cases. In addition, Behring points out that the Southern District of California has little knowledge or memory of the underlying technologies discussed in the *Syva* case.

Delaware's light docket "has been repeatedly recognized as a legitimate reason by both the Third Circuit Court of Appeals and this district." *Media Group*, 1996 WL 756760, at *7. In addition, pursuant to Delaware's Civil Justice Expense and Delay Reduction Plan and the Civil Justice Reform Act of 1990, "trial [in Delaware] shall be scheduled to occur within 12 months, if practicable, and no later than 18 months, after the filing of the complaint." *See* 28 U.S.C. § 471 (1993); D.Del.LR 16.2(c). Lastly, the Court finds no significance in the fact that the *Syva* case, which occurred almost ten years ago and involved two different parties, was in California. The Court therefore holds that this factor also does not weigh strongly in favor of transfer.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                              Page 6
Not Reported in F.Supp., 1998 WL 24354 (D.Del.)
(Cite as: Not Reported in F.Supp.)

**2. The Local Interest and Public Policies of Fora**

Biosite contends that since it is headquartered in California, has research and manufacturing facilities in California, and most of the relevant events occurred in California, the public interest favors transfer to California. Biosite urges the Court to adopt the "center of gravity" test. Briefly stated, that test states that when the center of gravity of the patent infringement suit is not the plaintiff's preferred forum, less weight should be given to plaintiff's choice of forum. *See, e.g., Renzetti v. D.H. Thompson, Inc.,* 1997 U.S.Dist. LEXIS 6121, at \*9 (E.D.Pa. May 2, 1997). Biosite maintains that the center of gravity is California and therefore, California is the appropriate forum for this patent litigation. Behring asserts because Biosite sells their products in Delaware and because there have been acts of infringement in Delaware, Delaware is just as an appropriate forum as California.

The *Schering* Court, in a similar patent transfer case, directly answered Biosite's "center of gravity" challenge in the following manner:
First, although headquartered in California, [defendant] is a Delaware corporation. More significant, however, is the nature of the dispute in this case. [The allegedly infringing product] is sold internationally and generates millions of dollars in revenues. The dispute over the [patent in suit] can hardly be described as a local California controversy, or implicating public policies unique to California. Accordingly, the public interests in this case do not tip the balance of convenience strongly in favor of [defendant].

**\*8** *Schering,* 969 F.Supp. at 269. This holding applies equally to the facts of this case. The Court holds that the public interests, represented by the public policies of the fora and the local interest of deciding controversies at home, do not weigh strongly in favor of transfer.

Because, on balance, both the public and private interests therefore do not weigh strongly in favor of transferring this litigation to the Southern District of California, Biosite's motion to transfer will be denied.

An appropriate order will issue.

D.Del.,1998.
Bering Diagnostics GmbH v. Biosite Diagnostics, Inc.
Not Reported in F.Supp., 1998 WL 24354 (D.Del.)

Briefs and Other Related Documents (Back to top)

• 1:97CV00501 (Docket) (Sep. 02, 1997)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court,D. Delaware.
SONY ELECTRONICS, INC., Sony Computer
Entertainment America, Inc., Sony Pictures
Entertainment, Inc., Sony Connect, Inc., Sony Online
Entertainment, Inc., Sony Corporation of America,
Sony BMG Music Entertainment, Inc., Sony Ericsson
Mobile Communications (USA), Inc., Plaintiffs,
v.
ORION IP, LLC, Defendant.
No. C.A. 05-255(GMS).

March 14, 2006.

Josy W. Ingersoll, Young, Conaway, Stargatt &
Taylor, Wilmington, DE, for Plaintiffs.
Donald E. Reid, Morris, Nichols, Arsht & Tunnell,
Wilmington, DE, for Defendant.

*MEMORANDUM*
SLEET, J.
**\*1** On November 23, 2004, Orion IP, LLC ("Orion"),
a Delaware corporation headquartered in Texas, filed
a patent infringement suit in the United States
District Court for the Eastern District of Texas
against fifteen individual defendants, none of whom
are parties to this action. However, on February 10,
2005, Orion amended its complaint to add additional
parties, including Sony Corporation of America
("SCA"). On April 7, 2005, SCA responded by filing
an answer in the Texas action asserting the
affirmative defenses of non-infringement and
invalidity as to both patents in suit. Then, on May 2,
2005, SCA and seven other so-called non-SCA
plaintiffs filed an action in this court seeking a
declaratory judgment of non-infringement and
invalidity with respect to the same patents as those
asserted against SCA in the Texas action. However,
although the patents at issue are the same, the
potentially-infringing products of the non-SCA
plaintiffs-their websites-are allegedly different than
the accused SCA website. Presently before the court
is Orion's motion to either dismiss or stay this case
under the first-filed rule, or alternatively, to transfer it
to the Eastern District of Texas pursuant to 28
U.S.C.A. § 1404(a) (1993). (D.I.11.)

Generally speaking, the first-filed rule is as simple as

its name suggests: "[w]here two patent lawsuits
involving the same claims are filed in different
jurisdictions, the Federal Circuit requires that the
first-filed action be given preference absent special
circumstances." *Corixa Corp. v. IDEC Pharm. Corp.,*
No. 01-615-GMS, 2002 WL 265094, at \*1 (D.Del.
Feb.25, 2002). The present case presents a small
complication, however, because only one of the
plaintiffs in this action is a defendant in the Texas
action. But, that complication is not too difficult to
overcome because "Civil Procedure Rule 21 permits
any claim against a party to be severed and proceeded
with separately." *Triangle Conduit & Cable Co. v.
Nat'l Elec. Prods. Corp.,* 125 F.2d 1008, 1009 (3d
Cir.1942). Moreover, "Rule 21 permits a court to
sever claims *sua sponte.*" *United States v. AMTRAK,*
No. 86-1094, 2004 U.S. Dist. LEXIS 10867, at \*21
(E.D. Pa. June 15, 2004). That being the case, and
there being no discernable prejudice in severing
SCA's claims against Orion, the court will exercise its
power to do so. As a result, the court is confronted
with a declaratory judgment action by SCA alone, the
inverse of which (i.e., an infringement action) was
filed about three months earlier in Texas. Therefore,
pursuant to the first-filed rule, SCA must be
dismissed from this case. *Cf. Triangle Conduit,* 125
F.2d at 1009 (holding that this district was under a
duty to enjoin a patent-holding defendant in a
declaratory judgment action from pursuing an
infringement action in another district against the
declaratory judgment plaintiff, even though the
infringement action in the other district would
proceed against other parties in the absence of the
declaratory judgment plaintiff).

**\*2** With SCA out of the case, the court must still
decide the fate of the non-SCA plaintiffs. Orion first
argues that, like SCA itself, the non-SCA plaintiffs
are subject to the first-filed rule under the holding of
*Corixa,* where this court granted a motion to transfer
a patent infringement action, based on the first-filed
rule, to a district where a previous declaratory
judgment action had been filed, even though one of
the plaintiffs in the patent infringement action was
not a defendant in the declaratory judgment action.
2002 WL 265094, at \*1-\*2. However, that plaintiff
was a licensee of a defendant in the declaratory
judgment action, and could therefore request
permission to join that action after the transfer. *Id.* at
\*2. In this case, the non-SCA plaintiffs cannot be
licensees of SCA because SCA is not the patentee.

Moreover, the "accused products" in this action are the websites of the non-SCA plaintiffs, which are allegedly different than the SCA website accused in the Texas action. Thus, *Corixa* is distinguishable, and the first-filed rule does not apply to the non-SCA plaintiffs.

Orion's next argument is that the action should be transferred pursuant to § 1404(a). In *Jumara v. State Farm Insurance Co.*, the Third Circuit outlined six private interests and six public interests relevant to such a transfer. The private interests are:
(1) The plaintiff's forum preference as manifested in the original choice;
(2) The defendant's preference;
(3) Whether the claim arose elsewhere;
(4) The convenience of the parties as indicated by their relative physical and financial condition;
(5) The convenience of the witnesses-but only to the extent that the witnesses may actually be unavailable for trial in one of the fora; and
(6) The location of books and records (similarly limited to the extent that the files could not be produced in the alternative forum).

55 F.3d 873, 879 (3d Cir.1995). Aside from Orion's preference for Texas and the non-SCA plaintiffs' preferences for Delaware, none of the other private interests are particularly relevant. Orion disagrees, and argues that convenience weighs in favor of transfer. Although Texas may indeed be more convenient for Orion, all of the non-SCA plaintiffs (and Orion) are incorporated in Delaware-a fact that certainly weighs against transfer. At best, then, the private interests are a wash.

The public interests outlined in *Jumara* include:
(1) The enforceability of the judgment;
(2) Practical considerations that could make the trial easy, expeditious, or inexpensive;
(3) The relative administrative difficulty in the two fora resulting from court congestion;
(4) The local interest in deciding local controversies at home;
(5) The public policies of the fora; and
(6) The familiarity of the trial judge with the applicable state law in diversity cases.

*Id.* at 879-80. Here, Orion argues that although it and the remaining plaintiffs are all Delaware corporations, the local interest favors Texas because Orion has offices in that state. In *Corixa*, three parties were Delaware corporations, and yet, that fact did not weigh against transferring the case to California because the "patents deal[t] with the treatment of

lymphoma, .... [which] has far-reaching implications [beyond Delaware's borders]." 2002 WL 265094, at *4. By the same token, the fact that Orion has offices in Texas does not weigh in favor of transfer where the patents deal with technology used in internationally-accessible websites. Orion also argues that because litigation involving the same patents is already underway in Texas, judicial resources will be saved granting a transfer. Although there may be some efficiency to be gained by consolidating certain aspects of discovery, Orion ignores the possibility that collateral issues specific to any one of the many unrelated parties involved in both cases may create inefficiencies that would not arise if the proceedings remained separate. *See Codex Corp. v. Milgo Elec. Corp.*, 553 F.2d 735, 739 (1st Cir.1977) ("Nor are we fully convinced of the propriety of using another customer suit of another manufacturer, which, incidentally, may have very different collateral issues, as a magnet to draw a suit to a jurisdiction where it otherwise should not be."). Moreover, simply because Orion initiated an action in Texas involving one set of parties, it should not be able to "bootstrap itself into staying there" when subsequent litigation arises involving a different set of parties. *Id.*

*3 In short, the *Jumara* interests do not weigh in favor of transfer, and therefore, Orion's motion must be denied as to the non-SCA plaintiffs.

## ORDER

IT IS HEREBY ORDERED THAT:

1. Orion's motion to dismiss (D.I.11) be GRANTED in part and DENIED in part; and

2. The claims of SCA against Orion be SEVERED and DISMISSED.

D.Del.,2006.
Sony Electronics, Inc. v. Orion IP, LLC
Slip Copy, 2006 WL 680657 (D.Del.)

Briefs and Other Related Documents (Back to top)

• 2005 WL 2385656 (Trial Motion, Memorandum and Affidavit) Orion Ip, Llc'S Reply Brief in Support of its Motion to Dismiss, Stay, or Transfer this Action to the Eastern District of Texas (Jul. 29, 2005) Original Image of this Document (PDF)
• 2005 WL 2385533 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Response in Opposition to

Slip Copy
Slip Copy, 2006 WL 680657 (D.Del.)
**(Cite as: Slip Copy)**

Defendant's Motion to Dismiss, Stay or Transfer This
Action to the Eastern District of Texas (Jul. 19, 2005)
Original Image of this Document (PDF)
• 2005 WL 1307841 (Trial Pleading) Complaint for
Delcaratory Judgment (May 2, 2005) Original Image
of this Document (PDF)
• 1:05cv00255 (Docket) (May. 02, 2005)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court, D. Delaware.
SRU BIOSYSTEMS, INC., Plaintiff,
v.
Douglas S. HOBBS, James J. Cowan and Coho
Holdings, Llc, Defendants.
**No. Civ. 05-201-SLR.**

Sept. 13, 2005.

John G. Day, Steven J. Balick, Ashby & Geddes,
Wilmington, DE, for Plaintiff.
Dale R. Dube, Blank Rome LLP, Wilmington, DE,
for Defendants.

MEMORANDUM ORDER

ROBINSON, J.
**\*1** At Wilmington this 13th day of September, 2005,
having considered defendants' motion to transfer and
the papers submitted in connection therewith;

IT IS ORDERED that said motion to transfer (D.I.11)
is denied for the reasons that follow:

1. Introduction. On April 7, 2005, plaintiff SRU
Biosystems, Inc. ("SRU") filed suit pursuant to 35
U.S.C. § 256 against defendants Douglas S. Hobbs
("Hobbs"), James J. Cowan ("Cowan") and CoHo
Holdings LLC ("CoHo"). (D.I.1) Plaintiff seeks to
have Dr. Brian Cunningham added as a named
inventor on U.S. Patent No. 6,870,624 ("the '624
patent") and U.S. Patent No. 6,791,757 ("the '757
patent").FN1 Alternatively, plaintiff seeks a
Declaratory Judgment that the patents in suit are
unenforceable because of the alleged inequitable
conduct of the defendants Hobbs and Cowan, the
named inventors, as well as their attorneys. On May
7, 2005, defendants filed their answer and
counterclaims for patent infringement against SRU.
(D.I.7) SRU has denied the counterclaim. (D.I.8) On
July 1, 2005, defendants moved to transfer the action
to the United States District Court for the District of
Massachusetts. (D.I.11, 12) Plaintiff filed its
opposition to which defendants have replied. (D.I.15,
16)

FN1. Collectively referred to as "the patents
in suit."

2. Background. SRU is a Delaware corporation that
developed and is close to commercializing a
biosensor device to be used in the field of diagnostics
and drug research. (D.I. 1 ¶ 10) SRU has over thirty
pending U.S. and foreign patent applications that
relate to the biosensor concept. Dr. Brian
Cunningham ("Cunningham") is a research scientist,
one of the founders of SRU and Chief Technical
Officer of SRU. Cunningham resides in Illinois and
has assigned all of his inventions to SRU. (*Id.* at ¶ 7)

3. Hobbs is the president of CoHo and Cowan is a
manager of Coho. Cowan and Hobbs reside in
Lexington, Massachusetts. Cowan and Hobbs are
named inventors on the patents in suit and have
assigned their rights in the patents to CoHo. Coho is a
limited liability company organized under the laws of
the State of Delaware with its principal place of
business in Burlington, Massachusetts. (D.I.12, Ex.
C, Ex. A) In addition to Cowan and Hobbs, Coho
employs one other person. Coho does not have a
place of business in Delaware and does no business
in the State. (D.I.12, Ex. C)

4. In October 2000, SRU hired Hobbs as a consultant
to assist Cunningham in the fabrication of the optical
component of a biosensor product. Hobbs continued
as a consultant until June 30, 2001. Cunningham filed
a number of patent applications related to a biosensor
device and assigned those applications to SRU. He
recognized Hobbs as a co-inventor on certain
applications. SRU contends that Hobbs initially
agreed to assign his rights to the patents, but has had
since refused to do so.FN2

FN2. SRU claims that Hobbs signed a
Memorandum of Understanding ("MOU")
memorializing this agreement.

5. Subsequently, Hobbs and Cowan filed their own
applications on a biosensor and assigned those
applications to CoHo, but did not name Cunningham
as an inventor. Those applications were issued as the
patents in suit.

**\*2** 6. Other litigation. In December 2004, SRU filed a
lawsuit against Hobbs in Massachusetts state court

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

for breach of contract and unfair competition. (D.I.15, Ex. D) SRU seeks to enforce the terms of the MOU and requests a permanent injunction ordering Hobbs to execute an assignment of the applications to SRU. The initial filings describe the lawsuit as follows:

This is a case ... involving a claim to determine the use or status of intellectual property. The details are as follows: Defendant Hobbs worked for SRU as a consultant for the development of a novel colorimetric resonant biosensor. Before beginning work as a consultant, Hobbs agreed to keep all information relating to the biosensor technology confidential ... Hobbs executed a MOU in which he agreed to "assign irrevocably and exclusively on a royalty free basis to SRU ... all rights pertaining to the jointly-developed technology as it applies to biochemical and biological testing, sensing and/or detection. Subsequent to signing the MOU, SRU filed numerous patent applications relating to the development of the biosensor technology ... SRU has asked Hobbs to execute an assignment of the applications pursuant to the terms of the MOU, but Hobbs has refused to execute the assignment. (D.I.16, Ex. D)

7. On June 29, 2005, the Massachusetts Superior Court entered an interim order directing Hobbs to comply with discovery and deferring decision on the "prosecution bar" issue until a later date. (D.I.15, Ex. G)

8. SRU has also commenced actions against Hobbs, Cowan and CoHo in Federal Court in Canada and in Ontario Superior Court. (D.I.12, Ex. D, E) These lawsuits are pending.

9. Standard of Review. Under 28 U.S.C. § 1404(a), a district court may transfer any civil action to any other district where the action might have been brought for the convenience of parties and witnesses and in the interests of justice. Congress intended through § 1404 to place discretion in the district court to adjudicate motions to transfer according to an individualized, case-by-case consideration of convenience and the interests of justice. *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 29, 108 S.Ct. 2239, 101 L.Ed.2d 22 (1988); *Affymetrix, Inc. v. Synteni, Inc.*, 28 F.Supp.2d 192, 208 (D.Del.1998).

10. The burden of establishing the need to transfer rests with the movant "to establish that the balance of convenience of the parties and witnesses strongly favors the defendants." *Bergman v. Brainin*, 512

F.Supp. 972, 973 (D.Del.1981) (citing *Shutte v. Armco Steel Corp.*, 431 F.2d 22, 25 (3d Cir.1970). "Unless the balance is strongly in favor of a transfer, the plaintiff's choice of forum should prevail". *ADE Corp. v. KLA-Tencor Corp.*, 138 F.Supp.2d 565, 567 (D.Del.2001); *Shutte*, 431 F.2d at 25.

11. The deference afforded plaintiff's choice of forum will apply as long as a plaintiff has selected the forum for some legitimate reason. *C.R. Bard, Inc. v. Guidant Corp.*, 997 F.Supp. 556, 562 (D.Del.1998); *Cypress Semiconductor Corp. v. Integrated Circuit Systems, Inc.*, 2001 WL 1617186 (D.Del. Nov.28, 2001); *Continental Cas. Co. v. American Home Assurance Co.*, 61 F.Supp.2d 128, 131 (D.Del.1999). Although transfer of an action is usually considered as less inconvenient to a plaintiff if the plaintiff has not chosen its " 'home turf' or a forum where the alleged wrongful activity occurred, the plaintiff's choice of forum is still of paramount consideration, and the burden remains at all times on the defendants to show that the balance of convenience and the interests of justice weigh strongly in favor of transfer." *In re M.L.-Lee Acquisition Fund II, L.P.*, 816 F.Supp. 973, 976 (D.Del.1993).

*3 12. The Third Circuit Court of Appeals has indicated that the analysis for transfer is very broad. *Jumara v. State Farm Ins. Co.*, 55 F.3d 873, 879 (3d Cir.1995). Although emphasizing that "there is no definitive formula or list of factors to consider," *id.*, the Court has identified potential factors it characterized as either private or public interests. The private interests include: "(1) plaintiff's forum preference as manifested in the original choice; (2) defendant's preference; (3) whether the claim arose elsewhere; (4) the convenience of the parties as indicated by their relative physical and financial condition; (5) the convenience of the witnesses but only to the extent that the witnesses may actually be unavailable for trial in one of the fora; and (6) location of books and records (similarly limited to the extent that the files could not be produced in the alternative forum)." *Id.* (citations omitted).

13. The public interests include: "(1) the enforceability of the judgment; (2) practical considerations that could make the trial easy, expeditious or inexpensive; (3) the relative administrative difficulty in the two fora resulting from court congestion; (4) the local interest in deciding local controversies at home; (5) the public policies of the fora; and (6) the familiarity of the trial judge with the applicable state law in diversity cases." *Id.* (citations omitted).

Slip Copy
Slip Copy, 2005 WL 2216889 (D.Del.)
(Cite as: Slip Copy)

14. Discussion. Defendants submit that transfer is warranted because Massachusetts is the more convenient form and SRU's preferred choice of forum. (D.I.12) Specifically, Massachusetts is the principal place of business for SRU, CoHo and where Hobbs and Cowan reside. Further, all events, witnesses and the execution of the MOU occurred in Massachusetts while, conversely, there is no connection to Delaware. Moreover, because SRU's Massachusetts action involves the same set of events, defendants assert that the court should sua sponte consolidate the two cases as well as the Canadian actions and transfer to the District of Massachusetts.

15. SRU opposes transfer on several grounds. First, it contends that the action at bar and the Massachusetts case involve different patents, different issues and different legal standards. Second, as a Delaware corporation, SRU's choice of forum should be afforded deference. Third, SRU asserts that the motion to transfer is part of a strategy to undermine the litigation.

16. Weighing the arguments against the *Jumara* balancing test, the court finds that the asserted advantages of moving the case to the District of Massachusetts are insufficient to warrant a transfer. Defendants' complaints about litigating here are outweighed by the fact that CoHo has enjoyed the benefits and protections as a limited liability company in Delaware and that the state has an interest in litigation regarding companies like SRU that are incorporated within its jurisdiction. Moreover, there is nothing of record to reflect any problems with potential witnesses refusing to travel to Delaware for trial. In fact, the record is devoid of any specific problems with witnesses, documents or business operations posed by litigating in Delaware. Considering that discovery can be conducted at any location convenient to the parties and their employees, the only event that will take place in Delaware is the trial. The travel expenses and inconveniences incurred for that purpose is not overly burdensome.

*4 17. Clearly, the dispute at bar has become a very personal one between the parties. The dispute is now being litigated by four different courts in four different judicial systems, none of which has the authority to consolidate the cases.[FN3] The papers submitted in connection with this matter suggest that neither plaintiff nor defendants are being entirely reasonable in their litigation strategies. Therefore, while the court's conclusion to deny transfer is consistent with its resolution of other transfer motions, the court will reconsider the transfer issue or, alternatively, impose sanctions if it determines that either plaintiff or defendants are abusing the judicial process while pursuing resolution of the lawsuit initiated here.

> FN3. To the extent defendants implicitly argue that the "first-filed rule" applies, the court disagrees. The first-filed rule requires that, where cases are pending in "federal courts of equal rank", *E.E.O.C. v. University of Pennsylvania,* 850 F.2d 969, 971 (3d Cir.1988), "the court which first had possession of the subject must decide it" while the second filed action should be stayed or transferred to the court where the first filed action is pending. *Crosley Corp. v. Hazeltine Corp.,* 122 F.2d 925, 929 (3d Cir.1941)(quoting *Smith v. McIver,* 22 U.S. (9 Wheat.) 532, 6 L.Ed. 152 (1824)). There are no other federal district court cases pending; therefore, this rule has no applicability.

18. Conclusion. For the reasons stated, defendant's motion to transfer (D.I.11) is denied.

D.Del.,2005.
SRU Biosystems, Inc. v. Hobbs
Slip Copy, 2005 WL 2216889 (D.Del.)

Briefs and Other Related Documents (Back to top)

• 2005 WL 1171972 (Trial Pleading) Complaint (Apr. 7, 2005) Original Image of this Document (PDF)
• 1:05cv00201 (Docket) (Apr. 07, 2005)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.                                                                                Page 1
Not Reported in F.Supp., 1997 WL 74660 (D.Del.)
**(Cite as: Not Reported in F.Supp.)**

<u>Briefs and Other Related Documents</u>
Only the Westlaw citation is currently available.
United States District Court, D. Delaware.
SUNDS DEFIBRATOR, INC., a Delaware
corporation; Sunds Defibrator Industries AB, a
Swedish corporation; and Sunds Defibrator Refiner
Segments AB, a Swedish corporation, Plaintiffs,
v.
DURAMETAL CORPORATION, a Delaware
corporation, Defendant.
No. CIV. A. 96-483 MMS.

Argued Jan. 22, 1997.
Decided Jan. 31, 1997.

<u>N. Richard Powers</u>, and <u>Harold Pezzner</u>, of Connolly,
Bove, Lodge & Hutz, Wilmington, Delaware; of
counsel: <u>Sidney David</u>, <u>John R. Nelson</u>, and <u>John P.</u>
<u>Maldjian</u>, of Lerner, David, Littenberg, Krumholz &
Mentlik, Westfield, New Jersey, for plaintiffs.
<u>Elizabeth M. McGeever</u>, of Prickett, Jones, Elliott,
Kristol & Schnee, Wilmington, Delaware; of counsel:
<u>David H. Binney</u>, and Douglas H. Blomgren, of
Preston Gates & Ellis, Seattle, Washington, for
defendant.

*MEMORANDUM OPINION*

<u>MURRAY M. SCHWARTZ</u>, Senior District Judge.

INTRODUCTION

*1 Plaintiffs in this lawsuit are Sunds Defibrator, Inc.
("SDI"), a Delaware corporation with its principal
place of business in Norcross, Georgia; Sunds
Defibrator Industries AB ("Sunds"), a Sweden
corporation with its principal place of business in
Sundsvall, Sweden; and Sunds Defibrator Refiner
Segments AB ("SDRS"), a wholly-owned subsidiary
of Sunds and a Sweden corporation with its principal
place of business in Hagfors, Sweden (collectively
"plaintiffs"). Docket Item ("D.I.") 1, at 2. Plaintiffs,
alleging patent infringement, sued Durametal Corp., a
Delaware corporation which has its principal place of
business in Tualatin, Oregon. *Id.;* D.I. 7, at 3.
Pursuant to <u>28 U.S.C. § 1404(a)</u>, Durametal seeks to
transfer venue to the United States District Court for
the District of Oregon. D.I. 6.

Two patents owned by Sunds are at issue: <u>U.S. Patent</u>
<u>No. 5,362,003 (the "003 patent")</u> entitled "Refining
Segment;" and <u>U.S. Patent No. 5,439,183 (the "183</u>
<u>patent")</u> for "Refiner Segment." D.I. 1, at 2. Both are
directed to a "refiner segment for use in disk refiners
for the treatment of lignocellulose-containing
materials," *id.* at 3; such technology relates to
processing wood and wood byproducts to make
paper, fiberboard and particle board. D.I. 7, at 3. It is
asserted in the complaint that Sunds, through SDRS
and SDI, markets and sells the products covered by
these patents in the United States and defendant has
infringed both patents. D.I. 1, at 3.

FACTS

Durametal is a Delaware corporation with its
principal place of business in Oregon. D.I. 7, at 3.
Other than its Delaware incorporation, it has no other
ties to the District of Delaware. *Id.* Durametal has
submitted a declaration by its president, Donald
Dauterman, asserting Durametal "has no offices,
employees, sales persons, mail drops, bank accounts,
telephone numbers or warehouses in the state of
Delaware." D.I. 8, ¶ 2. Durametal designs and
manufactures its allegedly infringing product in the
same location as the company's headquarters,
Tualatin, Oregon. D.I. 7, at 3.

Durametal through affidavit has advised the Court
five current employees are knowledgeable about the
design, manufacture and sale of the alleged infringing
products: President Donald Dauterman, Vice
President Ian Deuchars, Product Engineer Kenneth
Hall, Engineering Manager Dan Higgins and Director
of Marketing Gus Keyser. *Id.* at 4; D.I. 8 ¶ 4.[FN1] All
relevant documents, according to defendant, are
located in Tualatin, Oregon as well. D.I. 8 ¶ 4.
Durametal also points to two potential non-party
witnesses: former owners of Durametal "with
knowledge of earlier designs of Durametal refiner
plates ... which may be prior art to the patents in suit"
who currently reside in Oregon. D.I. 7, at 4; D.I. 8 ¶
5.

FN1. Dauterman in an affidavit dated
October 30, 1996, states as of that date he
was recovering from back surgery and
extended travel would be "extremely

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                    Page 2
Not Reported in F.Supp., 1997 WL 74660 (D.Del.)
(Cite as: Not Reported in F.Supp.)

uncomfortable and painful." *Id.* ¶ 7.

Plaintiffs assert their relevant witnesses reside either in Sweden or in Norcross, Georgia. D.I. 10, at 3. They are all current employees. *Id.;* Declaration of Hannu Melarti ¶ 5. Specifically, they are Nils Virving, the inventor of record on both patents and SDRS General Manager for Product Development and Research, who lives in Sweden; Hakan Norberg, the President of SDRS, who also resides in Sweden; Jan-Ake Gaven, Manager for Materials Development at SDRS, and also a resident of Sweden; Thomas Wikman, General Manager for Refiner Segments for SDI, who resides in the state of Georgia and Robert Guiler, Sales Manager for Refiner Segments for SDI, also a Georgia resident. *Id.;* Declaration of Hannu Melarti ¶ 5.

**\*2** Plaintiffs finally note this forum is closer to the home offices of all plaintiffs than is the District of Oregon. Delaware is closer to plaintiffs' attorneys, who are located in New Jersey, and their documents, located in Georgia and Sweden. D.I. 10, at 4.

DISCUSSION

28 U.S.C. § 1404(a) governs transfer:
For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought.

As plaintiffs do not contest this action could have been brought in the District of Oregon, *see* D.I. 10, at 5, the Court must examine (1) the convenience of the parties, (2) the convenience of witnesses and (3) the interest of justice. The Third Circuit Court of Appeals in *Jumara v. State Farm Insurance Company,* 55 F.3d 873, 879 (3d Cir. 1995), set forth a number of factors to be considered under the umbrella of these three broad categories:
The private interests have included: plaintiff's forum preference as manifested in the original choice, ... the defendant's preference, ... whether the claim arose elsewhere, ... the convenience of the parties as indicated by their relative physical and financial condition, ... the convenience of the witnesses -- but only to the extent that the witnesses may actually be unavailable for trial in one of the fora, ... and the location of books and records (similarly limited to the extent that the files could not be produced in the alternative forum), ...
The public interests have included: the enforceability

of the judgment, ... practical considerations that could make the trial easy, expeditious, or inexpensive, ... the relative administrative difficulty in the two fora resulting from court congestion, ... the local interest in deciding local controversies at home, ... the public policies of the fora ... and the familiarity of the trial judge with the applicable state law in diversity cases, ...."

*Id.* (citations omitted). However, the appellate court noted "there is no definitive formula or list of the factors to consider." *Id. Jumara* does not appear to undermine the Third Circuit Court of Appeals' earlier opinion in *Shutte v. Armco Steel Corp.,* 431 F.2d 22, 25 (3d Cir. 1970), *cert. denied,* 401 U.S. 910 (1971), in which it was stated the party seeking the transfer, Durametal, bears the burden of establishing the need for transfer. In *Shutte* it was stated, "unless the balance of convenience of the parties is strongly in favor of defendant, the plaintiff's choice of forum should prevail." 431 F.2d at 25 (citation omitted).

After consideration of "all relevant factors to determine whether on balance the litigation would more conveniently proceed and the interests of justice be better served by transfer to a different forum," *Jumara,* 55 F.3d at 879 (citation omitted), the Court will deny Durametal's motion to transfer. [FN2]

> FN2. In their briefs, both parties addressed the "home turf" rule, which has never been cited in any opinion of the Third Circuit Court of Appeals, but instead was born, bred and propagated in the District of Delaware. The earliest reference to the rule is found in *Burroughs Wellcome Co. v. Giant Food, Inc.,* 392 F. Supp. 761, 763 (D. Del. 1975). The rule holds the presumption against transfer is especially strong when a plaintiff's choice of forum is its home turf. *The Media Group, Inc. v. Turtle Wax, Inc.,* No. 96-234, 1996 WL 756760, at \*4 (D. Del. Dec. 23, 1996).
> When first utilized, a corporate plaintiff's home turf referred to the location of its principal place of business, and plaintiff's decision to litigate there was entitled to great deference based on the convenience to plaintiff of litigating in a place near to its home. *Id.; see also The Joint Stock Society v. Heublein, Inc.,* 936 F. Supp. 177, 186 (D. Del. 1996). The definition of home turf has since been expanded to cover the forum closest to a plaintiff's principal place of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

business in which personal service over the defendant can be obtained. *Media Group, 1996 WL 756760, at \*4*.

Although not briefed or argued by the litigants, a strong argument can be made that the "home turf" rule is now subsumed in the *Jumara* private interest factor with emphasis on "plaintiff's forum preference." At any rate, the concept of home turf is no longer meaningful in this case because plaintiff's home offices are so far from Delaware. To reiterate, plaintiffs' choice of forum *is* entitled to deference in this case; however, the status of Delaware as plaintiff's home turf is not relevant to the decision.

A. Private Interests

**\*3** The private interests of the litigants include the parties' respective choices, where the claim arose, the parties' respective financial conditions, and the convenience of witnesses and location of books and records to the extent that either the witnesses or the records might not be made available for trial, according to the Third Circuit Court of Appeals. *Jumara, 55 F.3d at 879*.

Weighing most of these private interests does not lead to a result that strongly favors either party. Neither party has provided the Court with documentation of their respective financial conditions; at oral argument it was conceded both parties could bear the financial burden of litigating away from home. Books and records could be made available in either court -- plaintiffs would have to transfer documents from Sweden and Georgia to whichever district is the trial forum. Durametal's records are in Oregon, and additionally, Durametal has asserted it wishes to produce its heavy refiner plates at trial. At this point in the litigation, it appears only 2 refiner plates, each weighing approximately 30 lbs, will be relevant at trial. This is not sufficient to call for transfer to Oregon.

As this Court recently stated, "'Convenience of the witnesses' is a phrase encompassing geographic location of witnesses relative to the forum and an 'interest of justice' consideration, i.e., whether the witnesses are physically available for trial in either of the competing fora." *Sherwood Medical Co. v. IVAC Medical Systems, Inc.*, No. 96-305, 1996 WL 700261, at \*4 (D. Del. Nov. 25, 1996). "As between geographic proximity of witnesses and being assured a court will hear live testimony, the latter will in most instances will be the far more important

consideration." *Id.* The Supreme Court has asserted, in the context of a motion for dismissal based on the doctrine *forum non conveniens*, "[c]ertainly to fix the place of trial at a point where litigants cannot compel personal attendance and may be forced to try their cases on deposition, is to create a condition not satisfactory to court, jury or most litigants." *Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 511 (1947)*.

The Third Circuit appellate court has instructed that while convenience of the witnesses is a factor, it is important only to the extent the witnesses would be unavailable for trial in one of the fora. *Jumara, 55 F.3d at 879*. Each party is able to procure attendance of its own employees for trial. Therefore, at issue is only non-party witnesses. The only possibility of non-party witnesses arises because Durametal urges it *may*[FN3] wish to call several non-party witnesses -- former employees -- who still reside in Oregon, and therefore are subject to compulsory process there. Durametal has not indicated these witnesses will not testify if the trial takes place in Delaware, nor has it explained the essential nature of their testimony. *See Sherwood, 1996 WL 700261, at \*4* (when evaluating the potential absence of a witness due to lack of compulsory process, what is important is "the Court's impression of the nature of prospective testimony to be given by the witness -- does it go to an important issue, is it cumulative, is a witness employed by a party and therefore available in any fora, and like considerations"). Because of the lack of specificity as to these witnesses' importance to Durametal's case and their availability, the Court is not persuaded the possibility they may not attend trial is sufficient to tip the balance in favor of a transfer.

FN3. emphasis added.

B. Public Interests

**\*4** The Third Circuit Court of Appeals has noted among the relevant public interests are: the enforceability of the judgment, practical considerations that could make the trial easy, expeditious, or inexpensive, the relative administrative difficulty in the two fora resulting from court congestion, the local interest in deciding local controversies at home, and the public policies of the fora. *Jumara, 55 F.3d at 879*.

Not all these considerations are relevant to the present case, and, on balance the public considerations do not strongly favor either party. Plaintiffs argue if venue is transferred to Oregon,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                          Page 4
Not Reported in F.Supp., 1997 WL 74660 (D.Del.)
(Cite as: Not Reported in F.Supp.)

traveling time for the Sweden employees will be nearly doubled. There is no direct flight from Sweden to Portland, Oregon, plaintiffs say, and the estimated travel time, due to airline schedules, is 16 hours and 10 minutes. D.I. 10, Declaration of Carol Splaine, ¶ 4. In the event the trial is in Oregon, however, defendant does not have to travel at all. On the other hand, if the trial is held in Delaware, plaintiffs' employees still must travel approximately 10 hours and 40 minutes, and additionally, defendant's employees must also travel about 7 hours. *Id.* ¶ 3, 5. It therefore seems almost a wash in terms of overall cost and time devoted, whether plaintiffs' Sweden employees travel all the way to Oregon, or whether both parties meet in Delaware. The public interest in overall reduction of litigation costs is not vindicated by a transfer.

The parties also have submitted information from both fora on the average time lapses between initiation of a lawsuit and trial. Plaintiffs believe, due to this district's status as a pilot district under the Civil Justice Reform Act of 1990, courts in this district attempt to resolve of civil cases within one year. D.I. 10, at 17. Defendant countered with a declaration by its attorney, Douglas Blomgren, that the average time from filing a case until trial in the District of Oregon is 13 months. D.I. 12 ¶ 2(a). Once again, based solely on statistics the parties' interests are nearly equally balanced.

What is at stake is whether this patent litigation should be fought out in the East Coast (i.e. Delaware, plaintiffs' choice of forum) or the West Coast (i.e. Oregon, defendant's choice of forum). The East Coast is preferred and more convenient to plaintiffs, while the West Coast is preferred and more convenient to defendant. As to the overall *respective* convenience of the parties, the defendant has a slight edge, but this slight tip of the balance of convenience stems not from evaluation of the transfer criteria, but from the fact that it is almost *always* more convenient for a defendant to litigate in its home district. That advantage, in and of itself without more is insufficient to tip the balance in favor of depriving a plaintiff of its choice of forum. *Shutte,* 431 F.2d at 25. As detailed above, the parties have asserted equally compelling interests under section 1404(a) and *Jumara.* Accordingly, defendant has failed to convince the Court to override the preference given to the plaintiffs on their choice of forum.

*5 An order will issue denying defendant's motion to transfer.

D.Del.,1997.
Sunds Defibrator, Inc. v. Durametal Corp.
Not Reported in F.Supp., 1997 WL 74660 (D.Del.)

Briefs and Other Related Documents (Back to top)

• 1:96cv00483 (Docket) (Oct. 01, 1996)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Slip Copy                                                                                          Page 1
Slip Copy, 2005 WL 2620196 (D.Del.)
**(Cite as: Slip Copy)**

Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court,D. Delaware.
TEXTRON INNOVATIONS INC., Plaintiff,
v.
THE TORO COMPANY, Defendants.
**No. Civ.A. 05-486 GMS.**

Oct. 14, 2005.

Edmond D. Johnson, The Bayard Firm, Richard L. Horwitz, Potter Anderson & Corroon, LLP, Wilmington, DE, for Plaintiff.
Richard L. Horwitz, David Ellis Moore, Potter Anderson & Corroon, LLP, Wilmington, DE, for Defendants.

*MEMORANDUM*

SLEET, J.

## I. INTRODUCTION

**\*1** On July 12, 2005, the plaintiff, Textron Innovations Incorporated ("TII") filed the above-captioned action against The Toro Company ("Toro"), alleging infringement of United States Patent Nos. 6,047,530,6,336,311, and 6,336,312, which are directed to a gang type rotary mower. Presently before the court is Toro's motion to transfer this action to the District of Minnesota, pursuant to 28 U.S.C. § 1404(a). For the following reasons the court will deny the motion.

## II. BACKGROUND

On July 12, 2005, TII filed the present patent infringement action involving technology related to the rotary mower used to cut golf course roughs. TII is the subsidiary of Textron Inc., and the assignee of the three patents in suit. (*See* D.I. 6, at 1 n. 1; D.I. 19, at 2.) TII is incorporated in Delaware and maintains its headquarters in Providence, Rhode Island. (D.I. 1 ¶ 3.) Toro is a Delaware corporation that maintains its headquarters in Bloomington, Minnesota. (*Id.* ¶ 4.) Toro's allegedly infringing products are manufactured in Tomah, Wisconsin. (D.I. 6, at 3.)

On August 15, 2005, Toro filed a separate action in Minnesota against Textron, Inc. and Jacobsen, a division of Textron, Inc., alleging that their products infringe two Toro patents relating to hydraulic drive system technology for riding mowers. The following day, Toro filed this motion to transfer venue to the District of Minnesota.

## III. DISCUSSION

Pursuant to Section 1404(a), the court may transfer a civil action "for the convenience of parties and witnesses, in the interest of justice, ... to any other district ... where it might have been brought." 28 U.S.C. § 1404(a). It is the movant's burden to establish the need to transfer, and "the plaintiff's choice of venue [will] not be lightly disturbed." *Truth Hardware corp. v. Ashland Prods., Inc.,* No. C.A. 02-1541 GMS, 2003 WL 118005, at \*1 (quoting *Jumara v. State Farm Ins. Co.,* 55 F.3d 873, 879 (3d Cir.1995)). In other words, "unless the balance of convenience strongly favors a transfer in favor of defendant, the plaintiff's choice of forum should prevail." *Shutte v. Armco Steel Corp.,* 431 F.2d 22, 25 (3d Cir.1970).

When considering a motion to transfer, the court must determine "whether on balance the litigation would more conveniently proceed and the interest of justice be better served by transfer to a different forum." *Jumara,* 55 F.3d at 879. This inquiry requires "a multi-factor balancing test," embracing not only the statutory criteria of convenience of the parties and the witnesses and the interest of justice, but all relevant factors, including certain private and public interests. *Id.* at 875. These private interests include the plaintiff's choice of forum; the defendant's preference; whether the claim arose elsewhere; the convenience of the parties; the convenience of the expected witnesses; and the location of books and records, to the extent that they could not be produced in the alternative forum.[FN1] *Id* at 879. Among the relevant public interests are: "the enforceability of the judgment; practical considerations that could make the trial easy, expeditious, or inexpensive; the relative administrative difficulty in the two fora resulting from court congestion; the local interest in deciding local controversies at home; [and] the public policies

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                    Page 2
Slip Copy, 2005 WL 2620196 (D.Del.)
(Cite as: Slip Copy)

of the fora." *Id.* at 879-80.

FN1. The first three of these private interest
factors collapse into other portions of the
*Jumara* analysis. Thus, the court will
consider them in the context of the entire
inquiry only. *See Affymetrix, Inc. v. Synteni,
Inc.*, 28 F.Supp.2d 192 (D.Del.1998).

**\*2** Upon consideration of the relevant factors, the
court finds that Toro has not met its burden of
demonstrating that transfer is appropriate. First, the
court concludes that convenience of parties factor
weighs in favor of maintaining the action in
Delaware. The court will afford less deference to
TII's choice of Delaware as a forum because it is not
its "home turf," or principal place of business. *See
Waste Distillation Tech., Inc. v. Pan Am. Res., Inc.*,
775 F.Supp. 759, 764 (D.Del.1991). However, it is
not appropriate to disregard a plaintiff's choice of
forum where it has a rational and legitimate reason
for choosing the forum. *See Joint Stock Soc'y v.
Heublein, Inc.*, 936 F.Supp. 177, 187 (D.Del.1996).
In the present case, the fact that Toro is incorporated
in Delaware is a rational and legitimate reason for TII
choosing to sue it in Delaware. *See Stratos
Lightwave, Inc. v. E20 Communications, Inc.*, No.
Civ. A. 01-309-JJF, 2002 WL 500920, at \*2 (D.Del.
Mar.26, 2002). Further, having received the benefits
of Delaware incorporation, Toro cannot now
complain that another corporation has chosen to sue
it here. *See id.* Indeed, it is difficult for the court to
find any inconvenience to Toro when it has
previously chosen this forum in order to litigate its
own patent infringement claims against Textron. *See
Toro Company v. Textron, Inc.*, 499 F.Supp. 241
(D.Del.1980). Thus, the convenience of the parties
weighs in favor of maintaining this action in
Delaware.

The court also finds that the location of books and
records weighs against granting Toro's motion to
transfer. Toro contends that its books and records
necessary for litigation are in Minnesota. A court
should consider the location of books and records in
its analysis. However, it must only do so to the extent
that the files could not be produced in the alternative
forum. *Jumara*, 55 F.3d at 879. Here, Toro does not
suggest that its documents could not be produced in
Delaware. Accordingly, this factor does not weigh in
favor of the transfer.

Toro also contends that non-party witness
convenience weighs in favor of a transfer. According

to the briefs, Toro plans to rely on testimony from
two original inventors of the patents in-suit, three
retired employees, and an employee of a local golf
course. The two inventors do not reside within the
subpoena power of Delaware or Minnesota.
However, they have both stated, in sworn
declarations, that they are willing to appear in
Delaware for depositions and trial. (D.I. 19, at 3.)
Thus, any inconvenience to the inventors weighs in
favor of maintaining the action in Delaware.

As for the other witnesses, Toro has elected to rely
upon retired and, therefore, "third-party" employees
that do not reside within the subpoena power of
Delaware. In support of its motion, Toro insists that
due to personal circumstances, travel to Delaware is
extremely inconvenient for its third-party witnesses.
(D.I. 6, at 4-6.) The court is not persuaded by this
argument, and finds Toro's reliance on former
employees, rather than its current employees,
questionable. Further, as this court has previously
held, a flight to Delaware is not an onerous task
warranting transfer. *Truth Hardware Corp. v.
Ashland Prods., Inc.*, No C.A. 02-1541 GMS, 2003
WL 118005, at \*2 (D. Del. Jan 13, 2003). Moreover,
Toro has not asserted that the identified witnesses are
the only individuals capable of testifying as to the
technology of the accused products. Nevertheless, if
necessary, TII has agreed to take witness depositions
in Minnesota. (*See* D.I. 19, at 23.) For these reasons,
the court concludes the convenience of the witnesses
does not favor transfer in this case.

**\*3** Finally, the court finds that the public interest
factors do not weigh strongly in favor of transfer to
Minnesota. First, Toro's pending litigation in
Minnesota was filed after TII initiated this lawsuit,
and involves different patents. Thus, the court
believes that this is not a relevant consideration in
favor of transfer. *See Mentor Graphics Corp. v.
Quickturn Design Sys., Inc.*, 77 F.Supp.2d 505, 513
(D.Del.1999) (refusing to give "any weight
whatsoever" to a mirror image action filed by the
defendant). Additionally, the court is not persuaded
that any disparity in court congestion, to the extent
there is any, will be so great as to weigh strongly in
favor of a transfer. Finally, it is well settled that
patent rights are not considered state or local matters
and do not implicate local interests. *Jones Pharma,
Inc. v. KV Pharm. Co.*, No. Civ. A. 03-786 JJF, 2004
WL 323109, at \* 3 (D.Del. Feb.17, 2004). The court,
therefore, finds no strong local interest in litigating in
the transferee forum. Accordingly, the court
concludes that public interest factors do not favor
transfer in the instant case.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                Page 3
Slip Copy, 2005 WL 2620196 (D.Del.)
**(Cite as: Slip Copy)**


*ORDER*

For the reasons stated in the court's Memorandum of
this same date, IT IS HEREBY ORDERED that:
1. The defendant's Motion to Transfer the Case to the
United States District Court for the District of
Minnesota (D.I.5) is DENIED.


D.Del.,2005.
Textron Innovations, Inc. v. The Toro Co.
Slip Copy, 2005 WL 2620196 (D.Del.)

Briefs and Other Related Documents (Back to top)

• 2005 WL 3242158 (Trial Pleading) Defendant's
Amended Answer and Counterclaims (Nov. 9, 2005)
Original Image of this Document (PDF)
• 2005 WL 2603883 (Trial Motion, Memorandum
and Affidavit) Plaintiff Textron Innovations Inc.'s
Brief in Opposition to Motion to Transfer Venue
(Aug. 30, 2005) Original Image of this Document
(PDF)
• 2005 WL 2603569 (Trial Pleading) Answer (Aug.
29, 2005) Original Image of this Document (PDF)
• 2005 WL 2603700 (Trial Motion, Memorandum
and Affidavit) Toro's Reply to Textron's Brief in
Opposition to Motion to Transfer Venue (Aug. 19,
2005) Original Image of this Document (PDF)
• 2005 WL 2603699 (Trial Motion, Memorandum
and Affidavit) Opening Brief Supporting Defendant
Toro's 28 U.S.C. | 1404 (a) Motion to Transfer Venue
to Minnesota (Aug. 16, 2005)
• 2005 WL 2385695 (Trial Pleading) Complaint (Jul.
12, 2005) Original Image of this Document (PDF)
• 2005 WL 2912858 (Trial Pleading) Complaint (Jul.
12, 2005) Original Image of this Document (PDF)


END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.